IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

JOSEPH M. CARIK; JAMES BEADNELL;      )
JOY BEADNELL; GEORGE DEMKO;        )
ADAM DIBLE; CAROL E. EMERSON;       )
MICHAEL GNIDOVEC; MICHAEL A. MASULA;  )
THOMAS JAMES OLSZEWSKI;            )
THOMAS STANZIANO; LAURA WINCHESTER;  )
JOHN DOE 1; JOHN DOE 2; JOHN DOE 3;     )
JOHN DOE 4; JOHN DOE 5; JOHN DOE 6;     )
JOHN DOE 7; JOHN DOE 8; JANE DOE 1;     )   Civil Action No. _____
JANE DOE 2; JANE DOE 3; JANE DOE 4;     )
JANE DOE 5; AND JENNIFER LACOGNATA,  )
                               )
      PLAINTIFFS,                )
                               )
      v.                        )
                               )
UNITED STATES DEPARTMENT OF HEALTH    )
AND HUMAN SERVICES, 200 Independence Ave.  )
SW, Washington, DC 20201;            )
KATHLEEN SEBELIUS, IN HER OFFICIAL   )
CAPACITY AS THE SECRETARY OF        )
THE UNITED STATES DEPARTMENT OF    )
HEALTH AND HUMAN SERVICES,        )
200 Independence Ave. SW, Washington, DC   )
20201;                           )
UNITED STATES FOOD AND DRUG       )
ADMINISTRATION, 10903 New Hampshire Ave., )
Silver Spring, MD 20993;            )
DR. MARGARET HAMBURG, IN HER     )
OFFICIAL CAPACITY AS THE COMMISSIONER )
OF THE UNITED STATES FOOD AND DRUG  )
ADMINISTRATION, 10903 New Hampshire Ave., )
Silver Spring, MD 20993;            )
UNITED STATES NATIONAL INSTITUTES OF )
HEALTH, 9000 Rockville Pike, Bethesda, MD 20892; )
DR. FRANCIS COLLINS, IN HIS        )
OFFICIAL CAPACITY AS THE DIRECTOR   )
OF THE UNITED STATES NATIONAL     )
INSTITUTES OF HEALTH,           )
9000 Rockville Pike, Bethesda, MD 20892;   )

1

AND MOUNT SINAI SCHOOL OF MEDICINE,          )
1 Gustave L Levy Pl NYC, NY 10029,                     )
                                                                              )
_____DEFENDANTS._____)

## COMPLAINT

Plaintiffs, all having been denied interstate access to lawfully prescribed medicines by FDA licensees, make this Complaint for declaratory judgment and injunctive relief against Defendants the United States Department of Health and Human Services, "HHS"; United States Food & Drug Administration, "FDA"; The National Institutes of Health, "NIH"; Kathleen Sebelius, Secretary of the United States Department of Health and Human Services; Dr. Margaret Hamburg, Commissioner of the United States Food and Drug Administration; Dr. Francis Collins, Director of the United States National Institutes of Health; stating as follows:

### PARTIES

1.     Plaintiff Joseph Carik is a U.S. citizen and a resident of Nevada and holds a state-issued, lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme"). By and through FDA consent, Plaintiff has been banned interstate access to FDA-approved doses of Fabrazyme during a drug shortage created by Genzyme (a Sanofi Company) an FDA licensee. Plaintiff is instead forcibly injected with a diluted, unregulated, unapproved dose of Fabrazyme because if the Plaintiff refuses infusion of the unapproved dose, then the FDA licensee will withdraw any access and not provide future access to the drug until the shortage is over. The United States Defendants have delegated all medical decisions during the shortage regarding Plaintiff's disease, life, and health to the sole discretion and control of a corporation regulated by and through grant of an FDA license.

2

2.      Plaintiff Michael Gnidovec is a U.S. citizen and a resident of Ohio and switched from the

diluted, unregulated, unapproved dose of Fabrazyme to an alternative treatment being studied for

FDA approval (i.e., Replagal™) manufactured by the licensee's competitor.  As punishment,

Plaintiff is banned from future interstate access to FDA-approved doses of Fabrazyme until the FDA

licensee, Genzyme (a Sanofi Company) declares that shortage is over.  The FDA licensee acted with

knowledge and consent of the United States Defendants in punishing Plaintiff's medical choice of an

alternative competitor's medication during the shortage.

3.      Plaintiff James Beadnell is a U.S. citizen and a resident of Arizona and holds a state-issued,

lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme").. By and through FDA

consent, Plaintiff has been banned interstate access to FDA-approved doses of Fabrazyme during a

drug shortage created by Genzyme (a Sanofi Company) an FDA licensee.  Plaintiff is instead forcibly

injected with a diluted, unregulated, unapproved dose of Fabrazyme because if the Plaintiff refuses

infusion of the unapproved dose, then the FDA licensee will withdraw any access and not provide

future access to the drug until the shortage is over.  Defendants have delegated all medical decisions

during the shortage regarding Plaintiff's disease, life, and health to the sole discretion and control of

a corporation regulated by and through grant of an FDA license.

4.      Plaintiff Laura Winchester is a U.S. citizen and a resident of Arizona and holds a state-issued,

lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme").  By and through FDA

consent, Plaintiff has been banned interstate access to FDA-approved doses of Fabrazyme during a

drug shortage created by Genzyme (a Sanofi Company) an FDA licensee.  Plaintiff is instead forcibly

injected with a diluted, unregulated, unapproved dose of Fabrazyme because if the Plaintiff refuses

3

infusion of the unapproved dose, then the FDA licensee will withdraw any access and not provide future access to the drug until the shortage is over. The United States Defendants have delegated all medical decisions during the shortage regarding Plaintiff's disease, life, and health to the sole discretion and control of a corporation regulated by and through grant of an FDA license.

5.     Plaintiff Jane Doe 1 is a U.S. citizen and a resident of California and holds a state-issued, lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme"). By and through FDA consent, Plaintiff has been banned interstate access to FDA-approved doses of Fabrazyme during a drug shortage created by Genzyme (a Sanofi Company) an FDA licensee. Plaintiff is instead forcibly injected with a diluted, unregulated, unapproved dose of Fabrazyme because if the Plaintiff refuses infusion of the unapproved dose, then the FDA licensee will withdraw any access and not provide future access to the drug until the shortage is over. The United States Defendants have delegated all medical decisions during the shortage regarding Plaintiff's disease, life, and health to the sole discretion and control of a corporation regulated by and through grant of an FDA license.

6.     Plaintiff Jane Doe 2 is a U.S. citizen and a resident of California and holds a state-issued, lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme"). By and through FDA consent, Plaintiff has been banned interstate access to FDA-approved doses of Fabrazyme during a drug shortage created by Genzyme (a Sanofi Company) an FDA licensee. Plaintiff is instead forcibly injected with a diluted, unregulated, unapproved dose of Fabrazyme because if the Plaintiff refuses infusion of the unapproved dose, then the FDA licensee will withdraw any access and not provide future access to the drug until the shortage is over. The United States Defendants have delegated all medical decisions during the shortage regarding Plaintiff's disease, life, and health to the sole

4

discretion and control of a corporation regulated by and through grant of an FDA license.

7.      Plaintiff John Doe 1 is a U.S. citizen and a resident of California and holds a state-issued, lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme"). By and through FDA consent, Plaintiff has been banned interstate access to FDA-approved doses of Fabrazyme during a drug shortage created by Genzyme (a Sanofi Company) an FDA licensee. Plaintiff is instead forcibly injected with a diluted, unregulated, unapproved dose of Fabrazyme because if the Plaintiff refuses infusion of the unapproved dose, then the FDA licensee will withdraw any access and not provide future access to the drug until the shortage is over. The United States Defendants have delegated all medical decisions during the shortage regarding Plaintiff's disease, life, and health to the sole discretion and control of a corporation regulated by and through grant of an FDA license.

8.      Plaintiff Thomas Stanziano is a U.S. citizen and a resident of Florida and holds a state-issued, lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme"). By and through FDA consent, Plaintiff has been banned interstate access to FDA-approved doses of Fabrazyme during a drug shortage created by Genzyme (a Sanofi Company) an FDA licensee. Plaintiff is instead forcibly injected with a diluted, unregulated, unapproved dose of Fabrazyme because if the Plaintiff refuses infusion of the unapproved dose, then the FDA licensee will withdraw any access and not provide future access to the drug until the shortage is over. The United States Defendants have delegated all medical decisions during the shortage regarding Plaintiff's disease, life, and health to the sole discretion and control of a corporation regulated by and through grant of an FDA license.

9.      Plaintiff John Doe 2 is a U.S. citizen and a resident of Massachusetts and holds a state-issued, lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme"). By and through FDA

consent, Plaintiff has been banned interstate access to FDA-approved doses of Fabrazyme during a drug shortage created by Genzyme (a Sanofi Company) an FDA licensee.  Plaintiff is instead forcibly injected with a diluted, unregulated, unapproved dose of Fabrazyme because if the Plaintiff refuses infusion of the unapproved dose, then the FDA licensee will withdraw any access and not provide future access to the drug until the shortage is over.  The United States The United States Defendants have delegated all medical decisions during the shortage regarding Plaintiff's disease, life, and health to the sole discretion and control of a corporation regulated by and through grant of an FDA license.

10.     Plaintiff John Doe 3 a resident of Massachusetts and holds a state-issued, lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme").  By and through FDA consent, Plaintiff has been banned interstate access to FDA-approved doses of Fabrazyme during a drug shortage created by Genzyme (a Sanofi Company) an FDA licensee.  Plaintiff is instead forcibly injected with a diluted, unregulated, unapproved dose of Fabrazyme because if the Plaintiff refuses infusion of the unapproved dose, then the FDA licensee will withdraw any access and not provide future access to the drug until the shortage is over.  The United States Defendants have delegated all medical decisions during the shortage regarding Plaintiff's disease, life, and health to the sole discretion and control of a corporation regulated by and through grant of an FDA license.

11.     Plaintiff Thomas James Olszewski is a U.S. citizen and a resident of Michigan and holds a state-issued, lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme").  By and through FDA consent, Plaintiff has been banned interstate access to FDA-approved doses of Fabrazyme during a drug shortage created by Genzyme (a Sanofi Company) an FDA licensee.  Plaintiff is instead forcibly injected with a diluted, unregulated, unapproved dose of Fabrazyme

6

because if the Plaintiff refuses infusion of the unapproved dose, then the FDA licensee will withdraw any access and not provide future access to the drug until the shortage is over. The United States Defendants have delegated all medical decisions during the shortage regarding Plaintiff's disease, life, and health to the sole discretion and control of a corporation regulated by and through grant of an FDA license.

12.    Plaintiff Jane Doe 3 is a U.S. citizen and a resident of Nevada and holds a state-issued, lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme"). By and through FDA consent, Plaintiff has been banned interstate access to FDA-approved doses of Fabrazyme during a drug shortage created by Genzyme (a Sanofi Company) an FDA licensee. Plaintiff is instead forcibly injected with a diluted, unregulated, unapproved dose of Fabrazyme because if the Plaintiff refuses infusion of the unapproved dose, then the FDA licensee will withdraw any access and not provide future access to the drug until the shortage is over. The United States Defendants have delegated all medical decisions during the shortage regarding Plaintiff's disease, life, and health to the sole discretion and control of a corporation regulated by and through grant of an FDA license.

13.    Plaintiff Carol E. Emerson is a U.S. citizen and a resident of New Mexico and holds a state-issued, lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme"). By and through FDA consent, Plaintiff has been banned interstate access to FDA-approved doses of Fabrazyme during a drug shortage created by Genzyme (a Sanofi Company) an FDA licensee. Plaintiff is instead forcibly injected with a diluted, unregulated, unapproved dose of Fabrazyme because if the Plaintiff refuses infusion of the unapproved dose, then the FDA licensee will withdraw any access and not provide future access to the drug until the shortage is over. The United States

Defendants have delegated all medical decisions during the shortage regarding Plaintiff's disease, life, and health to the sole discretion and control of a corporation regulated by and through grant of an FDA license.

14.    Plaintiff John Doe 4 is a U.S. citizen and a resident of New York and holds a state-issued, lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme"). By and through FDA consent, Plaintiff has been banned interstate access to FDA-approved doses of Fabrazyme during a drug shortage created by Genzyme (a Sanofi Company) an FDA licensee.. Plaintiff is instead forcibly injected with a diluted, unregulated, unapproved dose of Fabrazyme because if the Plaintiff refuses infusion of the unapproved dose, then the FDA licensee will withdraw any access and not provide future access to the drug until the shortage is over. The United States Defendants have delegated all medical decisions during the shortage regarding Plaintiff's disease, life, and health to the sole discretion and control of a corporation regulated by and through grant of an FDA license.

15.    Plaintiff John Doe 5 is a U.S. citizen and a resident of New York and holds a state-issued, lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme"). By and through FDA consent, Plaintiff has been banned interstate access to FDA-approved doses of Fabrazyme during a drug shortage created by Genzyme (a Sanofi Company) an FDA licensee.. Plaintiff is instead forcibly injected with a diluted, unregulated, unapproved dose of Fabrazyme because if the Plaintiff refuses infusion of the unapproved dose, then the FDA licensee will withdraw any access and not provide future access to the drug until the shortage is over. The United States Defendants have delegated all medical decisions during the shortage regarding Plaintiff's disease, life, and health to the sole discretion and control of a corporation regulated by and through grant of an FDA license.

16.     Plaintiff John Doe 6 is a U.S. citizen and a resident of North Carolina and holds a state-issued, lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme"). By and through FDA consent, Plaintiff has been banned interstate access to FDA-approved doses of Fabrazyme during a drug shortage created by Genzyme (a Sanofi Company) an FDA licensee..  Plaintiff is instead forcibly injected with a diluted, unregulated, unapproved dose of Fabrazyme because if the Plaintiff refuses infusion of the unapproved dose, then the FDA licensee will withdraw any access and not provide future access to the drug until the shortage is over.  The United States Defendants have delegated all medical decisions during the shortage regarding Plaintiff's disease, life, and health to the sole discretion and control of a corporation regulated by and through grant of an FDA license.

17.     Plaintiff John Doe 7 is a U.S. citizen and a resident of North Carolina and holds a state-issued, lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme"). By and through FDA consent, Plaintiff has been banned interstate access to FDA-approved doses of Fabrazyme during a drug shortage created by Genzyme (a Sanofi Company) an FDA licensee..  Plaintiff is instead forcibly injected with a diluted, unregulated, unapproved dose of Fabrazyme because if the Plaintiff refuses infusion of the unapproved dose, then the FDA licensee will withdraw any access and not provide future access to the drug until the shortage is over.  The United States Defendants have delegated all medical decisions during the shortage regarding Plaintiff's disease, life, and health to the sole discretion and control of a corporation regulated by and through grant of an FDA license.

18.     Plaintiff Adam Dible is a U.S. citizen and a resident of Ohio and holds a state-issued, lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme").  By and through FDA consent, Plaintiff has been banned interstate access to Fabrazyme and went untreated during a drug

9

shortage created by Genzyme (a Sanofi Company) an FDA licensee. The United States Defendants have delegated all medical decisions during the shortage regarding Plaintiff's disease, life, and health to the sole discretion and control of a corporation regulated by and through grant of an FDA license.

19.   Plaintiff George Demko is a U.S. citizen and a resident of Pennsylvania and holds a state-issued, lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme").  By and through FDA consent, Plaintiff has been banned interstate access to FDA-approved doses of Fabrazyme during a drug shortage created by Genzyme (a Sanofi Company) an FDA licensee. Plaintiff is instead forcibly injected with a diluted, unregulated, unapproved dose of Fabrazyme because if the Plaintiff refuses infusion of the unapproved dose, then the FDA licensee will withdraw any access and not provide future access to the drug until the shortage is over.  The United States Defendants have delegated all medical decisions during the shortage regarding Plaintiff's disease, life, and health to the sole discretion and control of a corporation regulated by and through grant of an FDA license.

20.   Plaintiff Jane Doe 4 is a U.S. citizen and a resident of Pennsylvania and holds a state-issued, lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme"). By and through FDA consent, Plaintiff has been banned interstate access to FDA-approved doses of Fabrazyme during a drug shortage created by Genzyme (a Sanofi Company) an FDA licensee. Plaintiff is instead forcibly injected with a diluted, unregulated, unapproved dose of Fabrazyme because if the Plaintiff refuses infusion of the unapproved dose, then the FDA licensee will withdraw any access and not provide future access to the drug until the shortage is over. The United States Defendants have delegated all medical decisions during the shortage regarding Plaintiff's disease, life, and health to the sole

discretion and control of a corporation regulated by and through grant of an FDA license.

21.     Plaintiff Jane Doe 5 is a U.S. citizen and a resident of Pennsylvania and holds a state-issued, lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme"). By and through FDA consent, Plaintiff has been banned interstate access to FDA-approved doses of Fabrazyme during a drug shortage created by Genzyme (a Sanofi Company) an FDA licensee.. Plaintiff is instead forcibly injected with a diluted, unregulated, unapproved dose of Fabrazyme because if the Plaintiff refuses infusion of the unapproved dose, then the FDA licensee will withdraw any access and not provide future access to the drug until the shortage is over. The United States Defendants have delegated all medical decisions during the shortage regarding Plaintiff's disease, life, and health to the sole discretion and control of a corporation regulated by and through grant of an FDA license.

22.     Plaintiff Michael A. Masula is a U.S. citizen and a resident of Pennsylvania and holds a state-issued, lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme"). By and through FDA consent, Plaintiff has been banned interstate access to FDA-approved doses of Fabrazyme during a drug shortage created by Genzyme (a Sanofi Company) an FDA licensee. Plaintiff is instead forcibly injected with a diluted, unregulated, unapproved dose of Fabrazyme because if the Plaintiff refuses infusion of the unapproved dose, then the FDA licensee will withdraw any access and not provide future access to the drug until the shortage is over. The United States Defendants have delegated all medical decisions during the shortage regarding Plaintiff's disease, life, and health to the sole discretion and control of a corporation regulated by and through grant of an FDA license.

23.     Plaintiff John Doe 8 is a U.S. citizen and a resident of Virginia and holds a state-issued,

lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme"). By and through FDA consent, Plaintiff has been banned interstate access to FDA-approved doses of Fabrazyme during a drug shortage created by Genzyme (a Sanofi Company) an FDA licensee. Plaintiff is instead forcibly injected with a diluted, unregulated, unapproved dose of Fabrazyme because if the Plaintiff refuses infusion of the unapproved dose, then the FDA licensee will withdraw any access and not provide future access to the drug until the shortage is over. The United States Defendants have delegated all medical decisions during the shortage regarding Plaintiff's disease, life, and health to the sole discretion and control of a corporation regulated by and through grant of an FDA license.

24.     Plaintiff Joy Beadnell is a U.S. citizen and a resident of Washington and holds a state-issued, lawfully obtained prescription for treatment for Fabry disease ("Fabrazyme"). By and through FDA consent, Plaintiff has been banned interstate access to FDA-approved doses of Fabrazyme during a drug shortage created by Genzyme (a Sanofi Company) an FDA licensee. Plaintiff is instead forcibly injected with a diluted, unregulated, unapproved dose of Fabrazyme because if the Plaintiff refuses infusion of the unapproved dose, then the FDA licensee will withdraw any access and not provide future access to the drug until the shortage is over. The United States Defendants have delegated all medical decisions during the shortage regarding Plaintiff's disease, life, and health to the sole discretion and control of a corporation regulated by and through grant of an FDA license.

25.     Plaintiff Jennifer Lacognata is a U.S. citizen and a resident of Florida and holds a state-issued, lawfully obtained prescription for treatment for her vitamin A deficiency disease but has been banned interstate access to FDA-approved doses of Aquasol A during a drug shortage created by FDA licensee, Hospira Corporation. The FDA licensee's actions were made with knowledge and

consent of the United States Defendants. The United States Defendants have delegated all medical decisions regarding Plaintiff's disease, life, and health to the sole discretion and control of a corporation regulated by and through grant of an FDA license.

26.    Defendant Department of Health and Human Services, 200 Independence Avenue SW, Washington, DC 20201, is an agency of the United States, and is responsible for administration and enforcement of 35 USC § 200-212, hereinafter the "Bayh-Dole Act" and the Food Drug and Cosmetics Act (21 U.S.C. § 301 et seq.), hereinafter "FDCA".

27.    Defendant Kathleen Sebelius is a U.S. citizen who works in the District of Columbia as the Secretary of the Department of Health and Human Services and is being sued in her official capacity.

28.    Defendant Food and Drug Administration, 10903 New Hampshire Avenue, Silver Spring, MD 20993, is an agency within the U.S. Department of Health and Human Services.

29.    Defendant Dr. Margaret Hamburg is a U.S. citizen who works as Commissioner for the FDA, and is being sued in her official capacity.

30.    Defendant National Institutes of Health, 9000 Rockville Pike, Bethesda, Maryland 20892 is an agency within the U.S. Department of Health and Human Services.

31.    Defendant Dr. Francis Collins is a U.S. citizen who works as Director of the NIH and is being sued in his official capacity.

32.    Defendant Mount Sinai School of Medicine ("Mt. Sinai") is a corporation organized and existing under the laws of the State of New York, with its headquarters and principal place of business located at One Gustave L. Levy Place, New York, NY 10029-6574 and doing business with the District of Columbia. Mt. Sinai holds limited title to and is the sole licensor of U.S. Patent No.

5,356,804, an invention funded by U.S. tax dollars by a public grant awarded by Defendant NIH. Mt. Sinai is named only to the extent it is considered a necessary party regarding the invalidation or lack of enforceability of U.S. Patent No. 5,356,804 covering use of Fabrazyme. Mt. Sinai is named herein as a necessary party defendant as to Plaintiffs' Count III (Violation of the Patent Clause of the US Constitution), and for that limited purpose, and is not a defendant as to Plaintiffs' Counts I, II, IV, or V. Unless otherwise expressly noted herein, all references to "the United States Defendants" are to be construed as references to Defendants Department of Health and Human Services, Kathleen Sebelius, the Food and Drug Administration, Dr. Margaret Hamburg, the National Institutes of Health, and Dr. Francis Collins, and should not be construed to refer to Defendant Mount Sinai School of Medicine.

## JURISDICTION AND VENUE

33.  This action seeks declaratory relief under the Federal Declaratory Judgment Act, 28 U.S.C. § 2201.

34.  Jurisdiction is conferred upon this judicial district pursuant to federal question jurisdiction under 28 U.S.C. § 1331 and § 1338(a).

35.  Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) and (e).

36.  Individual and prudential standing is proper as the Plaintiffs have suffered actual concrete harm from The United States Defendants in contravention to the laws of the Sovereign states and the U.S. Constitution.

37.  The case is ripe because interstate drug rationing decisions made under FDA licenses will cause ongoing severe physical harms or death to the individual Plaintiffs and such actions by

14

these FDA licensees are non-reviewable by regulatory authorities, the Department of Health and Human Services, the Food and Drug Administration, or the National Institutes of Health or administrative courts.  These cases are capable of repetition while escaping review due to the variable length of time a drug is in shortage.

38.   No procedural or substantive relief for Plaintiffs is available except by adjudication of this court.  Without an injunction, the Plaintiffs will continue to suffer irreparable physical injuries and even die, which places vastly greater hardship on the plaintiffs.  There is no legitimate government interest served by allowing The United States Defendants to grant or maintain FDA licenses to corporations that have (upon information and belief) created and failed to mitigate otherwise preventable drug shortages.

39.   Declaratory relief will resolve this controversy.

40.   A preliminary injunction against The United States Defendants will prevent ongoing severe physical harms or death to Plaintiffs and protect the judicial process from The United States Defendants' licensees' ability to withdraw medications at will from commerce in order to retaliate against or suborn government employees, the Plaintiffs, the United States Defendants, and the officers of this court during adjudication of this controversy.


## FACTUAL BACKGROUND

### I) General Background on Drug Shortages


41.   At present there exist over 260 concurrent prescription drug shortages in the U.S., far more

15

than any in history.

42.    Indeed, for every drug shortage that the FDA has averted, two new ones arise.

43.    The danger of drug shortages to the health and life of American citizens are well known.

44.    Once a medically necessary drug is placed into interstate commerce, withdrawal of drug from

the market results in grievous harm to patients, just as assuredly as withdrawal of oxygen, food,

or water for those who have come to rely on such access for survival.

45.    Indeed, current drug shortages have been blamed for at least 15 deaths. [1]

46.    While Congress will be promulgating new laws to address future shortages and future

victims, the instant case concerns the current victims of current drug shortages.

47.    Despite the proliferating crisis, the Department of Health and Human Services, the Food and

Drug Administration, and the National Institutes of Health have illegally delegated

unprecedented governmental authority to licensees and contractors.

48.    Under established medical practices, a patient will normally decide in private consultation

with her physician how, when and to what extent a treatment will be administered.

49.    Additionally, the doctor and patient will discuss the pros and cons of undergoing such

treatment so that the treatment is administered with informed consent.

50.    However during a drug shortage, FDA licensees (not doctors, patients or the FDA) decide

whether or not a patient will be treated, decide what order patients will be treated, decide

whether or not to dilute the medication for administration, decide how much, if any,

---

1 Associated Press, "Drug shortages blamed in at least 15 deaths" September 23, 2011 available at
http://www.cbsnews.com/stories/2011/09/23/earlyshow/health/main20110587.shtml

information on the medical consequences of removing a patient from the drug will be released

to the public, veto doctors' and patients' requests for access, and exact profits while forcing

patients to waive claims for liability in return for access to the medication. *See,* for example,

liability waiver for "charitable" access to the taxpayer-funded invention, Fabrazyme, attached

hereto and incorporated herein as Exhibit A.

51.   Indeed, FDA licensees causing drug shortages now exercise absolute control over the

physical bodies of American citizens who have come to rely on interstate access to a drug

needed to treat their diseases.

52.   Necessarily then, the root cause of every injury from interstate drug shortage (not due to

increased demand) is the FDA allowing manufacturers to provide drugs into interstate

commerce without backup or safety measures.

53.   The United States Defendants further vitiate the injuries to victims of interstate drug

shortages by delegating all authority to substantively regulate the medical care of victims to the

very companies that caused the shortage in the first place.

54.   When the FDA licensees exit the market, even temporarily as in a drug shortage, the FDA

could withdraw the license.

55.   Indeed, responsible FDA licensees often exit interstate markets without creating a drug

shortage, unlike companies which withdraw from interstate commerce due to the FDA

licensee's own negligence.

56.   As such, if an FDA licensees exits the market, even temporarily, due to its own negligence

then a mere intent to  return to interstate commerce cannot be a legal basis for the FDA to

delegate unprecedented and illegal power to control the physical bodies of American citizens and the public health of citizens of the individual states.

57.   It would be a simple legal matter for the FDA to intervene during a drug shortage and escrow what little drug is available for interstate distribution in accordance with the needs of the people until the licensee returns fully to the interstate market, because the FDA, not FDA licensees, controls the interstate prescription drug market.

58.   However, the FDA has argued that the FDCA is inadequate to protect against shortages because Congress has delegated complete control of public health during a drug shortage to the company causing the drug shortage.

59.   The FDA reasons that the agency cannot force a company to manufacture a drug under the FDCA.

60.   While the FDA's statement is true, the FDA fails to acknowledge that the agency's most powerful enforcement measure has nothing to do with forcing a company to make a drug; the FDA has the power to exclude manufacturers from re-entering the interstate market once U.S. patients have been injured or died due to drug shortages attributable in whole or in part to the actions of FDA licensees.

61.   Indeed, it is the express duty of the FDA to exclude pharmaceutical manufacturers from interstate commerce forever once the FDA license has been used to induce reliance and then used to cause otherwise preventable death an injury to innocent American citizens.

62.   In order to obtain FDA licenses, companies implicitly promise the government, the states, patients, doctors, and investors that they will provide unfettered interstate access to their

products, and accordingly profit from interstate commerce based on such promises.

63. Indeed, most drug companies recognize and abide by their promise to reliably supply drug for interstate commerce.

64. Therefore, FDA licensees that demonstrate negligence, recklessness and willful indifference to the lives of American citizens should not be rewarded by further profits from interstate commerce when they exit the market (no matter the length of time), but rather excluded from the public trust so that responsible manufacturers can replace them in the interstate market.

65. As such, grant or continuation of FDA licenses to manufacturers that have withdrawn interstate access to FDA licensed medications without providing safety measures to protect the health of Americans during their exit from interstate commerce (no matter how temporary) violates the separation of powers under the U.S. Constitution, violates the 10th Amendment reservation of police powers to the states, violates the Patent Clause of the U.S. Constitution (Article I, Section 8, Clause 8), violates the right to substantive and procedural due process under the 5th Amendment, violates the fundamental Constitutional right of self-determination in medical treatment decisions, violates the fundamental Constitutional right to privacy against discrimination based on medical and genetic information, violates the Bayh-Dole Act, and violates the Food, Drug and Cosmetics Act.

66. The instant case arises from The United States Defendants' actions during prescription drug shortages affecting interstate commerce.

67. Plaintiffs are currently being denied lawful access to the full FDA approved and physician-recommended doses of prescription drugs needed to treat their diseases.

68.   Under supervision and by consent of the FDA, certain agency licensees are banning interstate access, restricting interstate access or providing only diluted untested doses into interstate commerce, despite Plaintiffs holding valid prescriptions authorized and necessary to protect the health of citizens of the individual states under state police powers.

69.   The instant case arises from two of interstate drug shortages (upon information and belief, among hundreds) currently caused by FDA licensees and allowed to continue by the willful inaction of the government agencies tasked with protecting the public health and regulating interstate commerce.

70.   First, this case concerns the drug shortage of Fabrazyme manufactured by Genzyme, a Sanofi Aventis company, "Genzyme".

71.   Fabrazyme is a medically necessary drug used to treat Fabry disease, a lethal genetic illness, and no alternative treatment is available in the U.S.[2]

72.   However, Genzymecreated a shortage of Fabrazyme in 2009 by introducing adulterated injectable vials Fabrazyme into interstate commerce, which resulted in the Department of Justice filing a complaint against Genzyme on May, 24, 2010, to which Genzyme responded by entering into consent decree with the FDA.

73.   In response to the shortage, Genzyme promulgated a rationing system for Fabrazyme whereby Americans were banned from access or given only diluted doses of the drug, while European patients were granted full FDA dosing.

―――――――――――――――――――――

[2] See, http://www.fda.gov/drugs/drugsafety/drugshortages/default.htm.  Fabrazyme® is used to treat a serious disease and there is no other available source of that product or alternative drug or therapy that is judged to be an adequate substitute.

74. Genzyme's diluted dose of Fabrazyme given to U.S. Fabry patients is untested and not FDA approved.

75. The European Medicines Agency has found that Genzyme's administration of lowered dose is dangerous (accelerates disease) and non-efficacious (most patients have had a severe return of symptoms including increased risk of heart attack, stroke, and renal failure).[3] *See*, EMA Assessment Report for Fabrazyme, November 11, 2010 attached hereto and incorporated herein as Exhibit B.

76. U.S. patients are forced to take the diluted dose or be placed at the end of the waiting list for access to drug; thus, U.S. Fabry disease patients face imminent and ongoing harm.

77. The patent monopoly to Fabrazyme was funded by taxpayers and owned by Mt. Sinai subject to the restrictions of the Bayh-Dole Act.

78. Mt. Sinai licenses the Fabrazyme patent (U.S. Patent No. 5,356,804) to Genzyme to benefit U.S. citizens having Fabry disease, specifically, Mt. Sinai licenses the patent "to have recombinant x-galactosidase A developed and made available for general use to patients for the treatment of Fabry Disease ...." *See*, Mt. Sinai-Genzyme License Agreement attached hereto and incorporated herein as Exhibit C.

79. HHS also holds "A non-exclusive, non- transferable, irrevocable, paid-up right to practice or have practiced the invention," in accordance with the Bayh-Dole mandate that a publicly funded patent not be subject to misuse or non-use and be made available for the benefit of the public and for the individual benefit of taxpayers that need access to the invention. U.S. Patent

---

3 Also available at http://www.ema.europa.eu/docs/en_GB/document_library/Other/2010/11/WC500099241.pdf

No. 5,356,804 states "The Government has certain rights in the invention [of Fabrazyme]." [4]

80.   Despite HHS holding property rights in Fabrazyme, the HHS, by and through the Director of the NIH, Francis Collins, explicitly refused a patient petition to allow any other licensees to help mitigate current or future shortages that affect the public health and interstate commerce. [5]

81.   As a result of the FDA's consent and approval of Genzyme's discriminatory program against interstate commerce and the NIH's refusal to license, U.S. citizens have been harmed and are at greater risk of death than non-US patients at the hands of the United States Defendants' contractors and licensees.

82.   As a result of the FDA's consent and approval of Genzyme's discriminatory program against interstate commerce and the NIH's refusal to license, Fabry patients throughout the United States have suffered unnecessary grave bodily harm and death by the United States Defendants' contractors and licensees.

83.   Second, this case concerns the drug shortage of Aquasol A, manufactured by Hospira Corporation under FDA license.

84.   Aquasol A is used to treat vitamin A deficiency for patients that cannot absorb the vitamin in their diet.

85.   Vitamin A deficiency leads to blindness, hearing loss, connective tissue disease and loss of the ability for the body to fight infections.

---

[4] Confirmatory license recorded on May 9, 2008 in the U.S. Patent Assignment Database at Reel/Frame:020928/0711.

[5] *See*, March-in Determination in The Case of Fabrazyme - NIH Office of Technology Transfer available at www.ott.nih.gov/policy/March-in-Fabrazyme.pdf

86. Aquasol A is a medically necessary drug and no alternative is available.

87. Hospira withdrew access to Aquasol A in 2010 because it created a drug shortage by switching manufacturing facilities.

88. Hospira closed the working facility <u>before</u> bringing the second facility on line leading to the obviously foreseeable consequence of restricting the Aquasol A supply.

89. The second manufacturing facility has still not been brought on line as of this filing and no more Aquasol A is available anywhere in the world.

90. Consequently, U.S. vitamin A deficient patients face imminent and ongoing harm from lack of treatment for their disease.

91. Although Aquasol A is not patented, the FDA has licensed Hospira as the sole manufacturer of the drug for use in interstate commerce and continues to grant new licenses to Hospira despite the fact that over thirty-three discrete shortages in the availability of Hospira on the U.S. marketplace have occurred since the FDA first licensed Hospira. The FDA's license to Hospira has granted it control over interstate commerce in the Vitamin A treatment market.

92. Indeed, the shortage of Aquasol A appears attributable to Hospira shifting to new manufacturing facilities without ensuring continued production of sustained quantities of Aquasol A.

93. A shortage of Aquasol A was not only foreseeable, it was completely preventable.

94. However, the HHS has argued that the solutions to protecting the public from interstate drug

shortages are beyond its control.[6]

95. When the HHS fails to regulate licensees creating drug shortages, the patients, doctors and hospitals relying on these manufacturers have no power to individually or privately manufacture these prescription drugs for themselves.

96. Thus, the HHS is the only bulwark protecting citizens from manufacturers' negligent actions because the individual States and their citizens are required under the Food, Drug, and Cosmetics Act to rely exclusively on FDA licensees for interstate access to prescription medication.

97. If the solutions to drug shortages are beyond the control of the FDA, then the FDCA forces American to submit to injury and death when they are denied medically necessary medication by FDA licensees because no other access to treatment is legally allowed.

98. Plaintiffs do not believe that the FDCA is designed to cause such injuries to innocent Americans.

99. Rather, Plaintiffs assert that FDA licenses are necessarily invalid under the FDCA once a licensee causes a preventable interstate drug shortage and exits from the interstate market.

100. As such, any subsequent interstate communications by a company whose license should have been invalidated due to the alleged causation of a drug shortage are arguably unauthorized under the FDCA.

101. The denial of interstate access to prescription medication by licensees, resulting in

---

6 Executive Order 13588, October 31, 2011 available at http://www.whitehouse.gov/the-press-office/2011/10/31/executive-order-reducing-prescription-drug-shortages.

foreseeable injury and death to patients (*i.e.*, individual state citizens), places a high burden of care on individual states.

102. Thus, the FDA is required under the FDCA to ban reckless, negligent, or otherwise irresponsible manufacturers (or manufacturers that fail to manufacture and distribute particular drugs for use by U.S. citizens) from remaining in the interstate prescription drug market as to those drugs, especially when these licensees have withdrawn from the market (even temporarily).

103. Impliedly, these manufacturers practice medicine by *de facto* overruling, modifying or ignoring doctor's treatment decisions. [7]

104. While the FDA cannot force a manufacturer to make a prescription drug for use in interstate commerce, it is statutorily required to immediately suspend a manufacturer's licenses once the licensee impedes interstate commerce in direct contravention to the FDCA and the Commerce Clause of the U.S. Constitution in which the FDCA finds authority.

105. Indeed, if the Congress did not grant the HHS the ability to regulate <u>all</u> of these FDA licensees' and contractors' actions affecting interstate commerce, then the FDCA itself is unconstitutional because the FDA has been tasked with a duty to protect innocent citizens from irresponsible manufacturers but denied the authority to exclude them from interstate

---

[7] For example, it is "[t]he purpose of [the {state-law} prohibition on the corporate practice of medicine] to preserve the vitally important doctor-patient relationship and prevent possible abuses resulting from lay control of corporations...." *Gupta v. Eastern Idaho Tumor Inst., Inc.*, 140 S.W.3d 747, 752 (Tex.App.-Houston [14th Dist.] 2004, pet. denied).

commerce.

106. Despite all Americans being legally bound to rely on FDA licensees for drug access, the HHS shifts 100% of the catastrophic costs of its irresponsible licensees to the individual States, Medicare, Medicaid and private insurance companies and the individual victims of the shortages, even while such FDA licensees collect vast profits from victims of the shortage as well as state and federally funded insurance programs.

107. Despite the commonsense interpretation of the FDCA as precluding manufacturers from maintaining an FDA license during a shortage created by its own negligence and recklessness, the FDA irrationally continues to review and grant <u>new</u> licenses to the worst and most willful offenders of the FDCA and FDA regulations.[8]

108. By improvidently granting and maintaining licenses to irresponsible manufacturers, while subsequently refusing to intervene to protect U.S. citizens from such licensees, the FDA itself has acted with knowing and willful indifference to the very human lives it has been tasked by Congress to protect under the FDCA.

---

[8] FDA licensee Genzyme Corporation has or will be presenting twenty new drug applications to the FDA, despite maintaining three concurrent shortages under current FDA licenses. For example, in October 2011 during the ongoing Fabrazyme, Thryogen and Cerezyme shortage, the Food and Drug Administration agreed to review Genzyme's application for an oral multiple sclerosis treatment, Aubagio, and is expected to rule on it in the second half of 2012, despite the clear risk of Genzyme creating a future shortage of the drug given past performance. Similarly, FDA licensee Hospira Corporation has or will be presenting thirty new drug applications to the FDA, despite creating more than thirty drugs shortages under current FDA licenses.

109. Indeed, despite the HHS having intimate knowledge of the harm to the health and lives of U.S. citizens resulting from FDA licensees' decisions, the HHS has consented to every action made by its licensees regulating interstate access of drug even when these licensees are causing the otherwise preventable death and suffering of thousands of Americans.

110. Therefore, as currently interpreted by the HHS, grant of an FDA license to manufacturers that withdraw drugs from the marketplace (or discriminate for access), and the allowance unto such manufacturers to retain their licenses, violates the U.S. Constitution because the federal government otherwise refrains from protecting American's lives from its licensees' actions or lack of safeguards once an FDA license has been granted.

111. Plaintiffs posit that the HHS has misinterpreted its own regulations because a plain reading of an FDA license shows that the licensee is limited to <u>introducing</u> prescriptions drugs into interstate commerce, not withdrawing prescription drugs from interstate commerce, especially once reliance has been induced.[9]

112. Similarly, a Bayh-Dole patent cannot be legally maintained or granted when public access to the invention is prevented by the contractor or its licensee.

113. Indeed, it would be contrary to common sense that the FDCA would only protect citizens from the foreseeable effects of drug adulteration but still place citizens' lives in jeopardy by the equally foreseeable consequence of a drug shortage created by the withdrawal of such an adulterated drug from the market.

114. Similarly, it would be contrary to the purpose of grant of a Bayh-Dole patent to allow the

---

[9] *See*, for example, FDA Fabrazyme Approval Letter 4/24/2003 attached hereto and incorporated herein as Exhibit D.

violators of the Act to profit from the Bayh-Dole patent monopoly during a drug shortage created by the contractor or its licensee.

115. In fact, it is an imminently foreseeable consequence that once the FDA takes action against its licensees, a drug shortage will often occur, especially where the FDA has not licensed or contracted a second source or stockpiled an inventory of the drug.

116. As such, without ensuring safeguards to protect the interstate drug supply, FDA regulatory action could easily cause harm to even more U.S. citizens than the adulteration of the drug because no back-ups are required.

117. This is exactly what has happened in the Fabrazyme shortage. It was less lethal for the FDA to allow Genzyme to supply adulterated drug at dangerously low doses than removing Genzyme from the market entirely.

118. In other words, under the HHS interpretation of the FDCA, it is preferable to allow for patients to be injured or die than to remove negligent and/or non-manufacturing manufacturers from the market entirely.

119. Accordingly, the FDCA as interpreted by the HHS encourages manufacturers to supply drugs for interstate commerce in restricted quantities (at which price is at a premium), since the FDA elects (as its policy) to not withdraw licenses from negligent manufacturers that threaten the interstate drug supply.

120. As a consequence of the FDA's interpretation of the FDCA, American citizens relying on drug access become hostages to FDA licensees who use the dependence of Americans on the drug supply to bargain with FDA regulators.

121. It was never the Congressional intent in drafting the FDCA to prevent manufacturers from

being removed from interstate commerce for FDCA violations.

122. However, as asserted by the HHS despite clear language in the FDA license, the HHS has

interpreted the scope of its licenses to include grant unprecedented powers over innocent U.S.

citizen's lives to include:

A)  Pre-emption over the federal government to regulate the interstate market during

prescription drug shortages because the ultimate power and authority to decide

which U.S. citizens will survive by receiving allocations or which citizens will be

harmed during the shortage is non-reviewable under an FDA license;

B)  Power to suborn U.S. citizens and the government because an FDA licensee may

withdraw interstate access or grant priority access to medication for U.S. citizens

on a secret and  individualized basis under an FDA license (e.g., FDA licensees

are easily able to determine which patients are government employees by

reviewing the insurance providers of patients requesting access to the drug);

C)  Power to artificially prolong a domestic drug shortage because under an FDA

license a manufacturer has final authority to ban Americans from drug access and

shift supplies overseas markets;

D)  Power to pre-empt the police powers of the individual states tasked with

protecting the health of its citizens because FDA licensees act with ultimate

unreviewable authority to decide which states receive prescription drugs and how

much, even in contravention to state public health authority mandates, doctor's

29

treatment decisions and FDA recommendations for dosing;

E)    Power to abolish the fundamental Constitutional right of U.S. citizens to exercise self-determination in medical treatment because FDA licensees have ultimate and unreviewable authority as whether American citizens will be treated for disease and, if treated, how little to give, as well as when access will be granted; and

F)    Power to abolish the fundamental Constitutional right of U.S. citizens to due process and judicial review because the HHS does not require its licensees to provide notice, hearing, and public proceedings for actions denying access of medication to patients and the U.S. states.

123. Despite the vast powers that the HHS believes that FDA licensees have over the U.S. and its citizens, the U.S. Constitution reserves for the United States Congress power "to regulate Commerce with foreign Nations, and the several States (Article I, § 8).

124. Such Constitutional powers may not be delegated into the hands of FDA licensees especially not to pre-empt Congressional authority and create private power to discriminate among the individual states and their citizens for interstate access to prescription drugs required to protect the health and safety of the Sovereign states' citizens.

125. Similarly, Constitutional powers may not be delegated into the hands of FDA licensees to regulate commerce with foreign nations, especially not to grant preferential access to medically necessary drug to foreign nationals over the health needs of U.S. citizens.

126. Moreover, granting an FDA license does not pre-empt the constitutionally reserved police

powers of the states to regulate public health. *See, for example, Wyeth v. Levine*, 555 U.S. 555 (2009) and, historically, *Jacobson v. Commonwealth of Massachusetts*, 197 U.S. 11 (1905).

127. However, despite the obvious illegality of vetoing and pre-empting state licensed physicians' orders, the HHS interprets the FDCA as directly pre-empting such constitutionally reserved police powers of the Sovereign States under the 10th Amendment.

128. Indeed, the FDA licensee's actions contravening state-licensed physicians' judgment for standard of care for state citizens can be considered criminal acts in each individual state particularly where the FDA licensees' actions cause the imminently foreseeable death and injury of state's citizen.

129. While the solutions to interstate drug shortage may be outside the control of the FDA, such solutions are not outside the control of the individual states under the 10th Amendment.

130. As such, in order to promote state law enforcement deterring interstate drug shortages, the FDA should be providing the states with information as to the negligence and reckless conduct of its licensees that leads to the physical harm and death of these states' citizens.

131. To defend state citizens, state attorney generals may choose to punish negligent FDA licensees and thereby deter further interstate drug shortages, whether the states charge such FDA licensees with murder, manslaughter, negligent homicide, criminal negligence, violation of the States' various food drug and cosmetics acts, violation of the ban on the corporate practice of medicine or other state statute.

132. Additionally, the United States Defendants vest licensees with the power to ban Americans from the exercising the right of self-determination in health care matters, a fundamental human

right that has long recognized at common law and upheld by United States Supreme Court under the Due Process Clause. *See, Cruzan v. Director, Missouri Department of Health,* 497 U.S. 261 (1990).

133. Since FDA licenses are currently interpreted by the HHS to allow FDA licensees the power to ban individual states and their citizens from interstate access to prescription medication, the HHS policy has the practical effect of requiring physicians and their patients to obtain the consent from FDA licensees to be treated for their disease.

134. Indeed, FDA licensees causing drug shortages, not U.S. citizens or their doctors, now decide absolutely and without review which U.S. citizens will be treated for their disease and which citizens will be withdrawn from FDA approved treatment and suffer or die, even when the decisions of the United States Defendants' licensees contravene the FDA's own recommendations and labeling requirements.

135. Despite the clear violation of fundamental rights by FDA licensees and the evisceration doctors' ability to practice medicine and abolishment of the states ability to protect the public health, the HHS does not provide any manner of due process under the 5th Amendment because HHS does not provide review or an appeals process for decisions of its licensees to deny Americans access to medically necessary drugs.

136. Under the current interpretation of the FDCA by the United States Defendants, all federal and state governmental authority to regulate medical care for U.S. citizens is pre-empted by an FDA license when the licensee creates a drug shortage.

137. Indeed, under the current interpretation of the scope of an FDA license, private individuals

are granted the judicially unreviewable authority to conduct <u>secret</u> adjudications judging which

innocent citizens will be denied interstate access to prescription drugs as well as the power to

rank the order in which U.S. citizens will be given access through interstate commerce to

prescription drugs, by placing American citizen on secret "waiting lists" for access to interstate

commerce.

138. FDA licensees' holding private medical information create secret waiting lists recording

individual U.S citizens by name and rank them for access to medical treatment.

139. The rankings of named U.S. individuals for access to prescription drugs by FDA licensees are

unreviewable by any governmental authority.

140. In the practice of medicine, allocation of limited drug supplies is performed according to the

principles of medical triage.

141. However, FDA licensees are not bound by any authority, medical principle, or duty to protect

the public health according the current interpretation of the FDCA.

142. Indeed, FDA licensees contravene physician's best medical judgment by allocating drug in

any manner that the FDA licensee believes will create profits for the corporation.

143. As discussed *infra*, FDA licensees' discriminatory decision for U.S. patients are invariably

based on maximizing profits and mitigating financial losses despite explicitly violating any

number of state and federal codes and criminal laws designed to protect public health.

144. Indeed, when an FDA licensee negligently or willfully interferes with a state physician's

ability to exercise independent judgment, the FDA licensee is practicing medicine, but the

HHS still refuses to intervene on patients' or the states' behalf. [10]

145. Further vitiating drug shortages, FDA licensees are also allowed to retain patent monopoly powers to <u>exclude</u> other manufacturers during a shortage it creates.

146. As such, other manufacturers are banned from mitigating the damages being caused by irresponsible FDA licensees.

147. While exercise of a patent monopoly alone would only cause economic injury, the coupling of an FDA license exercised by an irresponsible manufacturer with the ability to exclude responsible manufacturers during a drug shortage actually increases licensees' profits.

148. Coupling an irresponsibly FDA licensees' ability to profit from a drug shortage with the ability to prevent any form of mitigation artificially vitiates drug shortages contrary to any public purpose whatsoever.

149. Similarly, the grant of an FDA license allows a manufacturer to collect monopolistic profits from the U.S. citizens whom it decides to sell the limited supplies while simultaneously denying other citizens access who, as a result, will suffer physical injury or die.

150. A patient or parent will pay any price to an FDA licensee that has created a drug shortage, even when the FDA licensee itself creates the shortage.

151. Indeed, FDA licensees causing drug shortages can easily force victims of a drug shortage and their families to perform any act the licensee desires, since the FDA licensee is allowed to control whether a drug shortage victim will be granted access to a drug and live or be denied

---

[10] *See* for example Pennsylvania Medical Practice Act of 1985 (63 P. S. § 422.10 et seq.) stating "No person other than a medical doctor shall engage in … Practice medicine and surgery.

access and die during the shortage.

152. As such, the grant of power to FDA licensees exceeds even traditional monopoly powers, since FDA licensees are empowered to collect premium prices that must be paid if the customer or his family wishes to obtain access to the drug to survive the shortage.

153. Indeed such premium prices have already been exacted from shortage victims in the form of increased prices for access to FDA licensed medications during shortages.

154. By granting and delegating federal powers to private individuals outside the scope of any agency license, any federal statute, any judicial review or the Constitution, the United States Defendants have violated multiple Federal statutes and the core principles and protections of the U.S. Constitution.

155. The HHS has illegally and unconstitutionally deprived American citizens of life and liberty as well as deprived the sovereign states of police power and the federal government its power to regulate interstate and international commerce by granting and maintaining FDA licenses to irresponsible manufacturers that cause interstate drug shortages.

156. There is clear but-for causation for the FDA's involvement in interstate drug shortages since but-for the improvident grant and maintenance of FDA licenses to induce reliance of the most vulnerable of American citizens, the  acts of the FDA licensees would not have caused harm to the public.

157. The HHS is fully aware that its licensees exercise absolute control over interstate and foreign commerce by controlling access to prescription drugs in contravention to the FDCA and the Constitution.

158. The HHS is fully aware that private corporations use FDA licenses to discriminate among equally valid state-authorized prescriptions and thereby impede free interstate access to prescription drugs.

159. The HHS is fully aware that FDA licensees' decisions to discriminate among the states for interstate access to prescription drugs are not subject to any rule of law, any form of federal oversight, or any form of judicial review.

160. The HHS is fully aware that the FDCA does not grant veto powers to FDA licensees over state sovereigns or remove Constitutional protections for citizens relying on free access to interstate commerce.

161. The HHS is fully aware that FDA licensees are acting illegally and even criminally to discriminate in interstate commerce against the individual states and the citizens that the states have a duty to protect under constitutionally reserved state police powers.

**II) HHS Approval of FDA Licensee Strategies Used to Profit the Drug Shortages**

162. While the HHS knowingly allows its licensees to regulate and discriminate for interstate access to prescription drugs, such consent is entirely irrational because a fundamental conflict exists between a public duty to public health and private licensees' desire to maximize profits.

163. If an FDA licensee is the sole manufacturer in the market, then there is a strong profit incentive to create and maintain an interstate drug shortage because the FDA licensee can increases prices for the drug in interstate commerce while reducing manufacturing costs by manufacturing less drug.

164. Indeed prescription drug manufacturers are under a fiduciary duty to investors to maximize profits and mitigate losses during interstate drug shortages, but are not under a duty to protect the public health.

165. In accordance, companies have adopted profit retention strategies based on discriminatory programs for interstate access to its products under FDA licenses.

166. Despite risking state criminal prosecution, FDA licensees still continue to allocate or dilute prescription drugs, presumably under a belief that an FDA license provides authority to pre-empt physicians' orders and state laws regulating public health.

167. Obviously, if an FDA licensee promises drug access and then withdraws from the market, it has a duty to protect those patients from any harm due to its exit from the market.

168. Indeed, FDA licensees are well aware of the reliance of the states and the individual patients on their products which they continue to encourage by advertising during the shortage and promising future access.

169. Thus to protect stock prices and retain customers during a shortage, FDA licensees use secret ranking systems to discriminate among equally deserving American citizens for access to medically necessary drugs during the shortage, including the promise of future access to customers in the form of a waiting list.

170. Secrecy as to how much drug is available and how it is allocated during a shortage serves no medical purpose or public benefit, but rather blinds state and the federal health authorities from

reviewing or criticizing such decisions.[11]

### A. FDA Licensee Profit Maximization by Preferentially Discriminating Among Individual's Private Medical Information

171. FDA licensees collect private medical information from doctor's prescriptions, including the name, state of residence, and diagnosis of the patient.

172. Additional medical information used to make discriminatory decisions is collected by corporate patient "assistance" programs.[12] These programs collect personal information on drug shortage victims including:  Name, insurance status, genetic status (e.g., type of mutation), gender, age, and history of treatment and symptoms.

173. By reviewing patients' private medical information, state of residence, and insurance information, FDA licensees construct drug allocation strategies to provide drug to the most profitable subset of patients requesting access to prescription drugs in interstate commerce. [13]

---

[11] Privacy laws would prevent disclosure of medical information to the public, but not disclosure to governmental authorities and physicians tasked with protecting public health or disclosure to these courts.

[12] The Genetic Information Nondiscrimination Act (GINA) protects Americans against discrimination based on their genetic information when it comes to health insurance and employment; however, the Act does not protect citizens from private corporations using genetic information to discriminate among U.S. citizens for access to medically necessary medications.

[13] *See*, for example, CDER Drug Storage Workshop 09-26-2011 transcript (p.339) available at http://www.fda.gov/downloads/Drugs/NewsEvents/UCM275801.pdf discussing use of historical purchases to allocate shortage drugs.

**B. FDA Licensee Profit Maximization by Preferentially Discriminating Between U.S. Customers in Favor of Overseas Customers**

174. FDA licensees maximize returns and reduce the effect of competition by discriminatorily allocating drug among various states, nations, and jurisdictions during drug shortages.

175. For example when allocating the taxpayer funded invention Fabrazyme to Fabry disease patients, Genzyme chose to provide full doses of drug to Europeans, while diluting the American drug supply or banning access altogether.

176. Genzyme is the sole FDA licensed supplier for enzyme replacement therapy for Fabry disease for the U.S. market.

177. However, Genzyme competes with Shire Corporation in the overseas market for enzyme replacement therapy for Fabry disease.

178. As a result of the Fabrazyme shortage, Fabry patients overseas were switching to Shire's product, Replagal®.

179. To prevent losing more overseas customers to its competitor, Genzyme promised full dose treatment to Europeans as an alternative to switching to the competitor's drug.

180. Genzyme subsequently shifted drug access away from the American market in favor of the European market.

181. Since Shire's drug has not been approved for use in U.S. interstate commerce, discriminatory allocation to overseas markets mitigated loss of market share and improved profits for Genzyme during the shortage it created.

**C. FDA Licensee Profit Maximization by Preferentially Discriminating Between Historically Less Profitable Customers (e.g., Less Populous States) In Favor Of Historically More Profitable Customers (e.g., More Populous States)**

182. FDA licensees and their distributors give priority access during interstate drug shortages to hospitals that have historically purchased the most prescription drugs from the FDA licensee and their distributors.

183. Usually, the "best customers" chosen for preferential access during drug shortages are large urban hospitals, which of course are located in the most populous states.

184. As a result, states having lower populations and smaller, more rural hospitals receive less drug proportionally than economically more powerful states during drug shortages.

185. By retaining "best customers" during a shortage, the manufacturer ensures that the most profitable customers (larger states) are least affected by interstate drug shortages.[14]

186. The HHS is fully aware of how states are preferentially being discriminated against by FDA licensees in interstate commerce but has adopted a non-interference policy with regard to its licensees exercising control and authority over interstate commerce during prescription drug shortages.

**D. FDA Licensee Profit Maximization by Preferentially Discriminating Between**

---

[14] *See*, for example, CDER Drug Storage Workshop 09-26-2011 transcript (p.272) available at http://www.fda.gov/downloads/Drugs/NewsEvents/UCM275801.pdf discussing use of historical purchases to allocate shortage drugs.

**Internally Funding Market Shortage Remediation In Favor of Funding New Product Markets**

187.  In most instances, FDA licensees creating drug shortages still plan to enter new prescription drug markets to promote new investment.

188.  When an FDA licensee creates a drug shortage, it shifts internal resources away from less profitable shortage markets to more profitable future markets, despite the critical public health need for capital investment for remediation of the shortage

189.  For example, Hospira Corporation has at least thirty-three concurrent interstate drug shortages ongoing, but has over twenty new drugs it plans to market in interstate commerce.

190.  Over the past two years, the FDA has found a host of manufacturing issues at various Hospira plants, prompting a warning letter and 483 inspection reports, but the FDA has failed to stay any new drug applications, despite gross violations.[15]

191.  By internally re-allocating corporate resources away from remediating its failures in interstate commerce markets to development of new interstate markets, Hospira promises future increased profits for investors.

192.  Genzyme (now Genzyme, a Sanofi Company) uses the same strategy of allocating internal resources away from its drug shortage markets to expand into other markets.

**E.  FDA Licensee Profit Maximization by Precluding Shortage Mitigation by**

---

[15]  *See*, for example, FDA inspection report of Hospira for   5/16/2011- 6/17/2011   available at http://www.fda.gov/downloads/AboutFDA/CentersOffices/OfficeofGlobalRegulatoryOperationsandPolicy/ORA/ORAElectronicReadingRoom/UCM276884.pdf

**Competitors**

193.  During a drug shortage, patentees and their licensees become highly vulnerable to competition because there is an unmet market need.

194.  To prevent competitors entering the shortage market, patent owners will refuse to license its patent to third parties and vigorously litigate any potential competitors to protect the market while the licensee is vulnerable to competition.

195.  For example, Defendant Mount Sinai Hospital, which owns the patent to Fabrazyme through the Bayh-Dole act, is suing Shire Corporation in the United Kingdom, Germany and Sweden for patent infringement.

196.  Shire is the only other manufacturer capable of producing an alternative treatment for Fabry disease during the shortage (Shire Corporation's Replagal®).

197.  Indeed, Mt. Sinai actually treats Fabry patients in its clinics and Mt. Sinai's patient would benefit from Shire's entry into the market.

198.  However, Mt. Sinai will also lose revenues if Shire is able to market its alternative product.

199.  Defendant Mt. Sinai's strategy of suing Shire for infringement is thus medically irrational in that it stands to deprive patients (potentially, including Mt. Sinai's own) of needed medications.

200.  To justify the injury to Mt. Sinai's patients, Mt. Sinai states that it will not pursue an injunction in Germany, but only money damages.

201.  However, Mt. Sinai has at least implicitly recognized its duty to Fabry patients for the severe and ongoing damages that its own licensee is causing to Mt. Sinai patients, the State of New

York, and the American public, but has not taken action consistent with its recognition of this duty.

### III) HHS Delegates Absolute and Un-reviewable Authority to Control Interstate Commerce of Prescription Drugs During Drug Shortages

202. The issue of federally regulated manufacturers causing critical supply chain interruptions in interstate commerce is not a new problem.  In fact, the Executive Branch of the Government has historically dealt with such problems in the Department of Defense "DoD".

203. Specifically, the DoD will make or have made any product that is necessary for protecting the public interest and the national security.

204. Indeed, the DoD protects supply chains for life-saving drugs such as antibiotics from shortage just as the HHS should be doing.

205. To protect supply chains, the DoD grants licenses only when a second source is provided to protect the supply chain.

206. To protect supply chains where there is not enough profit to sustain a competitive market, the DoD directly contracts to manufacture the product.

207. To protect supply chains, the DoD will pay patent licenses fees to have products manufactured, so private property rights do not interrupt the supply chain.

208. Indeed, in some instances, the DoD actually owns the patents to products and does not need to pay patent fees, much as the HHS owns the patents to Bayh-Dole and Orphan Drug inventions—inventions obtained through public funding—and would not need to pay license fees to have such drugs manufactured.

209.  Where prescriptions drugs are in the public domain (e.g., generic), there is no property right impeding the HHS from hiring contractors to supply the drug.

210.  Indeed, the HHS already spends hundreds of millions of dollars to contract for the manufacture of vaccines to protect the public health from pandemics.

211.  In June 2007, HHS awarded two cost-reimbursable contracts totaling $132.5 million to expand domestic pandemic vaccine manufacturing capacity by 16 percent.

212.  In January 2009, HHS awarded a $487 million contract to build a U.S. manufacturing facility for cell-based influenza vaccine.

213.  However, the HHS does not contract to manufacture drugs during shortages despite the immediate, grave injuries and deaths being caused to U.S. citizens.  Ironically, FDA drug shortage victims may not even survive long enough to be protected by the HHS-contracted vaccine stockpiles.

214.  Nevertheless, despite a long history of success in supply chain logistics by the DoD, the HHS does not exercise any authority over supply chains interruptions affecting interstate commerce even though it has the same powers as the DoD, including a Congressional mandate granting the HHS power regulate the interstate prescription drug supply on behalf of the national welfare, health and security, as well as sovereign immunity from suit, *Chevron* deference, the right to exclude unreliable or negligent manufacturers from the market under the FDCA and in many cases actually owning the actual property rights to the product under the Bayh-Dole act.

215.  The inaction and willful refusal to exercise Congressional granted property rights during a drug shortage has never been explained or even addressed by HHS.

216. Indeed, no regulations have ever been promulgated by the NIH under the Bayh-Dole act or the FDA under the Orphan Drug Act to address when government retained property rights should be used, such as in an interstate drug shortage, thus evidencing a clear intent by these agencies to avoid enforcing such Governmental rights.

217. Similarly, the HHS has failed to acknowledge any duty to regulate its licensees' discrimination programs for interstate access among the individual sovereign states for prescription drugs.

218. The HHS has never suggested that due process, an appeals process or even oversight should attach for FDA licensees' denial of prescription drug access to the states and the citizens that the states protect.

219. The HHS has knowingly and willingly placed total control of interstate commerce of prescription drugs under the absolute and unreviewable authority of private companies holding FDA licensees, despite such companies having acted with willful indifference to human lives by creating drug shortages in interstate commerce in the first place.

## IV) The Fabrazyme Shortage

### A.  Introduction

220.  Fabry Disease is a heritable genetic illness and results in the body being unable to synthesize the enzyme alpha-galactosidase A, which is critical for the degradation and export of fats from cells.

221.  Fabry Disease is a life-threatening illness and without treatment results in the premature

death of Fabry patients from complications such as renal disease, heart attack, and stroke.

222.  Left untreated, Branton *et al.*, "Natural History and Treatment of Renal Involvement in Fabry Disease;" J. Am. Soc. Nephrol. 13:S139-S143 (2002) found from survival analysis that 50% of patients developed End Stage Renal Disease "ESRD" by 53 years, with a range of 21 to 56 years.  Importantly, all patients in this National Institute of Health ("NIH") study who lived into their 50s developed ESRD.

223.  While no cure for Fabry Disease is yet available, one of the greatest breakthroughs in scientific research on Fabry Disease has been the discovery that enzyme replacement therapy with agalsidase beta (Fabrazyme) can effectively treat Fabry patients.

224.  Specifically, the NIH awarded grant no. DK 34045 to Dr. Robert J. Desnick at the Mount Sinai School of Medicine of New York University to develop Fabrazyme as an enzyme replacement therapy to treat Fabry Disease.

225.  Mt. Sinai was granted U.S. Patent No. 5,356,804 to a method of producing agalsidase beta subject to the requirements and obligations of 35 U.S.C. §§ 200-212, commonly known as the Bayh-Dole Act.

226.  Mt. Sinai licensed U.S. Patent No. 5,356,804 for the manufacture of agalsidase beta (Fabrazyme) to Genzyme Corporation, which is the sole supplier of the drug to the U.S. marketplace.

227.  In April 2003, the FDA granted approval for Genzyme to market Fabrazyme for intravenous infusion for treatment of Fabry patients.

228.  From the date of approval until approximately June 2009, Genzyme was able to manufacture

46

enough Fabrazyme to treat all currently diagnosed Fabry patients in the U.S.

229.  No other enzyme replacement therapy is approved in the U.S., although a slightly different molecule, designated agalsidase-alfa (Shire Corporation's Replagal®) is marketed overseas for treatment of Fabry Disease.

230.  Genzyme and Mt. Sinai currently hold over 95% market share over Fabry disease enzyme replacement therapy in the United States.

231.  Sometime before June 2009, Genzyme decreased production of Fabrazyme as a result of a viral contamination in their Allston Landing, MA manufacturing plant.

232.  As a result of the contamination, Fabry patients were injected intravenously with Vesivirus 2117, a rodent virus.[16]

233.  Genzyme caused the viral contamination of Fabrazyme by failing to clean and sterilize their bioreactors between production batches, and thus introduced the virus by cross-contamination.

234.  Specifically, Genzyme would use the same bioreactors to produce both Fabrazyme and a different biological drug, Cerezyme, which is used to treat Gaucher disease.

235.  The Cerezyme production batches were initially contaminated with Vesivirus 2117, resulting in a shortage of Cerezyme, which is still ongoing as of this filing.

236.  Genzyme then cross-contaminated Fabrazyme cultures by failing to properly clean and sterilize the bioreactors before switching it for Fabrazyme production leading to a shortage of Fabrazyme.

---

[16] Vesivirus 2117 has been isolated from biologics manufacturing processes employing Chinese hamster cell substrates on a number of occasions, the first being reported in 2003.  Oehmig et al., J. Gen. Virol. 84, 2837-2845, (2003).

237.  The Allston Landing facility producing Fabrazyme was the subject of a FDA warning letter that followed an inspection in September and October of 2008.  One of the FDA's concerns was controls to protect against microbial contamination.[17]

238.  Genzyme additionally shifted capital away from production and maintenance of Fabrazyme stocks to enter a new biologics market, leading to foreseeable insufficient capacity and inventory to mitigate any shortages it would encounter, despite the FDA warning.

239.  The FDA approval of Fabrazyme is based on a recommended prescribed dose of 1 mg/kg body weight infused every two weeks as an intravenous (IV) infusion.  *See,* FDA approved package insert, attached hereto and incorporated herein as Exhibit E.

240.  In June 2009, as a direct result of its reduced production of Fabrazyme, Genzyme implemented a plan for selling its reduced supply of Fabrazyme to known Fabry patients at the time, wherein Genzyme diluted the effective dose for known Fabry patients to only less than one-third (1/3) of the FDA-recommended dose.

241.  As part of the Genzyme drug dilution program, Genzyme also unilaterally exercised its FDA license and its federally licensed monopoly power to bar any newly diagnosed patients from

---

[17] Genzyme has also created concurrent shortages for Cerezyme infusions used to treat Gaucher disease and Thyrogen infusions used to treat cancer-related hypothryroidism. Thyrogen, like Fabrazyme, was developed using U.S. taxpayer funding and the government owns rights to the drug under the Bayh-Dole act; however, Thyrogen patients have not retained counsel or otherwise petitioned the FDA and NIH for being discriminated against for access in interstate commerce.  The NIH does not report or investigate shortages of Bayh-Dole inventions unless petitioned.

receiving Fabrazyme.

242. Physicians only prescribe the recommended dose of 1mg/kg of Fabrazyme infused every two weeks for their patients, in accordance with FDA recommendations and the sole approved use of Fabrazyme.

243. Indeed, in a letter to Plaintiff Mr. Carik on July 17, 2009, his treating physician explicitly opposed Genzyme's drug dilution plan, stating to patients and Genzyme that "It is my firm understanding that treatment with enzyme replacement medications [Cerezyme and Fabrazyme] are only beneficial at doses studied.  Any less than recommended, the dosing results in inadequate therapeutic treatment." *See,* Physician Letter to Patients, attached hereto and incorporated herein as Exhibit F.

244. However, when the shortage began, Genzyme decided to refuse to honor U.S. doctors' prescriptions for full doses of Fabrazyme for U.S. citizens.

245. In contrast, Genzyme honors overseas prescriptions full doses, despite U.S. taxpayers funding the scientific research for the patent on Fabrazyme.

246. Whether by reduction of mass weight, reduction of frequency of dosing, or both, the pharmacological effectiveness of Fabrazyme is negated by reducing the given dose below the FDA recommended 1mg/kg, or by reducing the dosage frequency by less that the FDA recommended every two weeks, or reducing both below FDA recommendations in combination.

247. Genzyme distributed Fabrazyme for over two years with an FDA-approved label requiring 1mg/kg every two weeks even though its allocation policy made it is impossible to administer

the drug in compliance with the FDA-approved label.

248. The Food, Drug and Cosmetic Act prohibits the introduction or delivery for introduction into interstate commerce prescription drug that has not been approved FDA. 21 USC §§ 331(d), 355(a); 42 U.S.C. § 262(a).

249. The FDCA also prohibits the introduction or delivery for introduction into interstate commerce of any drug or biologic that is "misbranded." 21 USC §§ 331(a), 352; 42 U.S.C. § 262(j).

250. The FDCA authorizes United States District Courts to restrain violations of the FDCA's "new drug" or "misbranding" requirements.   Violations of the FDCA's "new drug" or "misbranding" requirements are also a criminal offense. 21 USC §§ 333(a), 355(a); 42 U.S.C. § 262(f).

251. The FDA suspended enforcement of the above FDCA provisions when it placed Genzyme under a consent decree.

252. Indeed, the FDA tacitly granted Genzyme absolute authority to veto sovereign states' request for access, authority to dilute medication ad hoc for U.S. patients, and the ability to discriminate among the citizens of the sovereign states for interstate access to the prescription drug supply of Fabrazyme.

253. With the FDA's consent, Genzyme was allowed to violate all of the FDCA regulations prohibiting interstate introduction of diluted and untested doses of drugs as well as introduction of drugs having label that is inconsistent with its intended use.

254. Thus, to promote a "greater" good, the FDCA provisions were suspended for Genzyme

during the Fabrazyme shortage.

255. As a result, the FDA granted Genzyme the power to dilute prescription medication to untested doses far below FDA-approved levels, contrary to the express provisions of the FDA license, the FDCA, the health needs of the citizens of the sovereign states, and overwhelming medical evidence of the danger of diluted dosing.

256. The FDA has also granted Genzyme the power to veto doctors' prescriptions even though the doctors were acting under authorization of sovereign state police powers.

257. While the FDA has some discretion to make decisions during a drug shortage, its discretion does not allow it or its licensees to veto sovereign states' police powers, especially when such decisions are made in secret, made in clear contravention to sound medical evidence, and made without due process for American citizens that are harmed by such discretionary FDA actions.

258. The FDA continues to grant access to interstate commerce to Genzyme despite the corporation having vetoed U.S. physicians' judgment in all 50 U.S. states for years.

259. Genzyme has also vetoed all Massachusetts's doctors' prescriptions for Fabrazyme, in favor of shipping the drug out of the Massachusetts for patients overseas.

260. Similarly, Mt. Sinai continues to license the Fabrazyme patent to Genzyme and collect royalties from overseas sales, despite the injurious effect to U.S. citizens of Genzyme's rationing system.

261. Even the patients of the National Institutes of Health are discriminated against to the benefit of European patients via the Genzyme rationing plan favoring non-U.S. patients, with apparent knowledge and consent of the HHS, the FDA and the NIH itself.

### IV) B. Timeline of the Fabrazyme Shortage

262. The Genzyme program of interstate discrimination of access is based, in part, on when a patient first was placed on Fabrazyme.

263. If the U.S. patient was a customer of Genzyme prior to June 2009 (the start of the shortage) then the U.S. Fabry patients were only allowed to receive diluted drug doses, although such diluted doses were never FDA approved or shown to be efficacious or safe.

264. If the U.S. patient was diagnosed after June 2009, then the patient denied treatment and placed on a waiting list.

265. Genzyme diluted the dose for American citizens at one point to only 30% of the FDA-approved and recommended dose.

266. As of this filing, U.S. Fabrazyme patients are currently receiving only 50% doses, but not Europeans who receive full doses.

267. All Fabry patients treated with Fabrazyme have also been forced to skip months of treatment including Fabry patients under the direct care of Mt. Sinai physicians and NIH physicians.

268. Genzyme has banned over 200 Americans from access to treatment for Fabrazyme since the beginning of the shortage and these American are currently ranked by name for access based on Genzyme's waiting list.

269. According to Genzyme, the FDA has been informed of the program diluting and banning drug for Americans, but not Europeans, and, thus, according to Genzyme the FDA has approved the discrimination program against U.S. citizens as well as the use of untested drug

doses in interstate commerce.[18]

270.  Genzyme actually did dilute dosing of Fabrazyme overseas briefly in 2009, but the European Medicines Agency "EMA" found after reviewing the medical evidence that such diluted doses were generally ineffective and in some cases actually accelerated the course of the disease.

271.  The EMA has banned diluted dosing of Fabrazyme except by consent of the patient.

272.  In contrast, the FDA has never publicly acknowledged reviewing any data generated from the diluted dosing program or the findings in Europe, which is consistent with the HHS non-interference policy with regard to its licensees exercising control and authority over interstate and foreign commerce during prescription drug shortages.

273.  When the EMA banned diluted dosing of Fabrazyme in Europe, Genzyme immediately capitulated by providing full doses overseas as choice to switching to the competitors product, Replagal® which is not available in the United States.[19]

274.  Only a "handful" of Europeans now receive diluted doses and only with the consent of the patient and physician.  All other European patients receive Replagal® or full-doses of Fabrazyme. *See,* [European] Fabrazyme Supply FAQs 3 Oct 2011, attached hereto and incorporated herein as Exhibit G.

---

[18] Silverman, "Genzyme Charged With Double Standard By Patients," Pharmalot, May 13, 2011, available at http://www.pharmalot.com/2011/05/genzyme-charged-with-double-standard-by-patients/ where a Genzyme spokeswoman stated that "We keep the FDA informed of our guidance [regarding drug allocation]."

[19] Replagal® is manufactured by Shire Corporation, but is not authorized for use in the US by the FDA.  It is however, manufactured in Massachusetts although Massachusetts citizens cannot legally be given the drug.

275. To create an ostensible medical justification for its drug dilution plan, Genzyme organized and underwrote a meeting termed the U.S. Fabrazyme Stakeholder's Working Group "FSWG" on September 23, 2009.

276. The document produced from the meeting is titled: Revised Guidance to the U.S. Fabry Community: Management of Fabrazyme (agalsidase beta for injection) Supply, hereinafter termed the "Revised Guidance Document," attached hereto and incorporated herein as Exhibit H.

277. The members of FSWG included Genzyme Employees and Institutional representatives from the University of Iowa Hospitals and Clinics, Columbia University Medical Center, Children's Memorial Hospital, Baylor College of Medicine, Cincinnati Children's Hospital Medical Center, University of Minnesota, Duke University Health Center, University of Washington, Massachusetts General Hospital, University of Alabama at Birmingham, Cedars-Sinai Medical Center, the National Fabry Disease Foundation, and the Fabry Support and Information Group.

278. The FSWG members all have received and continue to receive compensation in some form by Genzyme, such as grants, honoraria, and donations.

279. The institutional representatives attending the Genzyme meeting approved the Genzyme denial of access program in the United States and were aware that the program would be administered by Genzyme using private medical records of the doctors' own patients including the genetic tests of Fabry patients.

280. It is unknown to what extent the attending representatives informed their institutions or the individual states in which they are licensed to practice medicine that the FSWG "guidelines"

for denial of medical treatment would adversely affect the Fabry patients under the care of such institutions and states.

281. In any event, U.S. institutions treating Fabry patients during the shortage have received substantial sums from Genzyme. For example, in 2010 during the shortage, Genzyme paid the University of Minnesota nearly $150,000. [20]

282. The same year as the grant payment, Genzyme was banning University of Minnesota patients from access to full FDA-approved doses of Fabrazyme.

283. No attendee or institution has withdrawn support for the FSWG program for which Genzyme blames for the discriminatory treatment of Americans over Europeans.[21]

284. Indeed, Genzyme used its FSWG meeting to promote adoption of the plan by non-attending physicians as acknowledged in Executive Summary – 2009 Business Plan presented by Genzyme employee Jeanne Penn's slide presentation on August 18, 2009, wherein Genzyme stated that "in consultation with key stakeholders, we [Genzyme] worked to develop Cerezyme and Fabrazyme dose conservation guidelines."

---

[20] C. Snowbeck, "U. Mayo cultivate close ties to drug firms" 12/26/2011 available at http://www.twincities.com/ci_19622850#.Tvn9yoMhTqM.email.

[21] Specifically, Genzyme stated on October 3, 2011 that: "In the European Union, regulatory authorities recommend that patients be treated at a full dose or switched to an alternative product [in 2010]." "Currently there are a handful of [consenting] European patients who are on a reduced dose of Fabrazyme. In the USA, where no other approved treatment for Fabry disease is currently available, the FSWG (Fabry Stakeholders Working Group) recommended [in 2009] that no group of Fabry patients [in the US] should be designated to receive full dose, as this would require a significant further reduction in dose or no treatment at all for other US patients treated with Fabrazyme." Exhibit G, *supra.*

285.  In the presentation of August 18, 2009, Genzyme also reported that "[i]nitial adoption of the Fabrazyme Stakeholders Working Group (FSWG) guidelines appears to be strong" and that "those in the Fabry community that have adopted the FSWG guidelines should be encouraged to continue to do so."  Moreover, "[t]hose in the community that have not yet adopted the FSWG guidelines are encouraged to consider doing so."

286.  The August 18, 2009 presentation also stated that Genzyme will "try to ensure equity on a global basis so that no one country is contributing disproportionately compared to others." (Emphasis added).

287.  Although asserting legal principles of equity, Genzyme still preferentially provided full access to Fabrazyme to foreign nations, while denying such equity of access to the U.S. states.

288.  Indeed, Genzyme excluded other important stakeholders from being involved in the FSWG such as the Department of Health and Human Services, the Food and Drug Administration, the National Institute of Health, independent non-compensated medical experts, state and federally funded institutions acting under a duty of care to treat Fabry patients that it treated, state governments, and individual Fabry patients or their legal representatives.

289.  Genzyme's denial of access program vetted by the Fabry Stakeholders Working Group was limited to only financial "stakeholders" with Genzyme.

290.  On October 23, 2009, the CEO of Genzyme at the time, Henri Termeer published a personal apology to Fabry patients admitting that Genzyme "strained its existing capacity" and that "our inventory of enzyme fell to suboptimal levels, leaving us [Genzyme] unable to meet the full demand."  Termeer Letter to Patients October 2009 attached hereto and incorporated herein as

Exhibit I.

291. In November 2009, Genzyme, under the direction of Henri Termeer, introduced into interstate commerce further adulterated Fabrazyme lots which contained particulate steel, glass and rubber.

292. Fabrazyme and Cerezyme patients are now required to use a filter on the infusion line to protect against injection of particulates.

293. On February 17, 2010, Genzyme reported to European Physicians that "All patients, especially those with adjusted dose regimes should be under close clinical surveillance.  A medical examination, including all relevant clinical parameters, should be performed every two months.  It is of the utmost importance to monitor plasma [globotriaosylceramide] GL-3 or urinary GL-3 levels, as for the moment the GL-3 level is the most sensitive parameter. Patients who demonstrate a deterioration of disease should reinitiate the original treatment with Fabrazyme." (Emphasis added). *See* [European] Healthcare Professional Communication (February 17, 2010), attached hereto and incorporated herein as Exhibit J.

294. On April 22, 2010, Genzyme stated that European "physicians are advised to reinitiate the treatment with the original dosing regime or initiate a treatment with alternative approved medicinal product" for those experiencing "aggravation of disease symptoms and/or adverse events ascribed to the lowered dose of Fabrazyme." (Emphasis added). *See* [European] Direct Healthcare Professional Communication (April 22, 2010), attached hereto and incorporated herein as Exhibit K.

295. On May 24, 2010, Genzyme signed a consent decree with the FDA, which included a $175

million dollar fine and oversight of the manufacture of Fabrazyme for at least seven years.

296. However, under the consent decree, Genzyme was allowed to continue to dilute drug doses below the full FDA-approved dose for use in interstate commerce, but send full doses to patients outside of the U.S.

297. Genzyme's FSWG meeting was convened <u>before</u> any medical evidence on the effects of the shortage had been collected. (Emphasis added).

298. Indeed it was only after the EMA study was published that European physicians were able to make an informed decision as to whether to continue diluted dosing.

299. Genzyme, however, did not convene a second FSWG meeting to review the evidence on which the EMA used to mandate full-doses.

300. Indeed, it was critical to Genzyme's profit retention strategy to limit physician information in the U.S. as much as possible so that the drug dilution program could continue, despite evidence that diluted doses had been found to be medically dangerous.

301. As a result of the selective timing of FSWG and a failure to convene a second meeting once medical evidence became available, Genzyme, now a Sanofi Company, disingenuously explained that "physicians are managing the limited supply of Fabrazyme in Europe differently than in other markets like the US. In the US, Genzyme worked closely with the Fabrazyme Stakeholders Working Group (consisting of Fabry medical experts, patient organization leaders and Genzyme representatives [all financially compensated by Genzyme, *supra*] ) to determine how to best use the available product in the U.S. [before the medical studies became available] and our communications to the US Fabry community reflected those discussions. <u>We keep the</u>

FDA informed of our guidance."[22] (Emphasis added because such a statement evidences that Genzyme has FDA approval for the dilution of the US supply of Fabrazyme).

302. Genzyme's explanation avoids mentioning that the FSWG was never given an opportunity to review the medical evidence on which "physicians are managing the limited supply of Fabrazyme in Europe."

303. Genzyme, a Sanofi Company, never reconvened the FSWG to see if the medical treatment guidelines should be revised for U.S. patients in light of the EMA's medical findings

304. The FDA has never reviewed any data as to whether giving diluted doses of Fabrazyme is dangerous.

305. Indeed, the FDA under its consent decree, continued to allow Genzyme (and now Genzyme, a Sanofi Company) to provide diluted doses to Americans despite clear medical evidence that such dosing was dangerous.

306. Ineffective dosing by intravenous infusion is medically dangerous because patients risk a potentially lethal infusion reaction every time they are treated. If patients do not obtain the medical benefit of the infusion, then there is there is no medical reason to risk injury and death by being infused with the drug.

307. It is unknown why the FDA would approve shipping of diluted dosages of drug into interstate commerce in the U.S., while simultaneously approving export of full doses for non-citizens

---

[22] Ed Silverman, Pharmalot, May 13, 2011 available at http://www.pharmalot.com/2011/05/genzyme-charged-with-double-standard-by-patients/. Notably, Genzyme, a Sanofi Company, does not provide data on the health effects of its diluted dosing program in the U.S.

especially when diluted doses were found to be too dangerous for use overseas.

308. The Genzyme drug dilution program has never been formally FDA approved nor recommended by any medical authority. Indeed, dilution of drugs below FDA approved doses for administration to humans may violate certain state civil and criminal codes.

309. On July 5, 2010, Genzyme reported to European Physicians that "in situations where alternative treatment is not available or where (continuation of) medical treatment with Fabrazyme is deemed medically necessary it is important to note that an increase in clinical manifestations indicative of Fabry disease progression has been observed on lowered dose." *See* [European] Direct Healthcare Professional Communication (July 5, 2010), attached hereto and incorporated herein as Exhibit L.

310. In August 2010 based on the medical evidence of the dangers of diluted dosing, Plaintiffs Joseph Carik and others requested that the NIH exercise its march-in rights under the Bayh-Dole Act to allow other manufacturers to enter the market to make Fabrazyme under U.S. Patent No. 5,356,804.

311. On October 22, 2010, the EMA issued a press release stating that "The [European Medicines Agency's Committee for Medicinal Products for Human Use] CHMP is now recommending that physicians switch back to prescribing the full dose of Fabrazyme according to the authorised product information, depending on the availability of enzyme replacement therapy and the severity of the disease." *See* [European] Direct Healthcare Professional Communication (July 5, 2010), attached hereto and incorporated herein as Exhibit M.

312. The EMA's recommendation was based on the observation "that since the introduction of a

lower dose of Fabrazyme in June 2009, there has been a steady increase in the number of

reported adverse events, matching the increase in the number of patients on the lower dose. At

first, most of the events were pain-related, soon followed by reports of events affecting the

heart, the central nervous system and the kidneys." *Id.*

313. On November 16, 2010, the EMA published a statistical study on the Fabrazyme supply

shortage in Europe, which showed that patients not only had a return of life threatening

symptoms but also an <u>accelerated</u> course of deterioration on the lowered dose. *See* EMA

Assessment Report, Exhibit B, *supra.*

314. The EMA found that "In the early stages of the shortage the main increases in AEs [adverse

events] were related to pain/paresthesia events, while later on in the shortage period, the main

increases were in serious cardiac events such as myocardial infarction, in serious nervous

disorders such as stroke, and – possibly to a lesser extent – in renal disorders. There have been

consistent reports of a higher percentage of patients reporting peripheral pain, abdominal pain

and diarrhoea on a daily basis after 25 June 2009 (start of the shortage)." *Id.*

315. The EMA reported that "**This pattern of adverse events** [from diluted dosing] **resembles**

**the natural, but accelerated, course of Fabry's disease**." (Bolding in original) *Id.*

316. Genzyme participated in the EMA study as part of its administration of the "Fabry Registry,"

a database collecting information on all Fabry patients, and Genzyme was aware of the EMA's

results and was in communication with the NIH at the time.

317. Neither Genzyme nor its parent company, Sanofi-Aventis, has informed the individual states,

U.S. doctors or patients of the results of the EMA study or offered full doses in accordance

with the medical evidence.

318. The FDA became aware of Genzyme's medically dangerous drug dilution program and approved it for use on U.S. citizens by knowingly allowing the program to continue under the FDA consent decree. Indeed, the FDA had final approval on the shipping release of diluted and untested drug, but approved release anyway.

319. The FDA did not review or otherwise study any health effects of diluted dosing that had been reported during shortage, despite such medical information being critical for the sovereign states and their agents to exercise state police power to protect the public health of its citizens.

320. Despite protests from U.S. doctors made as early as July 2009 coupled with an FDA consent decree and supporting medical evidence of the dangers of diluting Fabrazyme and an admission by Genzyme that diluted dosing should be discontinued in Europe, Genzyme continued to exercise its FDA license and its grant of monopoly power from Mt. Sinai to veto state authorized prescriptions.

321. Indeed on December 1, 2010, Defendant Collins, Director of the NIH, which holds a non-exclusive license to the Fabrazyme patent, refused patients' petition to open the license for Fabrazyme to be made by other contractors despite there being a critical shortage due to negligent manufacturing practices, an imminent threat of future shortages and despite being expressly granted the power to license such manufacturing under the Bayh-Dole act.[23]

322. It is unknown why the NIH would deny U.S. patients access to drugs made by second sources during a drug shortage, especially when the NIH's own patients are being discriminated against

and suffering unnecessary injury and death from the NIH's refusal to license Fabrazyme for use by NIH patients.

323. The NIH continues to advertise weekly for new Bayh-Dole inventions that are available to license despite the flagrant and ongoing misuse and non-use of the inventions that are currently licensed such as Fabrazyme and Thyrogen.

324. The medical value of whether to allow other manufacturers besides Genzyme to make Fabrazyme is still being considered by Defendant Collins more that one and one-half years later (as of the date of this filing).

325. Indeed, if a second source of Fabrazyme had been contracted under Bayh-Dole march-in rights immediately when the shortage began in June 2009, such second manufacturer would likely have completed or be close to completing the regulatory approval needed to mitigate the current shortage, which is not expected (even optimistically) to be over until the second half of 2012, if ever.

326. It is notable that Genzyme provided information that was, at minimum (and in hindsight), misleading to the NIH on which Defendant Collins relied in his decision.

327. Genzyme told the NIH that it was working with physicians, regulatory authorities and patient groups to <u>minimize</u> the impact of the shortage on the health of Fabry patients.[24] (Emphasis added).

328. Genzyme did not disclose that it had decided to "minimize" the impact of the shortage more

---

[23] NIH, December 1, 2010, "Determination In the Case of Fabrazyme Manufactured by Genzyme Corporation"

[24] *Id.*

in Europe than in America.

329. Providing full doses to Europeans while denying access to Americans cannot be considered equitable distribution to all regions; however, Genzyme has proffered a bizarre and (at minimum) misleading definition of "equity".

330. Genzyme has explained that "equitable" distribution means that Genzyme would increase the dose of Europeans based on the EMA study but not in America based on the Fabry Stakeholders Working Group meeting convened by Genzyme prior to the release of the EMA study.

331. Indeed, Genzyme's misleading use of the term "equitable" when communicating with the NIH was intended to hide the fact that Americans would be placed at higher risk of suffering and dying than Europeans carrying the same genetic mutation and suffering from the same disease.

332. When it acquired Genzyme, Sanofi-Aventis never disclosed to the NIH that its definition of "equitable" resulted in Americans preferentially dying and suffering over patients in other nations.

333. Indeed, Sanofi-Aventis expressly adopted Genzyme's Fabrazyme allocation system leading to the preferential death and suffering of Americans during the shortage.

334. Genzyme had similarly misled the NIH by stating that it would restore the supply of Fabrazyme in the 1st half of 2011.

335. Genzyme has made at least nine illusory promises regarding when the Fabrazyme shortage

would end.[25]

---

[25] June 24, 2009:  "The company currently expects the period of shortage for Cerezyme and Fabrazyme to last approximately 6-8 weeks. This period is expected to begin in August for Cerezyme and in October for Fabrazyme."

July 22, 2009:  "Genzyme has now completed the sanitization of the Allston facility and is on-track to resume production of both drugs there this month.  Genzyme expects new Cerezyme and Fabrazyme supply from Allston by the end of the year."

October 21, 2009:  "Genzyme has completed the first production cycles for Fabrazyme, is preparing to begin the next, and anticipates that the first shipments of new Fabrazyme will take place in late-December. The company expects that it will be able to fully meet anticipated demand for these therapies in the first quarter of 2010."

February 22, 2010: "[W]e have not achieved the expected Fabrazyme inventory level needed to support our goal of meeting 70% of global demand in April. We have taken steps to increase and stabilize the production of Fabrazyme and if these efforts are successful, we anticipate that we will be able to increase Fabrazyme availability to patients for the second half of 2010."

April 21, 2010:  "Genzyme has made progress in increasing the productivity of the Fabrazyme manufacturing process. The first run of a new working cell bank (WCB) resulted in a 30 percent increase in productivity, and a second run is underway. Genzyme's goal is to increase productivity an additional 30 percent.  Genzyme estimates that it will need to continue the 30 percent shipping allocation through the third quarter."

July 21, 2010:  "We do expect that supply will change in a meaningful way by the end of September, and in the October through December 2010 time period additional supply will be available to support increases in Fabrazyme dose or infusion frequency."

December 1, 2010:  "Genzyme has expressed its commitment to provide a full supply of Fabrazyme® in the first half of 2011."

March 25, 2011: "[w]e want to assure you that we are still on track to return to normal supply of Fabrazyme in the second half of 2011 with the expected approval of our new manufacturing facility in Framingham, Massachusetts"

336.  Despite the NIH reliance on Genzyme's' seventh illusory promise for an end date to the shortage, Sanofi-Aventis' was skeptical of Genzyme.

337.  In Sanofi-Aventis' press release of intent to acquire of Genzyme in March 2011 (the 1st half of 2011), Sanofi-Aventis created contingent value rights "CVR" to stockholders based on Genzyme's ability to restore the supply according to its promises.  The CVR would only be paid if Genzyme could hit wildly optimistic production quotas.

338.  Although Sanofi-Aventis completed its purchase of Genzyme, it never paid the CVR since Genzyme could not, as expected by Sanofi-Aventis, fulfill its promise to restore the supply of Fabrazyme.

339.  Sanofi-Aventis has never publicly disclosed the basis for its disbelief in Genzyme's promises although once it acquired Genzyme it assumed an ongoing duty to report to the NIH and FDA.

340.  On January 3, 2011, Genzyme announced in a Securities and Exchange Commission filing that it entered into a fill and finish manufacturing services deal with Hospira, for Cerezyme (Gaucher disease), Fabrazyme (Fabry disease), Myozyme (Pompe disease) and Thyrogen (thryroid cancer).

341.  Hospira leads the list of current drug shortages in the U.S. reporting at least thirty three

---

July 28, 2011: "The Framingham plant is undergoing validation and our current expectation is that we will begin to be able to supply Fabrazyme produced at the plant to patients in the first quarter of 2012."

December 15, 2011: Genzyme is on track to resume full Fabrazyme deliveries in the second half of 2012.

concurrent shortages, more than any other manufacturer.[26]

342.  On January 19, 2011 Plaintiff Joseph Carik and others submitted a Citizen Petition to the

FDA informing the agency of discriminatory allocation of drug out of interstate commerce into

overseas markets and requested access to full FDA-approved doses of Fabrazyme like patient

in Europe.

343.  As in the NIH re-hearing petition, the Plaintiffs expressed concerns to the FDA over a lack of

hearing or other due process before the drug was denied to them in favor of Europeans.

344.  While the FDA replied within the six months required under the statute, the FDA merely

stated that the issues were "complex" and required more time to analyze.  No information was

provided as to when a decision would be rendered.

345.  The Citizen Petition is still pending with the FDA over one year after the agency was notified

that its own licensee is discriminating against the individual states and their citizens such that

Americans are more likely to be harmed to favor jurisdictions outside of interstate commerce

where alternative treatment is available.

346.  The delay is inexplicable since Genzyme clearly violated the FDCA and full doses of

Fabrazyme are medically required.

347.  However, the HHS non-intervention and delegation policy regarding drug shortages would be

evidenced by intentional agency delay of review so as to moot the NIH rehearing request and

-------

[26] As calculated from the FDA drug shortages website on December 3, 2011.  *See*

http://www.fda.gov/Drugs/DrugSafety/DrugShortages/ucm050792.htm. Hospira, like Genzyme, has received multiple

warnings regarding manufacturing violations as discussed *infra*.

the FDA Citizen Petition.

348.   Whether or not the FDA and NIH decide to respond at this point, the FDA approval for drug dilution of the U.S. supply of Fabrazyme was made extra-judicially and outside of the bounds of congressionally granted authority under the FDCA and Constitutional protections.

349.   Indeed, the FDA has been aware of Genzyme's diluted dosing plan since at least the issuance of the consent decree in May 2010.

350.   The FDA is fully aware that the diluted dosages are not in comportment with the previously FDA approved recommendations present in the labeling insert for Fabrazyme.

351.   It is illegal at the federal and state level to sell drugs into interstate commerce where the labeled indication does not reflect how the drug will be used, particularly where the dose to be administered is below the recommended amount or frequency.

352.   On March 10, 2011, injured U.S. Fabry patients holding valid but vetoed state-authorized prescriptions, filed suit against Genzyme Corporation and Mt. Sinai hospital praying for relief of the court for damages caused by the actions of Genzyme and Mt. Sinai.  Case number 1:11-cv-10739-DPW, *Hochendoner et al. v. Genzyme Corporation et al.* (United States District Court of the District of Massachusetts)

353.   The case is currently pending transfer from the District of Massachusetts to the Southern District of New York.

354.   On March 25, 2011, Genzyme announced that it had destroyed yet another lot of defective Fabrazyme, leading to another shortage in which American patients were not allowed infusions for the months of May and June of 2011.

68

355. Genzyme also announced it was reallocating limited stocks away from U.S. patients in favor of overseas patients, so as to provide full dose treatment to Europeans, despite overseas patients having access to the alternative treatment, Replagal®.

356. Genzyme's letter to U.S. patients stated that the reason for the reallocation away from the U.S. sovereign states and its citizens was to "to help share the impact of this loss," when in fact only U.S. citizens actually felt the impact of the "loss" by receiving even more diluted doses while overseas patients received their full doses.  See, Genzyme letter to patients, March 25, 2011 attached hereto and incorporated herein as Exhibit N.

357. Genzyme uses its government granted monopoly to maintain a "general pool" of Fabrazyme from which it makes allocation decisions.

358. Genzyme uses the "general pool" as a reserve inventory for overseas patients so that Europeans are protected from supply disruptions, as occurred on March 25, 2011 where doses were allocated away from the general reserve (including U.S. children) to maintain full doses for Europeans.

359. On April 8, 2011, the foreign national company, Sanofi-Aventis purchased Genzyme.

360. Sanofi-Aventis paid Henri Termeer approximately $158 million dollars upon his exit.

361. Sanofi-Aventis, under the direction of Chris Viehbacher (also a foreign national) adopted the Genzyme discrimination system against the U.S. states and its citizens for prescription drug access because the program reduced competition in overseas markets.

362. Indeed, Chris Viehbacher, as director of Sanofi-Aventis, did not withdraw Genzyme's patent infringement suits against Shire Corporation when it acquired Genzyme, even though Shire is

the only supplier of an alternative medication capable of mitigating the Fabrazyme shortage.

363. On April 5th, 2011, Plaintiff Carik and others requested rehearing for the march-in petition consistent with the NIH promise to re-review the case if the market supply was not being diligently restored, expressing further concerns regarding due process issues related to the Genzyme discrimination, the drug dilution program, and potential conflicts of interest. The case is still pending.

364. On July 25, 2011 Genzyme, a Sanofi Company, announced publicly that it would provide doses of Fabrazyme at the diluted dose to Americans for the month of August.

365. However on August 3, 2011, Genzyme, a Sanofi Company, told patients privately that it would not ship any Fabrazyme for the month of August.

366. On August 25, 2011, Genzyme, a Sanofi Company, announced publicly that no drug would be available for Americans during August and apologized for the confusion and inconvenience, and then promised to ship "August" doses in September.

367. Despite such misleading language used to communicate with patients, the medical consequence was that U.S. Fabry patients received no treatment for the month of August, even at diluted dose.

368. The FDA does not review communications to patients by Genzyme, a Sanofi company, regarding the drug shortage.

369. Genzyme, a Sanofi Company, provided full doses of Fabrazyme to non-US markets during the month of August 2011 so the effect of missing doses was only felt in US interstate

commerce.[27]

370. On October 28th, 2011, Shire announced that it had filed for FDA approval to sell Replagal®
in the United States.

371. Three days later on October 31, 2011, Genzyme, a Sanofi Company, announced that U.S.
Fabry patients would now be given access to full FDA-approved doses of Fabrazyme.

372. Despite the brief respite from diluted dosing in November and December of 2011, Genzyme,
a Sanofi Company, re-instituted the diluted dosing program.

373. Ironically, Chris Viebacher, CEO of Sanofi-Aventis, recently touted the medical benefits of
"five-times the dose of enzyme" of Fabrazyme  at the currently banned FDA dose in
comparison to Shire's Replagal®.

374. Indeed, Genzyme promotes the benefits of Fabrazyme being available at "five-times" the
dose despite such promotion violating the express language of the FDA Fabrazyme license
which states "No comparative promotional claim [of Fabrazyme] or claim of superiority over
other products  should be made unless data to support such claims are submitted to and
approved by the Center for Biologics Evaluation and Research." *See*, FDA Fabrazyme
Approval Letter 4/24/2003, Exhibit D, *supra*.

375. No data has ever been submitted to the FDA showing that Fabrazyme is superior to
Replagal® because it was administered intravenously at "five times" the dose or, for that
matter, any data supporting the medical benefit of diluting Fabrazyme below FDA-approved

---

[27] Genzyme, a Sanofi Company, Fabrazyme® (agalsidase beta) Supply Update Frequently Asked Questions
(Europe) October 3, 2011available at http://fabryintnetwork.com/upload/File/Fabrazyme_Supply_FAQ_s_3Oct2011.pdf

levels for treatment of Fabry disease.

### IV) The Aquasol A Shortage

376.     Hospira markets Aquasol A, injectable vitamin A, in the United State under FDA license

no. (NDA) 006823.

377.     Aquasol A is used to treat patients with vitamin A deficiency that cannot absorb the

vitamin in their diet.

378.     FDA license no. (NDA) 006823 is strictly limited to permission to introduce Aquasol A

into interstate commerce to treat vitamin A deficiency.

379.     The FDA license does not permit withdrawal of access to a drug once reliance is induced

by the promise to reliably supply the drug into interstate commerce.

380.     Hospira is currently the only FDA approved manufacturer of injectable vitamin A in the

world.

381.     The FDA is aware that Hospira is the sole supplier for those in medical need of injectable

vitamin A.

382.     Prior to November 2010 Hospira was able to manufacturer enough Aquasol A to meet

market demand under its FDA license.

383.      Sometime before November 2010, Hospira ceased shipping Aquasol A.

384.     Hospira has admitted that the inability to ship Aquasol A was due to a lack of foresight

and inventory retention when it decided switch manufacturing sites without taking adequate

precautions to protect the customers that rely or would rely on Aquasol A for treatment.

385.     Under its FDA license, Hospira had decided to change manufacturing sites but closed

the previous site before bringing the new manufacturing site on line leading to the obviously foreseeable shortage.

386.     Hospira failed to stockpile enough Aquasol A to create a reserve inventory to prevent supply disruptions during the transition between manufacturing sites.

387.     By withdrawing access to Aquasol A, Hospira created a global shortage which led directly to patients' otherwise preventable injuries.

388.     In December 2010, Hospira promised to patients, the FDA, investors, and physicians that it would resume shipping Aquasol A in 2011.

389.     Hospira has failed to meet its promised date of return of supply, and now predicts it will begin shipping at the end of 2012.

390. FDA-licensee Hospira Corporation is, upon information and belief, involved in over thirty-three concurrent interstate drug shortages as of the date of this filing, all occurring under FDA licenses.

391. Hospira is pursuing approval of additional FDA licenses based on the assertion that it is capable of safely and reliably supplying interstate market is such licenses are granted.

392. In April 2011, Plaintiff Mrs. Lacognata was diagnosed with vitamin A deficiency.

393. Because Plaintiff Mrs. Lacognata is unable to absorb vitamin A through her diet, she requires injections of vitamin A to prevent the symptoms of vitamin A deficiency which can cause permanent blindness, susceptibility to infections, and other catastrophic injuries.

394. Vitamin A deficiency has already caused Plaintiff Mrs. Lacognata's eyesight to worsen to the extent that she has lost sight in one eye and is losing sight in the other eye.

395. Without treatment soon, Plaintiff Mrs. Lacognata's loss of sight will be irreversible.

396. Based on her worsening eyesight, her employer, United Airlines, placed Plaintiff Mrs. Lacognata on unpaid medical leave, withdrawing her medical insurance, her wages, and her benefits, although she had worked for United Airlines for decades.

397. In May 2011, Plaintiff Mrs. Lacognata received a Florida-authorized prescription for Aquasol A, which could restore her eyesight and return her to health.

398. When Plaintiff Mrs. Lacognata attempted to fill the state authorized prescription for Aquasol A, she was informed that the pharmacist could not get access.

399. Plaintiff Mrs. Lacognata was informed by her diagnosing physician that she should not waste her money visiting him until the shortage was over because he had no other effective method to treat her.

400. In June 2011, Hospira told Plaintiff Mrs. Lacognata that Aquasol A would be backordered until September 2011.

401. However, in September 2011, Hospira told Plaintiff Mrs. Lacognata that Aquasol A would now be backordered until July 2012.

402. In July 2012, Plaintiff Mrs. Lacognata was then informed by her personally assigned patient representative that Hospira managers had informed patient representatives to quit looking for additional reserves of Aquasol A—nothing was available anywhere in the world.

403. Hospira contacts Plaintiff Mrs. Lacognata monthly, but has been unable to tell her when she will receive access to Aquasol A.

404. Plaintiff Mrs. Lacognata has contacted the FDA regarding the Aquasol A shortage, but the

FDA has told Mrs. Lacognata that it is unable to help her.

405. Hospira has informed Plaintiff Mrs. Lacognata that the repeated delay in access is due to the Hospira corporate officers placing other undisclosed projects ahead of restoring the Aquasol A supply.

406. The FDA is aware of Plaintiff Mrs. Lacognata's deteriorating situation.

407. Indeed, the FDA is aware that Hospira has created a secret waiting list ranking and naming customers for future access to Aquasol A.

408. Plaintiff Mrs. Lacognata, is currently on Hospira's waiting list for access to Aquasol A, although her position on the list is undisclosed.

409. The medical benefit of Aquasol A is diminished or abrogated entirely if the product is not delivered to the patient in a timely and regular manner.

410. FDA licensee Hospira has induced reliance on its ability to continuously supply Aquasol A by promising the FDA, investors, doctors and patients, illusory end dates to the shortage.

411. Upon information and belief, the illusory promises regarding the end of the shortage were made in an attempt to forestall competitors from entering the market as well as placate the FDA.

412. Moreover, the actions of FDA licensee Hospira de-prioritizing the restoration of the Aquasol A supply in order to obtain additional FDA licenses further exacerbated the damages caused by the inadequate measures taken to protect U.S. citizens during the manufacturing shift.

413. Hospira's business strategy to shift resources away from Aquasol A remediation strategies and prioritize new drug sales is evidenced by its most recent investor presentation where

Hospira stated that: "71% of Hospira's Overall $16B … Pipeline Launching Over the Next Five Years." [28]

414. By and through FDA consent, Hospira has de-prioritizing restoring interstate access to Aquasol A and, thus, placed Plaintiff, Ms. Lacognata's life and health in further direct and foreseeable harm.

415. The FDA continues to allow Hospira access to the interstate prescription drug market.

416.      As of this filing, United States citizens still do not receive the FDA approved drug Aquasol A for medically necessary treatment.

## Count I.  Violations of the Doctrine of Separation of Powers

417. The Constitution provides that "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States." U.S. Const., Art. I, § 1. From this language the Court has derived the nondelegation doctrine: that Congress may not constitutionally delegate its legislative power to another branch of Government. "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government." *Mistretta v. United States*, 488 U.S. 361, 371, 109 S.Ct. 647, 654, 102 L.Ed.2d 714 (1989). *Touby v. U.S.* 500 U.S. 160, 165 (1991).

418. By grant of an FDA license and HHS consent, the Executive branch of the government has delegated private corporations the power to collect private personal medical data, promulgate rules of drug rationing based on such individual private medical data, create secret waiting lists discriminating against American based on their medical condition, enforce bans of access to

---

[28] See, HOSPIRA INC - FORM 8-K - EX-99.1 - January 10, 2012.

life saving drugs, and then adjudicate appeals (usually in the form of letters or phone calls begging for treatment) made by individuals for relief from the licensees' action.

419.   These final rules created by FDA licensees regulating interstate access to medications during drug shortages are non-reviewable by the U.S. courts.

420.   As such, the United States Defendants have created rulemaking and judicial entities (i.e., FDA licensees) that operate outside of legislative authority, that conduct secret adjudications outside of judicial authority, and that enforce discriminatory rules affecting interstate commerce as well as veto sovereign states order protecting public health outside of executive authority.

421.   By refusing to withdraw licenses from manufacturers creating drug shortages, the HHS vests tri-partite legislative, judicial, and executive authority in FDA licensees over the lives of U.S. citizens and the police powers of the sovereign states, thereby violating the Doctrine of Separation of Powers under the U.S. Constitution.

## Count II.  Violation of the 10th Amendment of the United States Constitution<br>Reservation of Police Powers to the Individual States

422.   The States have traditionally regulated health and safety matters. *See*, for example, *PLIVA, Inc. v. Mensing*, 131 S.Ct. 2567, 2586 (2011), *citing Medtronic, Inc. v. Lohr* 518 U.S. 470 (1996).

423.   The Supreme Court has held that the grant of a license under the FDCA does not pre-empt state police power. *See, e.g., Wyeth v. Levine*, 555 U.S. 555, (2009).

424.   The Sovereign states additionally regulate the practice of medicine by requiring that only state-licensed physicians prescribe medicines.

425. By and through the consent of the FDA, licensees have modified and vetoed state prescriptions as well as discriminated among individuals and the states in interstate commerce.

426. By vesting FDA licensees with veto powers over state-licensed physicians' prescription during drug shortages, the HHS has abolished a core police power of the States.

427. The United States Defendants' actions violate the 10th Amendment of the U.S. Constitution because State police powers are exclusively reserved to the States and relied upon by Plaintiffs for their health and safety and are not pre-empted by grant of FDA license. *Bond v. United States* 564 U.S. __ (2011).

## Count III. Violation of the Patent Clause of the US Constitution

428. The Patent Clause, Art. I, § 8, cl. 8, of the Constitution states that Congress has the power to "promote the progress of science ... by granting exclusive rights to ...inventors."

429. Accordingly, Congress may only grant patent monopolies to the extent that such patents promote the sciences.

430. Use of a patent monopoly to the detriment of U.S. citizens does not promote the sciences.

431. Indeed, the Constitutionally ratified patent monopoly was only intended to allow inventors to collect monopoly rents in the form of higher prices, not rents that the monopolist can demand at threat of death and injury.

432. However, U.S. patent number 5,356,804 is used not only to collect monopoly rents but also collect "premium prices" from customers.

433. U.S. patent number 5,356,804 to Fabrazyme is currently being used to collect premium prices because the patentee and licensee are using its market control to dilute medication and ban

treatment for U.S. customers but not overseas customers.

434. Since the U.S. government derives its power entirely from the consent of the governed, it is impossible for the government (or its licensees/grantees) to lawfully grant or maintain a patent monopoly that is being used to the detriment of U.S. citizens.

435. U.S. citizens do not consent to being harmed in order to preserve a patent monopoly or "promote" the sciences.

436. The U.S. Constitution should not be construed as granting an inventor the power to bring about harm (intentionally or unintentionally, and directly or indirectly) U.S. citizens by denial of access to the invention.

437. The instant case thus exceeds the Constitutional limitations placed on patent monopolies under the Patent Clause.

438. Indeed, Justice Douglas feared that the U.S. citizens could be caused to die and suffer unnecessarily by a patentee: "[t]ake the case of an invention or discovery which . . . reveals the secrets of a dread disease. Is it possible that a patentee could be permitted to suppress that invention for seventeen years . . . and withhold from humanity the benefits of the cure?" *Special Equip. Co. v. Coe*, 324 U.S. 370, 383 (1945) (Douglas, J., dissenting).

439. The Plaintiffs assert that such a patent policy resulting in death and injury was never intended as part of the Constitution.

440. Indeed, Congress and these courts have long recognized that a patent monopoly is limited in its scope to the revenue collection of monopolistic rent consistent with the scope of the claimed invention, not the ability to collect premium prices.

441. Congress and these courts have always recognized that certain inventions must never be denied to the American public or misused because physical harm would result.

    a. For example, pollution control devices cannot be suppressed under the Clean Air Act.

    b. Use of patented articles and methods by physicians and hospitals to treat patients are exempted from infringement under the Patent Act.

    c. Patents to publicly funded inventions may not be misused or subject to non-use under the Bayh-Dole act.

    d. Indeed, even extension of a patent monopoly to collect rents tied to non-patented products renders the patent invalid under the judicially created doctrine of patent misuse, even though such harms are merely economic, not physical as is the case here.

442. Thus, extension of a patent monopoly to collect rents under the threat of death and physical suffering by withdrawing access to the invention far exceeds any scope of grant by the Patent act, any legislation, or the Patent Clause of the U.S Constitution.

443. As such, U.S. patent number 5,356,804 is invalid or unenforceable as being Unconstitutional because it is being currently exercised to the detriment of U.S. citizens and restrain others from entering the market to mitigate the injuries and deaths caused by the patentee.

444. Strictly in the alternative, Plaintiffs assert that the Bayh-Dole act under which U.S. patent number 5,356,804 was granted should be declared Unconstitutional because the Act as interpreted by the United States Defendants (as well as the United States Defendants' policy) violates the Patent Clause.

445. There is no purpose whatsoever in artificially prolonging a potentially lethal drug shortage until the term of a Bayh-Dole patent expires, especially when the Americans that funded the invention are being injured.

446. One of the express Congressional purposes of the Act is "To protect the public against nonuse or unreasonable use of inventions [funded by taxpayers]...." 35 U.S.C. §200, a mandate that is consonant with the Constitutional purpose of the Patent Clause to "promote the progress of science."

447. However as in the instant case, where a Bayh-Dole contractor exercises a publicly funded patent to threaten judgment of money damages or otherwise uses a Bayh-Dole patent to deter a competitor from mitigating a potentially lethal drug shortage, the Bayh-Dole act (despite its language) allows contractors to prolong drug shortages thereby causing otherwise preventable injuries or death to Americans in direct opposition to promoting "the progress of science" under the Patent Clause.

## Count IV.  Violation of the 5th Amendment

448. The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law . . . ." In numerous decisions, th[e] Court "has held that the Due Process Clause of the Fifth Amendment forbids the Federal Government to deny equal protection of the laws. *E. g., Hampton v. Mow Sun Wong*, 426 U.S. 88, 100, 96 S.Ct. 1895, 1903, 48 L.Ed.2d 495 (1976); *Buckley v. Valeo*, 424 U.S. 1, 93, 96 S.Ct. 612, 670, 46 L.Ed.2d 659 (1976); *Weinberger v. Wiesenfeld*, 420 U.S. 636, 638 n. 2, 95 S.Ct. 1225, 1228, 43 L.Ed.2d 514 (1975); *Bolling v. Sharpe*, 347 U.S. 497, 500, 74 S.Ct. 693, 694, 98 L.Ed. 884 (1954)."

*Vance v. Bradley*, 440 U.S. 93, 95 n. 1, 99 S.Ct. 939, 942, 59 L.Ed.2d 171 (1979)." *Davis v. Passman*.  442 U.S. 228, 233 (1979).

449.  The United States Defendants have vested the power to discriminate for access to medically necessary drugs to its licensees who use private genetic information and private medical information to make such discriminatory decisions.

450.  However, privacy of a person's genetic code and a person's private medical information is a constitutionally protected interest.

451.  The United States Defendants have vested the power to withdraw access to medically necessary drugs, or dilute medications in contravention to physicians' recommendations which has lead to the death and injury of American citizens.

452.  However, the right to medical self-determination is a constitutionally protected interest.

453.  The United States Defendants do not provide substantive or procedural due process for its licensees' acts discriminating for access to medication, acts violating core privacy interests, acts depriving Americans the right to medical self determination, or acts depriving Americans citizens of their life and health.

454.  Indeed, the right to challenge government decisions and delegation of power depriving American citizens of life and health is a constitutionally protected interest.

455.  Therefore, the United States Defendants violate the 5th Amendment right to due process by failing to provide any form of notice, relief or appeals process for its licensees' actions violating core constitutionally protected interests.

## Count V.  Violation of the Food, Drug and Cosmetics Act

456. The Food, Drug and Cosmetic act provides that the power promote public health by regulating interstate commerce for prescription drugs is granted to the FDA.

457. SEC. 903. [21 USC §393] States:

(b) MISSION.—The Administration shall—

(1) promote the public health by promptly … taking appropriate action on the marketing of regulated products in a timely manner;

458. Indeed, the FDA has the power to take any appropriate action within its authority against reckless and irresponsible manufacturers in order to protect public health, including withdrawal of licenses.

459. Even during a shortage, FDA licensees continue to market their products in interstate commerce, maintain their trademark in interstate commerce, publicly announce dates for restoring the regulated product to the patients and the States, create interstate waiting lists for access to the regulated product, and further make promises to the FDA and public investors in the U.S. and throughout the world about the regulated product.

460. Thus, it is contrary to a plain reading of the FDCA that the FDA is powerless over its licensees' actions during an interstate drug shortage.

461. Indeed, once an FDA licensee has violated Federal regulations and foreseeably impeded free access of the states in interstate commerce to a medicine needed to protect the public health, an FDA license is *per se* invalid as the public health is *per se* at risk.

462. To the extent and FDA licensee ever wishes to regain access to the interstate market once it acts recklessly or negligently by creating a drug shortage but subsequently wishes to

communicate with investors, doctors, or patients involved in the market, the FDA holds all authority to regulate these communications, to control interstate shipping decisions, to control all drug-access decision, to control all discriminatory access decision, and to control all other decisions relating to public health until the licensee is allowed to re-enter the market and assure a reliably supply the drug.

463.  In other words, an FDA license is an all or nothing proposition—either the manufacturer supplies the drug without discrimination to the individual states and citizens or it contracts directly with the Federal Government as the sole purchaser for subsequent redistribution to the states.

464.  The alternative of FDA licensees being able to discriminate among the individual states and individual American citizens, especially during a shortage the licensee itself created, violates the FDCA and the Constitution.

465.  However as a practical matter, the HHS has hired only twelve individuals to handle over 230 concurrent drug shortages.

466.  As such, the FDA would incorrectly argue that the invalidation of FDA licenses would only worsen the shortages.

467.  Plaintiffs oppose the HHS interpretation of the FDCA as creating hostage situations where it is preferable to let the irresponsible manufacturer remain in the interstate market than withdraw the license.  It is a simple matter for the FDA to stay review of all future licenses until the licensee has restored the drug supply and provided restitution to the states and the citizens for the damage the shortage caused.

468. If the HHS refuses to withdraw licenses from reckless manufacturers or otherwise argues that the FDCA does not give it the power to exclude irresponsible manufacturers from interstate commerce, then the FDCA is accordingly unconstitutional.

469. Specifically, the HHS would be arguing that the FDCA grants unlimited control over interstate and foreign commerce to FDA licenses when the licensee causes a shortage.

470. Plaintiffs do not necessarily assert that the FDCA is unconstitutional, but rather that the interpretation of the act by the HHS and the FDA are unconstitutional; however, to the extent the court agrees with the HHS interpretation of the FDCA as delegating total and unreviewable power over interstate commerce and public health to private individuals, the Act should be declared unconstitutional, so the Congress may draft proper legislation so as to protect U.S. citizens from drug shortages created by FDA licensees.

## PRAYER FOR RELIEF

The Conduct by the United States Defendants offends core Constitutional protections to be free Government- deprivation of a serious nature affecting the life, limb, and liberty of individual citizens.

Unless enjoined by this Court, the United States Defendants are likely to continue to engage in such conduct.

Failure to grant immediate relief will place the Plaintiffs under direct threat of retaliation by FDA licensees since the United States Defendants have delegated complete control over interstate and international access to medically necessary drugs into the hands of these private individuals. Indeed, if the United States Defendants are not immediately enjoined from granting

or maintaining FDA licenses to private individuals deciding which citizens have preferential access to drug, then the chilling effect will be profound. Without an injunction, no subsequent drug shortage victim would ever dare to challenge the FDA or FDA licensees' actions for fear of potentially lethal and judicially unreviewable retaliation by such FDA licensees withdrawing access to shortage medication or re-ordering secret waiting lists.

The United States Defendants' conduct results in ongoing irreparable harm to the Plaintiffs for which the Plaintiffs have no adequate remedy at law.

Plaintiffs respectfully ask the court to:

a. to the extent that this Court finds that the Food, Drug and Cosmetics Act as interpreted and applied by the FDA delegates to licensees the judicially unreviewable power to create, profit from, discriminate among U.S. citizens, and maintain interstate prescription shortages, declare the Food, Drug, and Cosmetics Act unconstitutional so as to place the control interstate commerce for prescription drugs under the individual states' constitutionally reserved police powers to protect public health;

b. enjoin the United States Defendants from allowing its licensees to retaliate and further discriminate against Plaintiffs by requiring that the drugs in shortage be shipped to a single destination of a special master, a judicially administered trust or other court-appointed authority for subsequent allocation, as necessary, in accordance with the principles of justice and due process to be allocated to the individual Plaintiffs in accordance with their valid state-authorized prescriptions or other public

health guidance, especially until due process measures are emplaced;

c.  enjoin FDA licensees from knowing or inferring the identity of private U.S. citizens, doctors, pharmacies, hospitals and other shipping destinations by requiring the United States Defendants to ship all manufactured drug in shortage to a single destination of a special master, a judicially administered trust or other court-appointed authority for subsequent allocation, as necessary, in accordance with the principles of justice and due process;

d.  enjoin the United States Defendants from allowing any of its licensees or Bayh-Dole patentees to discriminate against, influence, or retaliate against the officers and employees of the Executive Branch, the Legislative Branch and the Judicial Branch of the U.S. Government, including attorneys employed by the Department of Justice and the officers of these courts, by enjoining FDA licensees from withdrawing or threatening to withdraw interstate access of prescription medications to these individuals or their families until conclusion of these proceedings or express approval by this court;

e.  enjoin exportation of FDA regulated drugs in shortage outside the jurisdiction of these Federal courts and outside of interstate commerce until such time as due process procedure are emplaced and until the health and safety of the Plaintiffs and the citizens of the sovereign states is assured;

f.  enjoin FDA licensees from making any public announcement of possible end dates to the shortages thereby promoting future access and sales of these medications under

their FDA license without first vetting such statements with the FDA under the Food, Drug and Cosmetics Act because Plaintiffs, other patients, physicians and state health authorities *de facto* must rely on such information to plan treatment of their patients;

g.   place all further interstate rationing decisions made by the United States Defendants or their licensees under review of the Judicial branch of government until such time as due process procedures are provided by the HHS or other Congressionally approved authority;

h.   enjoin Defendant FDA and Defendant Hamburg from continuing to accept or review new requests for FDA licenses to enter access interstate commerce if they have created interstate drug shortages or discriminated for access to medically necessary FDA regulated drugs;

i.   invalidate FDA licenses where such licenses are exercised by dangerous, negligent, and reckless manufacturers causing drug shortages and otherwise exercised to discriminate against citizens and the individual states;

j.   disgorge from the United States Defendants all fines collected from FDA licensees causing shortages;

k.   disgorge from FDA licensees all profits collected under drug shortages so as to prevent these FDA licensees being unjustly enriched by the premium prices collected from Americans that are forced by Federal law to rely on such licensees, and allocate such disgorgements in a manner that promotes restoring the supply of prescription drugs to the individual states and their citizens;

l. enjoin Defendant HHS, Defendant Sebelius, Defendant FDA, Defendant Hamburg, Defendant NIH, and Defendant Collins from authorizing or otherwise providing grants or other taxpayer funding to institutions, individuals, and contractors that create interstate drug shortages and/or collect premium prices in the form of profits and royalties extracted from the dying and injured victims of Bayh-Dole inventions' being misused and non-used, including, but not limited to Defendant Mt. Sinai;

m. declare invalid or unenforceable U.S. patent number 5,356,804, or, in the alternative declare the Bayh-Dole act unconstitutional;

n. grant Plaintiff attorneys' fees and costs; and

o. grant such other and further relief as the court deems necessary.


Respectfully submitted,

Thomas M. Dunlap, Esq. (D.C. Bar No. 471319)
DUNLAP, GRUBB & WEAVER, PLLC
199 Liberty Street, SW
Leesburg, VA 20175
T: 703/777-7319
F: 703/777-3656
tdunlap@dglegal.com

Counsel for Plaintiffs


C. Allen Black, Jr., Esq.
The Law Office of C. Allen Black, Jr.
1579 Montgomery Rd.
Allison Park, PA 15101
(412) 908-3268

Counsel for Plaintiffs
(*pro hac vice* admission pending)

February 17, 2012