## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| JOSEPH , CARIK, *et al.*,       ) | |
|       ) | |
| Plaintiffs,       ) | Civil No. 12-00272 (BAH) |
|       ) | |
| v.       ) | |
|       ) | |
| UNITED STATES DEPARTMENT OF       ) | |
| HEALTH AND HUMAN SERVICES, *et al.*,       ) | |
|       ) | |
| Defendants. | |

## DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' COMPLAINT

U.S. Defendants hereby move to dismiss this case pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure based upon lack of subject matter jurisdiction and failure to state a claim upon which relief can be granted.  The grounds for this motion are fully set forth in the accompanying Memorandum in Support of Defendants' Motion to Dismiss filed herewith.

Respectfully submitted,

Date:  May 4, 2012

| | |
|---|---|
| Of Counsel: | |
| | RONALD C. MACHEN JR., D.C. Bar #447889 |
| WILLIAM B. SCHULTZ | United States Attorney |
| Acting General Counsel | for the District of Columbia |
| | |
| ELIZABETH H. DICKINSON | STUART F. DELERY |
| Associate General Counsel, | Assistant Attorney General |
| Food and Drug Division | |
| | MAAME EWUSI-MENSAH FRIMPONG |
| ERIC M. BLUMBERG | Acting Deputy Assistant Attorney General |
| Deputy Chief Counsel, Litigation | |
| | MICHAEL S. BLUME |
| Julie Dohm | Director, Consumer Protection Branch |

| Assistant Chief Counsel | By:   /s/ Lauren H. Bell |
| U.S. Department of Health & Human Services | LAUREN H. BELL |
| Office of the General Counsel | Trial Attorney |
| White Oak 31 Room 4582 | Consumer Protection Branch |
| 10903 New Hampshire Avenue | U.S. Department of Justice |
| Silver Spring, MD 20993-0002 | P.O. Box 386 |
| (301) 796-8732 | Washington, DC 20044 |
|  | Tel: (202) 353-1991 |
|  | Fax: (202) 514-8742 |

Attorneys for U.S. Defendants

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
_____
                                          )
JOSEPH M. CARIK¸ et al.,                  )
                                          )
          Plaintiffs,                     )
                                          )
          v.                              )  Civil No. 12-00272 (BAH)
                                          )
UNITED STATES DEPARTMENT OF               )
HEALTH AND HUMAN SERVICES, et al.,        )
                                          )
          Defendants.                     )
_____ )
```

**U.S. DEFENDANTS' MEMORANDUM**
**IN SUPPORT OF MOTION TO DISMISS**

This is a classic case of suing the wrong defendants.  Plaintiffs bring a host of statutory and constitutional claims against the U.S. Department of Health and Human Services ("HHS"), Food and Drug Administration ("FDA"), and National Institutes of Health ("NIH"), as well as their respective heads (collectively, "U.S. defendants" or "the government"), because two drug manufacturers, Genzyme Corp. and Hospira, Inc., have been unable to furnish plaintiffs with full doses of two drugs in short supply, Fabrazyme and Aquasol A.  In as much as plaintiffs allege that the drug shortages were caused by the manufacturers, *see, e.g.*, Compl. ¶ 69, these claims should have been brought against the manufacturers, if at all; as alleged against the government, they are nonjusticiable, inadequately pleaded, and meritless.

The entire complaint must be dismissed for lack of subject matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1).  Plaintiffs do not have standing because the government did not cause plaintiffs' inability to obtain full doses of the drugs, and there is no relief against the government warranted by the allegations in the complaint that would redress

plaintiffs' injuries.  Furthermore, all of the claims pertaining to Fabrazyme are moot because Genzyme has resumed production of the drug, thereby eliminating the Fabrazyme shortage.

Even if plaintiffs' claims were justiciable, the complaint also must be dismissed for a failure to state a claim upon which relief can be granted.  Fed. R. Civ. P. 12(b)(6).  Plaintiffs have failed to plead facts consistent with their allegations that the government has violated the U.S. Constitution, the Federal Food, Drug, and Cosmetic Act ("FDCA"), and the Bayh-Dole Act. Count I, alleging that HHS and FDA violated the nondelegation doctrine, fails because neither agency delegated any of the alleged authorities to Genzyme or Hospira.  Count II fails because plaintiffs do not state the material elements of a claim under the Tenth Amendment—that Congress lacked the authority to enact the FDCA or that the FDCA *compels* the states *as states* to legislate or administer or enforce a federal regulatory program.

Count III alleges that a patent claiming a method of producing Fabrazyme and the Bayh Dole Act, as interpreted by NIH, are unconstitutional under the Patent Clause, but plaintiffs have no constitutional or statutory causes of action to bring such claims.  Count IV, alleging a violation of the Due Process Clause, also must be dismissed because plaintiffs allege that Genzyme and Hospira, not the government, violate their due process rights, and the actions of these private entities are not fairly considered government action subject to the Fifth Amendment.  Lastly, Count V, alleging a violation of the FDCA, fails because plaintiffs have no cause of action.

U.S. defendants have the utmost sympathy for patients suffering from Fabry disease and vitamin A deficiency and do not question the legitimacy of plaintiffs' desire for access to Fabrazyme and Aquasol A.  Nonetheless, plaintiffs have sued the wrong defendants and their complaint should be dismissed in its entirety.

## BACKGROUND

I.     STATUTORY AND REGULATORY FRAMEWORK

    A.     FDA's Authority Over Drugs and Biological Products

As discussed, plaintiffs' allegations concern two products regulated by FDA, Aquasol A

and Fabrazyme.  The former is a drug regulated under the FDCA, 21 U.S.C. §§ 301–99d, and the

latter is a biological drug regulated under both the FDCA and the Public Health Service Act

("PHSA"), ch. 373, 58 Stat. 682 (1944) (codified as amended in scattered sections of 42

U.S.C.).[1]  Although different statutory and regulatory provisions govern approval for biological

products and other new drugs, in practice the regulatory programs are quite similar.

The FDCA governs the regulation of drugs in the United States.  The statute broadly

defines "drug" to include, in relevant part, articles "intended for use in the . . . mitigation,

treatment, or prevention of disease" or "intended to affect the structure or any function of the

body of man."  21 U.S.C. § 321(g)(1).  Every drug is considered to be a "new drug" unless it is

generally recognized by qualified experts as safe and effective for its labeled uses.  *See id.*

§ 321(p)(1).  A new drug can be marketed in the United States if a new drug application

("NDA") demonstrating the safety and effectiveness of the drug has been approved by FDA.  *See

id.* §§ 355(a), (b), 331(d).

The FDCA and the PHSA govern the regulation of biological products in the United

States.  The PHSA defines biological products in relevant part as any "virus, therapeutic serum,

toxin, antitoxin, vaccine, . . . or analogous product . . . applicable to the prevention, treatment, or

---

[1]  A product may be both a drug and a biological product.  *See, e.g., CareToLive v. von Eschenbach*, 525 F. Supp. 2d 952, 957 (S.D. Ohio 2007); *United States v. Loran Med. Sys., Inc.*, 25 F. Supp. 2d 1082, 1084 (C.D. Cal. 1997).  A product that has been licensed under the PHSA is not required also to have an approved new drug application under the FDCA; in every other respect, however, the FDCA applies.  42 U.S.C. § 262(j).

cure of a disease or condition of human beings." 42 U.S.C. § 262(i). The PHSA grants FDA authority to issue licenses based on, among other things, a showing that the biological product is "safe, pure, and potent," *id.* § 262(a)(2)(C)(i)(I), and that "the facility in which the product is manufactured . . . meets standards designed to assure that the biological product continues to be safe, pure, and potent," *id.* § 262(a)(2)(C)(i)(II). Licenses are issued by FDA upon approval of a biologics license application ("BLA").

The FDCA provides certain grounds on which an enforcement action may be taken against violative products and their manufacturers. *See generally* 21 U.S.C. § 331 (listing prohibited acts); *see also id.* §§ 332–34 (authorizing injunctions, criminal prosecutions, and seizures). For instance, the FDCA prohibits the introduction into interstate commerce of drugs that are adulterated, *see id.* § 331, and a drug is "deemed" to be adulterated if it is not manufactured in compliance with current good manufacturing practice, *see id.* § 351(a)(2)(B). Likewise, the introduction or delivery into interstate commerce of a new drug or biological product that is not the subject of an NDA or BLA is prohibited. *See id.* § 355(a); 42 U.S.C. § 262(a). Although it is a violation of the law to ship drugs in interstate commerce that do not comply with the requirements in the FDCA and PHSA, FDA does not have the authority to force a private entity to manufacture or distribute its products at all, much less distribute them to particular patients.

Finally, the FDCA and FDA regulations specify the bases for withdrawing an NDA and revoking a BLA. With respect to NDAs, the FDCA identifies the circumstances in which FDA "shall"[2] and "may"[3]—after due notice and opportunity for hearing—"withdraw approval of an

---

[2] The agency "shall" withdraw an application if it finds:

> (1) that clinical or other experience, tests, or other scientific data show that such drug is unsafe for use under the conditions of use upon the basis of which the

application." 21 U.S.C. § 355(e). Similarly, the PHSA authorizes FDA to establish, by

regulation, requirements for the revocation of BLAs, *see* 42 U.S.C. § 262(a)(2)(A), and FDA has

---

application was approved; (2) that new evidence of clinical experience, not
contained in such application or not available to the [agency] until after such
application was approved, or tests by new methods, or tests by methods not
deemed reasonably applicable when such application was approved, evaluated
together with the evidence available to the [agency] when the application was
approved, shows that such drug is not shown to be safe for use under the
conditions of use upon the basis of which the application was approved; or (3) on
the basis of new information before [the agency] with respect to such drug,
evaluated together with the evidence available to [the agency] when the
application was approved, that there is a lack of substantial evidence that the drug
will have the effect it purports or is represented to have under the conditions of
use prescribed, recommended, or suggested in the labeling thereof; or (4) the
patent information prescribed by subsection (c) of this section was not filed within
thirty days after the receipt of written notice from the [the agency] specifying the
failure to file such information; or (5) that the application contains any untrue
statement of a material fact . . . .

21 U.S.C. § 355(e).

[3] The agency "may" withdraw an application if it finds:

(1) that the applicant has failed to establish a system for maintaining required
records, or has repeatedly or deliberately failed to maintain such records or to
make required reports, in accordance with a regulation or order under subsection
(k) of this section or to comply with the notice requirements of section 360(k)(2)
of this title, or the applicant has refused to permit access to, or copying or
verification of, such records as required by paragraph (2) of such subsection; or
(2) that on the basis of new information before [the agency], evaluated together
with the evidence before [it] when the application was approved, the methods
used in, or the facilities and controls used for, the manufacture, processing, and
packing of such drug are inadequate to assure and preserve its identity, strength,
quality, and purity and were not made adequate within a reasonable time after
receipt of written notice from the [agency] specifying the matter complained of;
or (3) that on the basis of new information before [the agency], evaluated together
with the evidence before [it] when the application was approved, the labeling of
such drug, based on a fair evaluation of all material facts, is false or misleading in
any particular and was not corrected within a reasonable time after receipt of
written notice from the [agency] specifying the matter complained of.

21 U.S.C. § 355(e).

promulgated regulations that set forth those requirements.[4]  None of these provisions requires

FDA to initiate proceedings to withdraw an NDA or revoke a BLA because a firm causes a

shortage of one of its drugs.

**B.    FDA's Drug Shortage Program[5]**

FDA established a Drug Shortage Program ("DSP") to address potential or actual drug

shortages that have a significant impact on public health.  FDA defines a drug shortage as "[a]

situation in which the total supply of all clinically interchangeable versions of an FDA-regulated

drug is inadequate to meet the current or projected demand at the user level."  Center for Drug

Evaluation and Research, Manual of Policies and Procedures 6003.1, at 7, *available at*

http://www.fda.gov/downloads/AboutFDA/CentersOffices/CDER/ManualofPoliciesProcedures/u

cm079936.pdf.  Issues that could be expected to lead to a potential shortage or disruption in

---

[4] 21 C.F.R. § 601.5(b) provides that the agency "shall notify the licensed manufacturer of the intention to revoke" its BLA if it finds any of the following:

> (i) Authorized [FDA] employees after reasonable efforts have been unable to gain access to an establishment or a location for the purpose of carrying out the inspection required under 600.21 of this chapter,
> (ii) Manufacturing of products or of a product has been discontinued to an extent that a meaningful inspection or evaluation cannot be made,
> (iii) The manufacturer has failed to report a change as required by 601.12 of this chapter,
> (iv) The establishment or any location thereof, or the product for which the license has been issued, fails to conform to the applicable standards established in the license and in this chapter designed to ensure the continued safety, purity, and potency of the manufactured product,
> (v) The establishment or the manufacturing methods have been so changed as to require a new showing that the establishment or product meets the requirements established in this chapter in order to protect the public health, or
> (vi) The licensed product is not safe and effective for all of its intended uses or is misbranded with respect to any such use.

[5]  Part I.B, which describes FDA's Drug Shortage Program, is provided as background for the Court and is not relied upon by the U.S. defendants for their motion to dismiss.

supply include product quality problems, such as the presence of particulates or impurities or

microbial contamination; transfer of manufacturing to an alternative facility; and the loss of

production capacity. *See* Draft Guidance: Notification to FDA of Issues that May Result in a

Prescription Drug or Biological Product Shortage 10–11 (Feb. 2012) ("Drug Shortage

Notification Draft Guidance"), *available at*

http://www.fda.gov/downloads/Drugs/GuidanceComplianceRegulatoryInformation/Guidances/U
CM292426.pdf.

FDA encourages manufacturers of drugs and biological products to promptly notify the

agency of issues that may result in a shortage or potential disruption to the supply of products.[6]

*See id.* at 11. Once notified, DSP works with pharmaceutical manufacturers and other

appropriate agency components to manage product shortages. For example, FDA may notify

and encourage manufacturers of the same or similar products to initiate or increase production of

their products; expedite review of regulatory submissions; consult with and advise sponsors on

how to resolve manufacturing or quality issues in an efficient and safe manner; or exercise

regulatory flexibility and discretion. *Id.* at 12.

Although FDA works with manufacturers to help prevent and mitigate these shortages,

FDA's authority to address potential and actual drug shortages is limited. *See* FDA, A Review

of FDA Approach to Medical Product Shortage 41 (Oct. 31, 2011) ("FDA Drug Shortage

Report"), *available at*

---

[6] *See* Drug Shortage Notification Draft Guidance 10 (explaining that FDA encourages
manufacturers to voluntarily report to FDA any disruptions in supply that could lead to a product
shortage, even beyond those situations covered by mandatory reporting under 21 U.S.C. § 356c);
*see also* Executive Order 13588: Reducing Prescription Drug Shortages (Oct. 31, 2011),
*available at* http://www.whitehouse.gov/the-press-office/2011/10/31/executive-order-reducing-
prescription-drug-shortages (directing FDA to use all available administrative tools to expand the
Agency's efforts to combat the problem of drug shortages).

http://www.fda.gov/downloads/AboutFDA/ReportsManualsForms/Reports/UCM277755.pdf.

FDA does not have the capacity or authority to manufacture, or to require the manufacture of,

medications.  *Id.* at 20.  Manufacturers play the primary role in preventing or responding to drug

or biological product shortages because they make the products needed by doctors and patients.

*See* Drug Shortage Notification Draft Guidance 13.

    **C.**    **Bayh-Dole Act**

    In 1980, the Bayh-Dole Act, 35 U.S.C. §§ 200–12, was enacted "to use the patent system

to promote the utilization of inventions arising from federally supported research or

development" and "to ensure that the Government obtains sufficient rights in federally supported

inventions to meet the needs of the Government and protect the public against nonuse or

unreasonable use of inventions."  35 U.S.C. § 200.  It achieves this goal by providing a federal

agency with march-in authority in certain limited circumstances to ensure that a federally funded

invention is available to the public.  The Bayh-Dole Act provides:

> With respect to any subject invention in which a small business firm or nonprofit
> organization has acquired title under this chapter, the Federal agency under whose
> funding agreement the subject invention was made shall have the right, in accordance
> with such procedures as are provided in regulations promulgated hereunder to require the
> contractor, an assignee or exclusive licensee of a subject invention to grant a
> nonexclusive, partially exclusive, or exclusive license in any field of use to a responsible
> applicant or applicants, under terms that are reasonable under the circumstances, and if
> the contractor, assignee, or exclusive licensee refuses such request, to grant such a license
> itself, if the Federal agency determines that such—
>
> (1)    action is necessary because the contractor or assignee has not taken or is not
>     expected to take within a reasonable time, effective steps to achieve practical
>     application of the subject invention in such field of use;
> (2)    action is necessary to alleviate health or safety needs which are not reasonably
>     satisfied by the contractor, assignee, or their licensees;
> (3)    action is necessary to meet requirements for public use specified by Federal
>     regulations and such requirements are not reasonably satisfied by the contractor,
>     assignee, or licensees; or
> (4)    action is necessary because the agreement required by section 204 has not been
>     obtained or waived or because a licensee of the exclusive right to use or sell any

> subject invention in the United States is in breach of its agreement obtained pursuant to section 204.

35 U.S.C. § 203(a). If the federal agency believes that an exercise of march-in rights might be

warranted, it notifies the contractor in writing of the information and requests informal

comments from the contractor as well as information relevant to the matter. *See* 37 C.F.R.

§ 401.6(b). Based on the available information, a federal agency can either notify the contractor

that it will not pursue such march in rights, *see id.*, or initiate march-in procedures, *see id.*

§ 401.6(c). To date, the government has never exercised its march-in authority.

## II.    FABRAZYME

Fabry disease is a rare, life-shortening, inherited disease caused by a deficiency of alpha

galactosidase A, an enzyme needed to metabolize lipids. *See* Compl. ¶¶ 220–21. An enzyme

replacement therapy to treat Fabry disease was developed by Dr. Robert J. Desnick at Mount

Sinai School of Medicine ("Mount Sinai") with funding from NIH grant no. DK 34045. *Id.*

¶ 224. The therapy involves intravenous infusion of recombinant alpha-galactosidase A

(agalsidase) into patients. The method for producing agalsidase is claimed in U.S. Patent No.

5,356,804 (the '804 patent), which was awarded to Dr. Desnick and assigned to Mount Sinai in

October 1994. *Id.* ¶¶ 225–226.[7] Mount Sinai exclusively licenses the '804 patent to Genzyme, a

company acquired by Sanofi in 2011. *See* Compl. Ex. C (License Agreement).

In April 2003, FDA granted accelerated approval of a BLA submitted by Genzyme to

manufacture agalsidase beta under the brand name Fabrazyme for use in patients with Fabry

---

[7] The term of the '804 patent expires in September 2015. *See* NIH, Determination in the Case of
Fabrazyme Manufactured by Genzyme Corporation 4 (2010), *available at*
http://www.ott.nih.gov/policy/March-in-Fabrazyme.pdf.

disease.  *See id.* ¶ 227; *see also id.* Ex. D (Fabrazyme Approval Letter).[8]  Genzyme is the only

manufacturer that has received FDA approval to manufacture and sell an agalsidase product to

treat Fabry disease in the United States.  *See id.* ¶ 229.

In June 2009, Genzyme announced that it had detected a virus in one of the bioreactors at

its facility in Allston Landing, Massachusetts, where Fabrazyme was manufactured.  *See id.*

¶ 231.  The company halted production of Fabrazyme so that it could sanitize the facility.  *See id.*

Ex. H, at 4 (Revised Guidance to the U.S. Fabry Community).  Because the inventory of

Fabrazyme was not sufficient to meet projected global demand, Genzyme convened the

Fabrazyme Stakeholders Working Group ("FSWG") to develop a set of recommendations on the

management of the Fabrazyme supply during the shortage.[9]  *Id.*  The FSWG developed a

"Guidance to the Fabry Community on the Management of Fabrazyme Supply," which was sent

to physicians who administer Fabrazyme to patients with Fabry disease.  *Id.*  The initial

Guidance recommended that physicians reduce the use of Fabrazyme to approximately 80% of

normal levels by asking all patients to miss the equivalent of two doses, either by skipping two

full infusions or receiving a half-dose for four infusions.  *Id.*

---

[8]  The accelerated approval program is available only for drugs and biological products that treat
serious or life-threatening diseases and only when the new product appears to provide a
meaningful therapeutic benefit over existing therapy.  *See generally* 21 C.F.R. part 601, subpart
E.  Genzyme also applied for and obtained orphan drug product status for Fabrazyme—a
designation given to a drug that treats "a rare disease or condition," 21 U.S.C. § 360bb.  *See*
FDA Application "Search Orphan Drug Designations and Approvals,"
http://www.accessdata.fda.gov/scripts/opdlisting/oopd/ (product name "fabrazyme").  The seven-
year market exclusivity associated with orphan drug product status pursuant to 21 U.S.C.
§ 360cc expired for Fabrazyme in April 2010.  *See id.*

[9] The FSWG is comprised of representatives of the Fabry Support and Information Group, the
National Fabry Disease Foundation, the Fabry Registry North American Board of Advisors, and
Genzyme Corporation.  *See* Compl. Ex. H, at 1.

In July 2009, Genzyme completed sanitizing the Allston facility and resumed production of Fabrazyme.  *See id.* Ex. I (Letter from Genzyme, Oct. 2009)  Despite efforts to conserve the supply of Fabrazyme, when Genzyme resumed production the drug shortage persisted because the volume of Fabrazyme produced was lower than Genzyme had originally anticipated.  *See id.* Ex. H, at 4.  As a result, the FSWG issued a "Revised Guidance to the U.S. Fabry Community" recommending that physicians reduce the use of Fabrazyme to 30 percent of normal levels for the remainder of 2009.  *See id.* at 4–5.  The reduced Fabrazyme supply allocation was subsequently extended.  *See, e.g.*, *id.* Exs. J–L (Letters from Genzyme to Healthcare Professionals).

Meanwhile, in November 2009, FDA completed a five-week inspection of the Allston plant and provided Genzyme with a list of inspection observations documenting deviations from current good manufacturing practice.  In May 2010, FDA and Genzyme agreed to a Consent Decree of Permanent Injunction ("Consent Decree"), which the United States District Court for the District of Massachusetts entered in November 2010, to correct the manufacturing violations at the company's Allston facility.  *See id.* ¶ 295; *see also* Consent Judgment, *United States v. Genzyme Corp.*, 1:10-cv-10865-MLW (D. Mass. Nov. 9, 2010), ECF No. 12.  Under the Consent Decree, Genzyme agreed, among other things, to adhere to an FDA-approved timeline for making facility improvements to comply fully with current good manufacturing practice, periodic inspections by FDA, and employment of an independent expert to inspect the Allston plant and issue recommendations.  *See id.* ¶¶ 4,6.  In addition, the Consent Decree established a timeframe for Genzyme to transfer its operations for filling drug vials from its Allston facility to other manufacturing sites, *see id.* ¶ 9, and did not enjoin the production of Fabrazyme at the Allston facility during the interim, *see id.* ¶ 5.

In August 2010, plaintiff Joseph Carik and others requested that the NIH exercise its march-in rights under the Bayh-Dole Act to grant an open license to the '804 patent "to allow other manufacturers to enter the market to make Fabrazyme" to treat Fabry disease.  Compl. ¶ 310.  In December 2010, NIH declined to exercise its march-in authority.  *See id.* ¶ 321; *see also* NIH Determination in the Case of Fabrazyme Manufactured by Genzyme Corporation (2010) ("NIH March-In Determination"), *available at* http://www.ott.nih.gov/policy/March-in-Fabrazyme.pdf, attached hereto as Ex. A.[10]  Petitioners requested a rehearing on their petition, which is currently pending.  *See* Compl. ¶¶ 343, 363.

In January 2011, after learning of NIH's decision on its march-in petition, plaintiff Joseph Carik and another petitioner submitted a citizen petition to FDA pursuant to 21 C.F.R. § 10.30, *see* Compl. ¶ 342, requesting that the FDA Commissioner cause "full doses of Fabrazyme to be allocated to U.S. citizens until the supply of drug can be restored," Joseph Carik and Amber Britton, Citizen Petition 2 (Jan. 13, 2011), *available at*

http://www.regulations.gov/#!documentDetail;D=FDA-2011-P-0055-0001, attached hereto as Ex. B.  The petitioners objected to Genzyme's distribution of Fabrazyme in Europe even though

---

[10]  The decision to decline the petition was based on the following determinations:  (1) granting patent use rights to a third party would not increase the supply of Fabrazyme because years of clinical studies and regulatory approval would be required before another manufacturer's product could become available to meet patients' needs in the United States and NIH has no information that a company is expecting imminent FDA approval of a competing version of an agalsidase beta product; (2) the '804 patent is not an obstacle for a company to conduct clinical trials in the United States to seek regulatory approval for a competing drug because such clinical trials are exempt from infringement under the Hatch-Waxman statutory safe harbor provision; and (3) Genzyme indicated that it expected to be able to produce Fabrazyme at full supply levels in the first half of 2011 and appeared to be working diligently and in good faith to address the Fabrazyme shortage.  *See* Defs. Mem. Supp. Mot. Dismiss Ex. A, at 4.

drug alternatives[11] are available to non-U.S. citizens.  *See* Defs.' Mem. Supp. Mot. Dismiss

("Defs.' Mem.") Ex. B, at 7.  The petitioners claimed that the denial of full doses of the drug to

U.S. citizens in favor of non-U.S. Citizens violates the constitutional rights of U.S. citizens under

the FDCA, Bayh-Dole Act, and the Due Process Clause of the Fifth Amendment.  *See id.* at 7–8.

FDA has not yet responded to the citizen petition.  *See* Compl. ¶ 345.

In March 2011, plaintiff Joseph Carik, among others, filed a lawsuit against Genzyme

Corporation and Mount Sinai in the United States District Court for the District of

Massachusetts.  *See* Compl. ¶ 352; *see also Hochendoner v. Genzyme Corp.*, Civil Action No.

1:11-cv-10739-DPW (D. Mass.).

Toward the end of 2011, Genzyme finished construction of a new manufacturing facility

in Framingham, Massachusetts, designed to expand the production of Fabrazyme.  In January

2012, FDA approved the Framingham manufacturing plant to produce Fabrazyme, *see* Genzyme

Press Release (Jan. 24, 2012), *available at*

http://www.businesswire.com/news/genzyme/20120123006531/en, attached hereto as Ex. C; and

Genzyme sent a Dear Healthcare Provider ("DHP") letter stating that "[s]tarting in March,

patients who are currently receiving treatment with Fabrazyme will be able to return to full dose

in the U.S," *see* DHP (Jan. 25, 2012), *available at*

http://www.fda.gov/downloads/Drugs/DrugSafety/DrugShortages/UCM296375.pdf, attached

---

[11]  Shire PLC, a United Kingdom company, markets Replagal, an agalsidase product called
agalsidase alpha that is similar to Fabrazyme, to treat Fabry disease in forty-five countries
outside the United States.  *Id.*  Replagal is not FDA-approved.  However, in response to the
shortage of Fabrazyme, Shire submitted, and FDA approved, a treatment protocol under its
investigational new drug application ("IND") for Replagal, which provided U.S. Fabry patients
access to the drug while Shire pursued market approval.  *See* Shire Press Release (Mar. 14,
2012), *available at*  http://www.shire.com/shireplc/en/media/shirenews?id=577.  In November
2011, Shire submitted a BLA to market Replagal in the United States, but withdrew the BLA in
March 2012.  *See id.*

hereto as Ex. D.  On March 1, 2012, Genzyme announced that it had begun shipping Fabrazyme produced at its Framingham plant.  *See* Genzyme Press Release (Mar. 1, 2012), *available at* http://www.businesswire.com/news/genzyme/20120301005875/en, attached hereto as Ex. E.  It further announced that "*patients in the U.S. are now able to return to full dosing in March*" and that "all new patients in the U.S. are eligible to begin Fabrazyme treatment, at full dosing levels." *Id.* (emphasis added).

## III.   AQUASOL A

In 1949, Hospira obtained FDA approval to market injectable vitamin A under the brand name Aquasol A for use in patients with vitamin A deficiency.  *See* Compl. ¶ 376.  Hospira is the only FDA-approved manufacturer of injectable vitamin A in the world.  *See id.* ¶ 381. Beginning in November 2010, Hospira experienced delays in transferring production of Aquasol A to a new manufacturing facility and ceased shipping the drug.  *See id.* ¶¶ 383–84.  Hospira anticipates resuming delivery of Aquasol A in December 2012.  *See id.* ¶ 389; *see also* FDA Drug Shortages, Current Drug Shortages,

http://www.fda.gov/Drugs/DrugSafety/DrugShortages/ucm050792.htm (Aquasol A).

## IV.   PLAINTIFFS' ALLEGATIONS

On February 17, 2012, Joseph Carik and twenty-three other plaintiffs, who allege that they have been denied access to full doses of Fabrazyme, and one plaintiff who alleges she has been denied access to Aquasol A, filed this suit in the District Court for the District of Columbia against HHS; Kathleen Sebelius, Secretary of HHS; FDA; Dr. Margaret Hamburg, Commissioner of FDA; NIH; Dr. Francis Collins, Director of NIH;[12] and Mount Sinai.  Plaintiffs allege that HHS and FDA have violated the separation of powers doctrine "[b]y refusing to

---

[12]  Secretary Sebelius, Commissioner Hamburg, and Director Collins are sued in their official capacities only.  *See* Compl. 1; *id.* ¶¶ 27, 29, 31.

withdraw market approval from manufacturers creating drug shortages" (Count I). Compl.

¶ 421. HHS and FDA also have allegedly violated the Tenth Amendment to the U.S.

Constitution by "vesting FDA licensees with veto powers over state-licensed physicians'

prescription during drug shortages," thereby abolishing the power of the states to regulate health

and safety matters (Count II). *Id.* ¶ 426. Plaintiffs further allege that the '804 patent is invalid,

unenforceable, and unconstitutional because it is currently being used to "restrain others from

entering the market to mitigate the injuries and deaths caused by the patentee" (Count III). *Id.*

¶ 443. Alternatively, plaintiffs allege that the Bayh-Dole Act as interpreted by NIH is

unconstitutional under the Patent Clause because it allows a manufacturer to prolong a drug

shortage through a patent that does not promote the progress of science (Count III). *Id.* ¶¶ 444,

447.

The Complaint further alleges that the U.S. defendants have violated plaintiffs' due

process rights (i.e., "privacy," "medical self-determination," "life and health," *id.* ¶ 453) under

the Fifth Amendment to the U.S. Constitution by "vest[ing]" manufacturers with "the power to

discriminate," *id.* ¶ 449, against plaintiffs using their private genetic and medical information and

"the power to withdraw [or reduce] access to medically necessary drugs" (Count IV), *id.* ¶ 451.

Plaintiffs further allege (contrary to their allegations regarding the pending NIH rehearing and

FDA citizen petition) that their procedural due process rights have been violated because the

government has failed to provide them with "any form of notice, relief, or appeals process"

regarding the manufacturers' actions during drug shortages (Count IV). *Id.* ¶ 455. Lastly,

plaintiffs allege that HHS and FDA violated the FDCA or that the FDCA is unconstitutional as

interpreted by FDA because the FDCA cannot allow "irresponsible manufacturers" to remain in

interstate commerce and the FDCA must compel FDA to withdraw market approval from them

(Count V).  *Id.* ¶ 467.

**ARGUMENT**

**I.    PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED FOR LACK OF SUBJECT MATTER JURISDICTION**

Federal judicial power is limited by Article III of the Constitution to resolving "cases"

and "controversies."  *See, e.g., Valley Forge Christian Coll. v. Americans United for Separation

of Church & State, Inc.*, 454 U.S. 464, 471 (1982).  To invoke federal court jurisdiction, a party

must establish the existence of a "justiciable controversy" with the adverse party—one that is

"definite and concrete, touching the legal relations of parties having adverse legal interests."

*Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 240–41 (1937).  Under Rule 12(b)(1), the party

seeking to invoke the jurisdiction of a federal court bears the burden of establishing that the court

has jurisdiction.  *See US Ecology, Inc. v. DOI*, 231 F.3d 20, 24 (D.C. Cir. 2000).

The doctrines of standing, ripeness, and mootness all flow from the Article III

requirement that there be a live case or controversy at the time the court decides the case.  *See

Allen v. Wright*, 468 U.S. 737, 750 (1984).  These doctrines require the Court to inquire whether

plaintiffs have suffered injury from *defendants'* conduct (standing), whether the harm asserted

has matured sufficiently to warrant judicial intervention (ripeness), and whether the occasion for

judicial intervention persists (mootness).  *See Warth v. Seldin*, 422 U.S. 490, 498, 499 n.10

(1975).  All of plaintiffs' claims in this case fail to satisfy one or more of these doctrines and thus

must be dismissed for lack of subject matter jurisdiction.[13]

---

[13]  In support of this motion, the federal defendants reference certain factual materials for the Court to consider in addition to the complaint.  The Court may consider such materials in ruling on challenges to its subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).  *See Coalition for Underground Expansion v. Mineta*, 333 F.3d 193, 198 (D.C. Cir. 2003); *Herbert v. Nat'l Acad.*

## A.    Plaintiffs Lack Standing

All of the claims in plaintiffs' complaint are nonjusticiable because plaintiffs lack standing.  To establish constitutional standing, a plaintiff must show, at an "irreducible constitutional minimum," that the following three requirements are met.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).  First, a plaintiff must suffer from an injury-in-fact, which is defined as "an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical."  *Id.* (quotation marks and citations omitted).  Second, the plaintiff must demonstrate a "causal connection between the injury and the conduct complained of."  *Id.*  This means that the injury has to be "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court."  *Id.* (quotation marks and alterations omitted).  Third, the injury in question must be redressable by the relief sought by the complaint.  *See id.*  "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing . . . is ordinarily substantially more difficult to establish."  *Id.* at 562 (quotation marks omitted).

Assuming arguendo that plaintiffs have alleged the requisite injury, plaintiffs nevertheless have failed to meet their burden of showing causation and redressability.  Plaintiffs identify their injury as "currently being denied lawful access to the full FDA approved and physician-recommended doses of prescription drugs needed to treat their diseases," Compl. ¶ 67, but plaintiffs' restricted access to full doses of Fabrazyme and Aquasol A is not fairly traceable

---

*of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992).  When ruling on a Rule 12(b)(6) motion, the Court may examine the complaint, items in the record of the case, and matters of public record.  *See Abhe & Svoboda, Inc. v. Chao*, 508 F.3d 1052, 1059 (D.C. Cir. 2007); *Philips v. Bureau of Prisons*, 591 F.2d 966, 969 (D.C. Cir. 1979) (same).

to any act of the government and cannot be redressed by a favorable decision from this Court.

As a result, plaintiffs lack standing.

### 1.    Plaintiffs Cannot Show Causation

The government is not the cause of the shortage of Fabrazyme and Aquasol A or

plaintiffs' limited access to these drugs.  Because manufacturers, not the government, produce

and distribute prescription drugs, they are the ones who are responsible for the drug shortages, as

plaintiffs acknowledge.  *See, e.g.*, Compl. ¶ 51 ("FDA licensees causing drug shortages"); *id.*

¶ 72 ("Genzyme created a shortage of Fabrazyme . . . .)"; *id.* ¶ 87 ("Hospira . . . created a drug

shortage by switching manufacturing facilities."); *see also generally* Second Am. Compl. ¶¶ 166,

169(f), *Hochendoner v. Genzyme*, Civil Action No. 1:11-cv-10739-DPW (D. Mass. June 30,

2011) (Plaintiff Carik and others allege that Genzyme caused the Fabrazyme shortage).

Genzyme experienced numerous manufacturing problems at its Allston facility, which resulted in

a shortage of Fabrazyme, and distributed its limited supply of Fabrazyme according to guidelines

crafted by the FSWG.  *See* Compl. Ex. H, at 4.  Hospira shifted its production of Aquasol A to a

new manufacturing site that is not yet on line and stopped distributing Aquasol A entirely.  *See*

*id.* ¶¶ 383–84.  Plaintiffs cannot maintain standing to sue the government based on injuries that

they concede are caused by the conduct of these manufacturers.  *See Lujan*, 504 U.S. at 560.

Plaintiffs assert that FDA's continued approval and refusal to withdraw approval of

Genzyme's BLA for Fabrazyme and Hospira's NDA for Aquasol A are the causes of their

limited access to the drugs.  *See* Compl. ¶ 156 ("There is clear but-for causation for the FDA's

involvement in interstate drug shortages since but-for the improvident grant and maintenance of

FDA licenses to induce reliance of the most vulnerable of American citizens, the acts of the FDA

licensees would not have caused harm to the public.").  As a factual matter, FDA has not refused

to withdraw marketing approval of either drug.  As a legal matter, the FDCA identifies the grounds for withdrawing approval of an NDA, and FDA regulations identify the grounds for revoking a BLA, *see supra* notes 2–4 and accompanying text; a manufacturer's causing of a drug shortage—whether by negligence or otherwise—is not among them.[14]  Thus, FDA does not have the statutory authority to withdraw approval of Fabrazyme and Aquasol A on the ground that Genzyme and Hospira caused drug shortages.  *See infra* Arg. Part II.E.2.

In any event, plaintiffs' theory of causation does not make sense.  If FDA were to withdraw approval of Genzyme's BLA and Hospira's NDA, the supply of those drugs would not increase.  In fact, it would disappear because in the absence of an approved application, marketing the drugs would be illegal.  *See* 21 U.S.C. § 355(a), 331(d); 42 U.S.C. 262(a)(1).  Understandably, plaintiffs have not even attempted to show that absent FDA's approvals of Fabrazyme and Aquasol A, "there is a substantial probability that they would have been able to" access full doses of these drugs.  *Warth*, 422 U.S. at 504.

### 2.    Plaintiffs Cannot Show Redressability

To redress plaintiffs' alleged injury, Genzyme, Hospira, or other unidentified manufacturers would need to start supplying plaintiffs with full doses of Fabrazyme and Aquasol A.  When plaintiffs' injuries hinge on the actions of manufacturers "not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict," *Lujan*, 504 U.S. at 562 (quotation marks omitted), plaintiffs bear the burden of "adduc[ing] facts showing that those [manufacturers'] choices have been or will be made in such manner as to produce causation and permit redressability of injury," *id.*  Specifically, plaintiff

---

[14]  FDA may withdraw an orphan drug's exclusivity under the Orphan Drug Act if the holder of the exclusive approval cannot assure the availability of sufficient quantities of the orphan drug.  *See* 21 C.F.R. § 316.36.  But neither of the drugs at issue has orphan exclusivity.  *See supra* note 8.

must demonstrate that a favorable decision by this Court would create "a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Utah v. Evans*, 536 U.S. 452, 464 (2002). Plaintiffs have failed to show that Genzyme or Hospira or other unidentified manufacturers are significantly more likely to provide plaintiffs with FDA recommended doses of Fabrazyme and Aquasol A should this Court find in plaintiffs' favor.

Plaintiffs request that *the Court* withdraw approval of Fabrazyme and Aquasol A, *see* Compl. Prayer for Relief ¶ i, under the baseless theory that FDA is required to withdraw approval from manufacturers that cause drug shortages, *see infra* Arg. Part II.E.2. But, as just discussed, the relief plaintiffs request would only *decrease* and ultimately *eliminate* the supply of the drugs plaintiffs seek. If the Court were to require FDA (contrary to the FDCA and FDA regulations) to withdraw approval of Fabrazyme and Aquasol A, as plaintiffs urge, then there would be no FDA-approved manufacturer to supply these sole source medications in the United States. Plaintiffs also seek a declaration that the FDCA is unconstitutional as interpreted and applied by FDA (without identifying which provision of the Constitution the FDCA allegedly violates) "so as to place the control [of] interstate commerce for prescription drugs under the individual states' constitutionally reserved police powers." Compl. Prayer for Relief ¶ a. Yet, there is absolutely no reason to think that the FDCA is somehow impeding the states, who are not parties in this case, from taking steps to solve these drug shortages or that states can and will ensure the availability of rationed drugs any more than FDA can and does.

Plaintiffs also seek a declaration that the '804 patent claiming the method of producing Fabrazyme is invalid, unenforceable, and unconstitutional, *see id.* ¶ m; *id.* ¶ 443, based on the groundless theory that the patent does not "promote the progress of science" within the meaning

of the Patent Clause in the U.S. Constitution, *see infra* Arg. Part II.C.  Assuming arguendo that plaintiffs' theory had legs to stand on, the relief would not help plaintiffs access Fabrazyme for the reasons provided in NIH's response to the march-in petition.  *See supra* note 10.  In particular, NIH has concluded that the '804 patent is not an obstacle to increasing the supply of agalsidase products because no company is even seeking FDA approval to market an agalsidase product, a prerequisite to supplying the drug that requires years of clinical studies.  *See* Defs.' Mem., Ex. A, at 4.  Moreover, NIH stated that *if* a manufacturer were to demonstrate interest in entering into a licensing agreement to market an agalsidase product, then NIH would reconsider exercising its march-in authority in light of the new information.  *See id.* at 9.  Plaintiffs have not even alleged, much less established, that the '804 patent is currently impeding some unknown manufacturer from manufacturing an agalsidase product or otherwise explained how a declaration that the '804 patent is invalid, unenforceable, or unconstitutional would provide them access to Fabrazyme, which they presumably now have, *see infra* Arg. Part I.B.

For similar reasons, plaintiffs would fare no better in obtaining Fabrazyme if the Court provided them with a declaration that the Bayh-Dole Act is unconstitutional, *see* Compl. Prayer for Relief ¶ m.  The Bayh-Dole Act provides a federal agency with march-in authority in certain limited circumstances to ensure that a federally funded invention is available to the public.  *See* 35 U.S.C. § 203(a).  Plaintiffs proposes no theory explaining how the Bayh-Dole Act impedes their access to Fabrazyme or Aquasol A, and their request to have the Act declared unconstitutional would foreclose a potential avenue to redressing other drug shortages that are actually caused by patent exclusivity.

Plaintiffs' other requested relief does not follow from the wrongs the government allegedly committed and is unrelated to improving plaintiffs' access to Fabrazyme and Aquasol

A.  *See, e.g.*, *Salazar v. Buono*, 130 S. Ct. 1803, 1818 (2010) ("A court must find prospective relief that fits the remedy to the wrong or injury that has been established.").  For instance, plaintiffs seek to enjoin FDA from accepting and reviewing new marketing applications from manufacturers that have created drug shortages and the government from providing grants or other taxpayer funding to them.  *See* Compl. Prayer for Relief ¶¶ h, l.  Even if plaintiffs prevailed on the substantive allegations in their complaint (which they cannot), this requested relief would not address any of the wrongs alleged in the complaint or increase the supply of Fabrazyme and Aquasol A.  Indeed, these seemingly punitive measures would presumably *decrease* incentives for manufacturers to research and seek market approval for drugs prone to shortage because they are difficult to manufacture, such as the sterile injectable drugs at issue here.[15]  Plaintiffs also seek to "enjoin exportation of FDA regulated drugs in shortage," *id.* ¶ e, but fail to allege a related legal violation that would make such a remedy appropriate, e.g., an allegation that Genzyme or Hospira has exported or will export Fabrazyme or Aquasol A in violation of a specific provision of the FDCA.  In addition, plaintiffs seek disgorgement from the government of all profits collected from manufacturers causing shortages, *id.* ¶ j, but the plaintiffs do not allege that the government has acted illegally or has been unjustly enriched by collecting monies from Genzyme pursuant to the Consent Decree or that plaintiffs are somehow entitled to those funds.[16]  Moreover, taking money away from the government would not improve plaintiffs' access to rationed drugs, and thus would not redress plaintiffs' alleged injury.[17]

---

[15]  *See* FDA Drug Shortage Report 4–5 (explaining why shortages of sterile injectable products are particularly challenging to address); *id.* at 3, 13 (reporting that sterile injectables accounted for 80 percent of drug shortages in 2010–11 and typically last for months).

[16]  Under the Consent Decree, Genzyme agreed to pay the United States Treasury equitable disgorgement in the amount of one hundred seventy-five million dollars.  *See* Compl. ¶ 295; *see*

In sum, plaintiffs have not established any causal link between an action or inaction of the government and their inability to obtain full doses of Fabrazyme and Aquasol A.  Moreover, even if the Court were to find in the plaintiffs' favor, there is no relief against the government potentially warranted by the legal wrongs identified in the complaint that would redress plaintiffs' injuries.

**B.    Plaintiffs' Claims Regarding Fabrazyme Are Moot**

Now that Genzyme has increased its supply of Fabrazyme to meet U.S. demand, all of the claims pertaining to the drug should be dismissed as moot.  Because the exercise of judicial power under Article III depends upon the existence of a live case or controversy, a federal court may not render advisory opinions or decide questions that do not affect the rights of parties properly before it.  *See North Carolina v. Rice*, 404 U.S. 244, 246 (1971).  An actual controversy must exist at all stages of judicial review, not merely when the complaint is filed.  *See Arizonans for Official English v. Ariz.*, 520 U.S. 43, 67 (1997).  If an event occurs while a case is pending that makes it impossible for the court to grant effectual relief to a prevailing party, then the case

---

*also* Consent Judgment ¶ 8, *United States v. Genzyme Corp.*, 1:10-cv-10865-MLW (D. Mass. Nov. 9, 2010), ECF No. 12.

[17] The remaining requested relief cannot be awarded to plaintiffs in this action because it is against manufacturers who are not parties to this lawsuit.  *See* Compl. Prayer for Relief ¶ b ("requiring that the drugs in shortage be shipped to a single destination of a special master, a judicially administered trust or other court appointed authority for subsequent allocation"); *id.* ¶ c ("enjoin FDA licensees from knowing or inferring the identity of private U.S. citizens, doctors, pharmacies, hospitals and other shipping destinations"); *id.* ¶ d ("enjoining FDA licensees from withdrawing or threatening to withdraw interstate access of prescription medications to [officers and employees of the Executive Branch, the Legislative Branch and the Judicial Branch of the U.S. Government]"); *id.* ¶ f ("enjoin FDA licensees from making any public announcement of possible end dates to the shortages thereby promoting future access and sales of these medications under their FDA license"); *id.* ¶ g ("place all further interstate rationing decisions made by . . . licensees under review of the Judicial branch"); *id.* ¶ k ("disgorge from FDA licensees all profits collected under drug shortages").

must be dismissed as moot.  *See City of Erie v. Pap's A.M.*, 529 U.S. 277, 287 (2000); *see also Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc) (explaining that a case is moot if "events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future" (quotation marks omitted)).

Because there is no longer a Fabrazyme drug shortage for U.S. patients, plaintiffs' claims pertaining to Fabrazyme are moot.  As discussed above, Genzyme announced in March 2012 that it had begun shipping Fabrazyme produced at its Framingham, Massachusetts plant, and is currently providing full dosing of Fabrazyme in the United States to past and new patients.  *See* Defs. Mem. Ex. E.  As a result, the plaintiffs being treated for Fabry disease are not currently suffering from their asserted injury and are not entitled to any declaratory or injunctive relief from this Court.

Plaintiffs allege that one of the exceptions to mootness—capable of repetition yet evading review—applies to this case.  *See* Compl. ¶ 37.  This exception applies where (1) the challenged action is too short in duration to be fully litigated prior to its cessation or expiration, and (2) there is a reasonable expectation that the same complaining party would be subjected to the same action again.  *See Clarke*, 915 F.2d at 704.  Neither requirement is met here.  Plaintiffs have had almost three years to challenge the government's response to the Fabrazyme shortage, which began in June 2009, but they opted to wait to file this suit in February 2012—nearly one month after FDA approved Genzyme's Framingham plant for production of Fabrazyme and Genzyme announced that it would be supplying enough Fabrazyme to meet demand in 2012.  *See* Defs.' Mem. Exs. D, E.  Nor can plaintiffs show a "reasonable expectation" that they will be unable to access the drug in the future.  Genzyme has not suggested that it anticipates another Fabrazyme

shortage.[18]  Thus, any assertion that there will be another Fabrazyme shortage is at best

speculative and beyond this Court's authority to redress.  *See Clarke*, 915 F.2d at 701.

## II.    PLAINTIFFS' COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED

Even if plaintiffs could establish jurisdiction to pursue this action, their claims would still

fail.  To state a claim upon which relief may be granted under Rule 12(b)(6), the plaintiff must

allege "any set of facts consistent with the allegations," *Bell Atl. Corp. v. Twombly*, 550 U.S.

544, 563 (2007), that "possess enough heft to 'sho[w] that the pleader is entitled to relief,'" *id.* at

557 (quotation marks omitted).  Under Rule 12(b)(6), the court must treat the complaint's factual

allegations as true and draw all reasonable inferences in the plaintiff's favor.  *See Holy Land*

*Found. for Relief & Dev. v. Ashcroft*, 333 F.3d 156, 165 (D.C. Cir. 2003).  But the court need not

accept as true legal conclusions cast as factual allegations or inferences unsupported by facts set

out in the complaint.  *See Warren v. Dist. of Columbia*, 353 F.3d 36, 40 (D.C. Cir. 2004).

Plaintiffs' claims under the Separation of Powers Doctrine, Tenth Amendment, the Patent

Clause, and the Due Process Clause of the Fifth Amendment of the U.S. Constitution, as well as

the FDCA, have no basis in fact or law.[19]  Because plaintiffs' allegations lack "enough heft" to

show that they are entitled to relief, dismissal under Rule 12(b)(6) is warranted.  *Twombly*, 550

U.S. at 557.

---

[18]  To the contrary, the company has announced that the Framingham facility has the capacity to increase substantially the production of Fabrazyme over the Allston plant.  *See, e.g.*, Genzyme Press Release (June 25, 2009), *available at* http://www.businesswire.com/news/genzyme/20090625005653/en ("This plant, which will include four 2000-liter bioreactors, will provide substantial additional capacity to support the growth of the two products [Fabrazyme and Cerezyme].").

[19]  The precise nature of the claims in plaintiffs' 470-paragraph, 89-page complaint is often difficult to discern.  Nothing in the defendants' motion to dismiss should be construed as a waiver of right to respond to any argument that they did not recognize in Plaintiffs' complaint.

### A.    Count I

Count I asserts that FDA has violated the nondelegation doctrine, an applied aspect of the separation of powers doctrine.  Plaintiffs allege that "[b]y refusing to withdraw licenses from manufacturers creating drug shortages, the HHS vests tri-partite legislative, judicial, and executive authority in FDA licensees over the lives of U.S. citizens and the powers of the sovereign states, thereby violating the Doctrine of Separation of Powers under the U.S. Constitution."  Compl. ¶ 421.  Plaintiffs further allege that "[b]y grant of an FDA license and HHS consent, the Executive branch of the government has delegated private corporations the power to collect private personal medical data, promulgate rules of drug rationing based on such individual private medical data, create secret waiting lists discriminating against American[s] based on their medical condition, enforce bans of access to life saving drugs, and then adjudicate appeals . . . made by individuals for relief from the licensees' action."  *Id.* ¶ 418.  All of these allegations, as well as Count I as a whole, fail because they allege legal conclusions unsupported by the facts:  neither HHS nor FDA delegated any of the alleged non-governmental authorities to Genzyme or Hospira through marketing approval or otherwise.

The U.S. Constitution provides "[a]ll legislative Powers herein granted shall be vested in a Congress of the United States.  U.S. Const. art. I, § 1.  "From this language the [Supreme] Court has derived the nondelegation doctrine:  that Congress may not constitutionally delegate its legislative power to another branch of Government."  *Touby v. United States*, 500 U.S. 160, 165 (1991).  "The nondelegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of Government."  *Mistretta v. United States*, 488 U.S. 361, 371 (1989).  It requires Congress to "lay down by legislative act an intelligible principle to which the person or body authorized to act is directed to conform."  *Whitman v. Am. Trucking Ass'ns*, 531

U.S. 457, 472 (2001) (quotation marks and alterations omitted).  Applying the intelligible

principle standard, courts deem a statute to be "constitutionally sufficient if Congress clearly

delineates the general policy, the public agency which is to apply it, and the boundaries of this

delegated authority." *Mistretta*, 488 U.S. at 372–73 (quotation marks omitted).

Although the typical claim under the nondelegation doctrine challenges *congressional*

action, rather than *agency* action, the D.C. Circuit has recognized a "novel constitutional claim"

under the nondelegation doctrine called "a subdelegation of authority theory." *Perot v. FEC*, 97

F.3d 553, 559 (D.C. Cir. 1996).  Under this theory, a plaintiff can challenge an *agency's*

delegation of authority to a private entity under Article I of the Constitution because "Congress

has delegated authority to the [agency], which in turn has delegated some portion of that

authority to the [private entity]." *Id.*  "The relevant inquiry in any delegation challenge

[including a subdelegation challenge] is whether Congress intended to permit the delegatee to

delegate the authority conferred by Congress." *Nat'l Park & Conservation Ass'n v. Stanton*, 54

F. Supp. 2d 7, 18 (D.D.C. 1999) (quotation marks omitted); *see also Am. Nurses Ass'n v. Leavitt*,

593 F. Supp. 2d 126, 139 (D.D.C. 2009) (same); *Am. Horse Prot. Ass'n, Inc. v. Veneman*, Civil

Action No. 01-00028, 2002 WL 34471909, at *4 (D.D.C. July 9, 2002) (same).  Therefore, to

bring a claim brought under the subdelegation theory, plaintiffs must allege facts sufficient to

show that, at the very least, Congress delegated the authorities at issue to the agency and that the

agency improperly redelegated the authorities to a private entity.

Plaintiffs have not sufficiently pleaded a traditional claim under the nondelegation

doctrine or under the subdelegation theory recognized by the D.C. Circuit.  Plaintiffs have not

pointed to any impermissible delegation of legislative power to the Executive Branch and

presumably proceed solely under a subdelegation theory.  The claims relating to the

subdelegation theory too must fail because plaintiffs have not supported with facts their

assertions that (1) Congress actually delegated to HHS and FDA the various authorities that the

agencies allegedly delegated to Genzyme and Hospira, or (2) that HHS and FDA did, in fact,

improperly delegate any of their authorities to these manufacturers.

Administrative agencies cannot delegate authorities that they do not possess themselves,

and plaintiffs have not identified any statutes or evidence of congressional intent delegating to

HHS the authorities at issue here.  FDA and HHS are administrative agencies that derive their

power and authority from a delegation by the legislative branch or from a delegation by the

executive to perform some duty assigned to it by the legislature.  *See, e.g.*, *La. Pub. Serv.*

*Comm'n v. FCC*, 476 U.S. 355, 374 (1986).  Plaintiffs have not identified a statutory provision or

other mechanism through which Congress delegated to HHS, which in turn delegated to FDA,

"the power to collect private personal medical data, promulgate rules of drug rationing based on .

. . individual private medical data, create secret waiting lists discriminating against American[s]

based on their medical condition, enforce bans of access to life saving drugs, and then adjudicate

appeals . . . made by appeals for relief from the licensees' action."  Compl. ¶ 418.  Plaintiffs'

claims that HHS and FDA have improperly delegated legislative authorities are insufficient as a

matter of law because the complaint fails to specify the alleged statutory source for the powers

they allege were improperly redelegated.

Nor do plaintiffs have any basis in fact for alleging that HHS and FDA have delegated

these or any other authorities to Genzyme, Hospira, or any other private entity.  They do not

point to any regulation, contract, plan, or any other evidence whereby HHS or FDA has

delegated the authorities at issue to Genzyme or Hospira.  *See, e.g.*, *Idaho v. ICC*, 35 F.3d 585,

597 (D.C. Cir. 1994) (discussing a regulation permitting any agency to delegate a duty to private

parties so long as it supervises the process); *Nat'l Park & Conservation Ass'n*, 54 F. Supp. 2d at 10 (describing a plan to delegate management to a local council). "[N]either Congress nor federal agencies normally delegate legal authority to private entities without saying that they are doing so." *Watson v. Philip Morris Cos.*, 551 U.S. 142, 157 (2007). FDA has not delegated any agency authorities expressly or implicitly to private manufacturers, and plaintiffs assert no factual basis for alleging that FDA delegated or redelegated any power to Genzyme or Hospira. *See id.* ("Although [plaintiff] uses the word 'delegation' or variations many times through its brief, we have found no evidence of any delegation of legal authority from the [agency] to the industry . . . .").

Plaintiffs apparently are under the misconception that FDA approval of an NDA or BLA constitutes a delegation of authority. *See* Compl. ¶ 418. Marketing approval, be it granted under the FDCA or PHSA, is authorization to introduce drugs and biological products into interstate commerce, not a delegation of governmental powers. *See* 21 U.S.C. § 355(a); 42 U.S.C. § 262(a). Contrary to plaintiffs' assertions, there are no hidden authorities conveyed to manufacturers through NDA or BLA approvals and none may be inferred. For all of these reasons, Count I fails as a matter of law.

### B.    Count II

Plaintiffs allege that the "United States Defendants' actions violate the 10th Amendment of the U.S. Constitution because State police powers are exclusively reserved to the States and relied upon by Plaintiffs for their health and safety and are not pre-empted by grant of FDA license," Compl. ¶ 427, and that "[b]y vesting FDA licensees with veto powers over state-licensed physicians' prescription[s] during drug shortages, the HHS has abolished a core police power of the States," *id.* ¶ 426. Plaintiffs have failed to "set forth sufficient information to

suggest that there exists *some* recognized legal theory upon which relief can be granted" under the Tenth Amendment. *Gregg v. Barnett*, 771 F.2d 539, 547 (D.C. Cir. 1985) (quotation marks omitted).

The Tenth Amendment to the Constitution provides that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. "If a power is delegated to Congress in the Constitution, the Tenth Amendment expressly disclaims any reservation of that power to the States . . . ." *New York v. United States*, 505 U.S. 144, 156 (1992). *See also United States v. Darby*, 312 U.S. 100, 124 (1941) ("The amendment states but a truism that all is retained which has not been surrendered."). The Supreme Court rarely declares laws unconstitutional for violating the Tenth Amendment, and has only done so in the modern era (i.e., post-New Deal legislation) where the federal government *compels* the states *as states* to enforce federal statutes. *See New York*, 505 U.S. at 179. Thus, the Tenth Amendment is implicated only where (1) Congress does not have the authority under the Constitution to enact a statute, or (2) the means of regulation employed impermissibly infringe on state sovereignty by "command[ing] state legislatures to legislate," *New York*, 505 U.S. at 179, or "to administer or enforce a federal regulatory program," *Printz v. United States*, 521 U.S. 898, 935 (1997).

Plaintiffs have not pleaded the material elements of a claim under the Tenth Amendment. Plaintiffs do not allege that Congress lacks the authority under the Constitution to enact the FDCA or the PHSA, which were enacted pursuant to the Commerce Clause, Art. I, § 8, cl.3. *See, e.g.*, *United States v. Walsh*, 331 U.S. 432, 434 (1947) ("The [FDCA] rests upon the constitutional power resident in Congress to regulate interstate commerce."); *cf. United States v. Palfrey*, 515 F. Supp. 2d 120, 124 n.5 (D.D.C. 2007) ("Since the Constitution explicitly delegates

to Congress the plenary authority to regulate interstate commerce, the Tenth Amendment cannot be violated by Congress' exercise of such authority.").  Nor do plaintiffs allege that the manner in which FDA is implementing the FDCA *compels* states *as states* to legislate or administer or enforce a federal regulatory program.  Nothing in the provisions of the FDCA and PHSA that authorize FDA to approve and withdraw approval of marketing applications commands the *states* to do anything, much less enact a particular kind of law or administer or enforce a particular program.  Nor does it amount to an invasion of state power under the Tenth Amendment for HHS or FDA to exercise their authorities under the FDCA and PHSA in a manner that affects states.  *See New York*, 505 U.S. at 167–68.[20]  Accordingly, plaintiffs have failed to state a claim that the FDCA or any action taken by FDA pursuant to the Act violates the Tenth Amendment.

## C.    Count III

Count III asserts a cause of action against the U.S. Defendants under the Patent Clause of the U.S. Constitution and, alternatively, the Bayh-Dole Act.  *See* Compl. ¶¶ 428–47.  There is no right of action against the government under either theory, and there is no viable claim under the Administrative Procedure Act ("APA"), even if one actually had been alleged.  Accordingly, Count III must be dismissed.

### 1.    Plaintiffs Lack a Cause of Action Under the Patent Clause

---

[20]  Congress' decision to regulate the marketing of drugs through the FDCA and PHSA does preempt the state from adopting conflicting legislation or regulations, but that result does *not* violate the Tenth Amendment either.  *See, e.g.*, *New York*, 505 U.S. at 167 ("[W]here Congress has the authority to regulate private activity under Commerce Clause, we have recognized Congress' power to offer States the choice of regulating [a private] activity according to federal standards or having state law pre-empted by federal regulation."); *Nuclear Energy Inst. v. EPA*, 373 F.3d 1251, 1306 (D.C. Cir. 2004) ("Congress's decision [to regulate] does preempt [the state] from adopting conflicting legislation or regulations.  But this is merely the natural and constitutionally unobjectionable result of the Supremacy Clause.").

Plaintiffs assert that the '804 patent is unconstitutional under the Patent Clause, because the patent allows its owner, Mount Sinai, through its licensee, Genzyme, to "restrain others from entering the marketplace to mitigate the injuries and deaths allegedly caused by the patentee." Compl. ¶ 443.  This claim is frivolous.

The Patent Clause provides:  "Congress shall have power . . . to promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries."  Art. I, § 8, cl. 8.  By its very terms, the Clause authorizes Congress to enact legislation and does not in any way confer a substantive right in any individual, not even an inventor.  *See Carter v. ALK Holdings, Inc.*, 605 F.3d 1319, 1325 (Fed. Cir. 2010) ("[T]he Patent Clause does not create private rights of actions on behalf of inventors."); *Bernstein v. New York*, 591 F. Supp. 2d 448, 468 (S.D.N.Y. 2008) ("On its face, the . . . Patent Clause confer[s] discretionary authority on Congress to pass laws relating to patents . . . . The text of the clause does not suggest any private right of action against any state or non-state actor, and I am not aware of any court that has created such a right.").[21]

---

[21]  See also *Hunter Douglas, Inc. v. Harmonic Design, Inc.*, 153 F.3d 1318, 1327–28 (Fed. Cir. 1998), *overruled on other grounds by Midwest Indus., Inc. v. Karavan Trailers, Inc.*, 175 F.3d 1356, 1359 (Fed. Cir. 1999) (holding that the Patent Clause does not support a cause of action); *Singhal v. Mentor Graphics Corp.*, No. C07-01587 JSW, 2007 WL 7143978, at *2 (N.D. Cal. Oct. 17, 2007) ("[B]ecause the Patent Clause is a grant of power to Congress, and not to any individual inventor, [the] cause of action must be dismissed for failure to state a claim upon which relief can be granted."); *Brosso v. Devices for Vascular Intervention, Inc.*, 879 F. Supp. 473, 474 (E.D. Pa. 1995) ("By its terms, [the Patent Clause] is a grant of power . . . [that] authorizes Congress to enact the patent laws, [and a limitation as it] does not confer any rights by itself upon an individual."); *Tape Indus. Ass'n of Am. v. Younger*, 316 F. Supp. 340, 346 (C.D. Cal. 1970) ("The Supreme Court . . . has made it absolutely clear that [Article I, § 8] merely empowers Congress to enact legislation and does not in any way confer a substantive right on any individual."); *Powers v. PTO*, No. Civ. A. 105cv312JCC, 2005 WL 2456979, at *2 (E.D. Va. Oct. 5, 2005) (""[T]he Patent Clause embodies a grant of authority to Congress and does not create a private cause of action."); *cf. In re Cooper*, 254 F.2d 611, 616–17 (C.C.P.A. 1958) ("Article I, Section 8, eighth clause, of the Constitution . . . does no more than grant power to Congress to secure certain rights to authors and inventors insofar as it elects to do so.").

Because the Patent Clause does not confer a private cause of action, plaintiffs' claim that the '804 patent is unconstitutional fails as a matter of law.  *Cf. Carter*, 605 F.3d at 1325–26 (upholding the district court's determination that an inventor's claim that a patent was unconstitutional under the Patent Clause warranted sanctions under Federal Rule of Civil Procedure 11).

### 2.    Plaintiffs Lack a Cause of Action Under the Bayh-Dole Act

Plaintiffs also assert, in the alternative, that the Bayh-Dole Act "as interpreted by the United States Defendants" should be declared unconstitutional, Compl. ¶ 444, because it "allows contractors to prolong drug shortages thereby causing otherwise preventable injuries or death to Americans in direct opposition to promoting 'the progress of science' under the Patent Clause." *id.* ¶ 447.

Plaintiffs, who are not affiliated with Mount Sinai or Genzyme, do not have a private right of action to challenge NIH's decision-making on licensing of the '804 patent.[22]  The Bayh-Dole Act does not provide a private right of action to plaintiffs for the enforcement of its provisions.  *See Duke v. Madey*, 413 F. Supp. 2d 601, 612 (M.D.N.C. 2006) ("[U]nder existing case law, there is no private right of action under the Bayh-Dole Act, because the purpose of the Bayh-Dole Act is to regulate the relationships between the Government and its funding recipients, not to regulate the relationships between private third parties."); *see also Gen-Probe, Inc. v. Ctr. for Neurological Study*, 853 F. Supp. 1215, 1218 (S.D. Cal. 1993) ("[N[o] court has

---

[22]  The fact that the march-in provisions expressly provide particularized rights and procedural remedies to "any contractor, inventor, assignee, or exclusive licensee adversely affected by a determination under this section" indicates that Congress did not intend to create private rights of action to third parties like plaintiffs.  35 U.S.C. § 203(b).  *Cf. Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 131 S. Ct. 2188, 2198 (2011) ("The [Bayh-Dole] Act contains not a single procedural protection for third parties that have neither sought nor received federal funds" (quotation marks omitted)); *Touche Ross & Co v. Redington*, 442 U.S. 560, 572 (1979) ("[W]hen Congress wished to provide a private . . . remedy, it knew how to do so and did so expressly.").

concluded that a private right of action exists under [35 U.S.C.] § 202."); *Platzer v. Sloan-Kettering Inst. for Cancer Research*, 787 F. Supp. 360, 364–65 (S.D.N.Y. 1992), *aff'd*, 983 F.2d 1086 (Fed. Cir. 1992) ("[T]he Court concludes that no private cause of action exists under § 202(c)(7)(B) of the Bayh-Dole Act."); *Ciba-Geigy Corp. v. Alza Corp.*, 804 F. Supp 614, 629 (D.N.J. 1992) ("[N]o private right of action exists under [35 U.S.C.] §§ 200–04 . . . ."); *cf. Leland Stanford Junior Univ. v. Roche Molecular Sys., Inc.*, 131 S. Ct. 2188, 2198 (2011) ("The [Bayh-Dole] Act's disposition of rights—like much of the rest of the Bayh-Dole Act—serves to clarify the order of priority of rights between the Federal Government and a federal contractor in a federally funded invention that already belongs to the contractor. *Nothing more*. (emphasis added)).

Because there is no private right of action available to plaintiffs under the Bayh-Dole Act, plaintiffs have failed to state a claim.

### 3.    Plaintiffs Have Not Stated a Claim Under the APA for a Violation of the Bayh-Dole Act

Although plaintiffs do not cite the APA as a basis for this Court's jurisdiction, the APA does authorize a suit, subject to limitations, by "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute."  5 U.S.C. § 702.  APA review is limited, however, to challenges to *final* agency action, 5 U.S.C. § 704, that are not "committed to agency discretion by law," *id.* § 701(a)(2). Because NIH's March-In Determination, which is not clearly challenged in plaintiffs' complaint, *see* Compl. ¶¶ 428–47, is not final agency action and is committed to the agency's discretion, any claim under the APA that plaintiffs may seek to file would also fail.

Plaintiffs cannot challenge the NIH March-In Determination because their petition for reconsideration is pending (*see* Compl. ¶¶ 343, 363) and the original determination is, therefore,

not "final agency action," 5 U.S.C. § 704.[23]  The pendency of a petition for reconsideration of the

agency action deprives the agency decision of finality.  *See United Transp. Union v. ICC*, 871

F.2d 1114, 1116 (D.C. Cir. 1989) ("We think it plain that a pending petition for rehearing must

render the underlying agency action nonfinal . . .  with respect to the filing party.").  While the

petition for reconsideration is pending, the original NIH March-In Determination is not final, and

plaintiffs are not entitled to seek relief under the APA.

The NIH March-In Determination is also barred from judicial review under the APA

because NIH's decision not to exercise its march-in authority is "committed to agency discretion

by law" and is therefore not subject to judicial review.  5 U.S.C. § 701(a)(2).  In *Heckler v.*

*Chaney*, 470 U.S. 821 (1985), the Supreme Court explained that agency decisions not to take

enforcement actions are presumptively unreviewable under § 701(a)(2), and the presumption can

only be overcome "if the statute is drawn so that a court would have . . . meaningful standards

against which to judge the agency's exercise of that discretion," *id.* at 832–33.

NIH's March-In Determination is entitled to the presumption of unreviewability because

it is an agency decision not to institute march-in proceedings under 35 U.S.C. § 203(a)(2), *see*

Defs.' Mem. Ex. A, at 1, and that presumption is not rebutted because the Bayh-Dole Act does

---

[23]  The pendency of the petition for reconsideration of the NIH's March-In Determination
also renders any challenge to it not ripe and thus deprives the court of subject matter jurisdiction.
*See TeleSTAR, Inc. v. FCC*, 888 F.2d 132, 134 (D.C. Cir. 1989). ("[T]he filing of a challenge to
agency action before the agency has issued its decision on reconsideration is incurably
premature."); *see also City of New Orleans v. SEC*, 137 F.3d 638, 639 (D.C. Cir. 1998) ("If a
party pursues administrative and judicial relief concurrently, its petition for judicial review 'will
be dismissed for lack of jurisdiction.'"); *Tenn. Gas Pipeline Co. v. FERC*, 9 F.3d 980, 980–81
(D.C. Cir. 1993) ("[T]he court has characterized a petition for review filed while a request for
agency reconsideration is pending as incurably premature."); *Wade v. FCC*, 986 F.2d 1433, 1433
(D.C. Cir. 1993) ("It is well established that a party may not simultaneously seek both agency
reconsideration and judicial review of an agency's order."); *King v. Leavitt*, 475 F. Supp. 2d 67,
71 (D.D.C. 2007) (same).

not provide meaningful judicial guidelines against which NIH's decision can be measured.  The statutory provision at issue provides a federal agency with the right to require the contractor to grant a nonexclusive or partially exclusive license in any field of use to a responsible applicant or applicants "*if the Federal agency determines*," 35 U.S.C. § 203(a) (emphasis added), that a contractor who has elected title to a federally funded invention fails to comply with certain statutory requirements, including the practical application of the invention or health and safety needs of the public, *id.* § 203(a)(2).  This provision clearly commits complete discretion with the federal agency to decide whether there are extant public health needs and, if so, how and when march-in authority should be exercised.  *See Heckler*, 470 U.S. at 835.[24]  As a result, a claim challenging NIH's March-In Determination under the APA could not clear the hurdle of § 701(a), and thus is not subject to judicial review.

### D.   Count IV

Count IV asserts that plaintiffs' substantive and procedural due process rights under the Fifth Amendment have been violated.[25]  *See* Compl. ¶ 448.  Plaintiffs claim that "Defendants do

---

[24]  Courts have held that 5 U.S.C. § 701(a)(2) precludes judicial review of agency decisions not to take action under other provisions of the Bayh-Dole Act.  *See, e.g.*, *Vanartian v. Gen. Elec. Co.*, 232 F.3d 911 (Tbl.), 2000 WL 357258, at *2 (Fed. Cir. Apr. 6, 2000) ("[J]udicial review is not available under § 701 of the APA because the underlying statute, [35 U.S.C.] § 202, provides no standards for judging the propriety of the agency's action."); *S. Research Inst. v. Griffin Corp.*, 938 F.2d 1249, 1254–55 (11th Cir. 1991) (stating that judicial review of an agency's determination made under 35 U.S.C. § 202 is unavailable under the APA, 5 U.S.C. § 701(a), because § 202 fails to provide any statutory guidance to meaningfully assess that agency decision); *Delano Farms Co v. Cal. Tbl. Grape Comm'n*, No. 1:07-cv-1610 OWW SMS, 2009 WL 3586056, at *17 (E.D. Cal. Oct. 9, 2009), *rev'd on other grounds*, 655 F.3d 1337 (Fed. Cir. 2011) ("[The Bayh-Dole Act] contains no substantive standards to aid judicial review of the disputed patenting activities.").

[25]  Although plaintiffs acknowledge that the due process clause forbids the government from denying equal protection of the law, *see* Compl. ¶ 448, the government does not construe this lone reference as asserting an equal protection claim.  If plaintiffs are asserting an equal

not provide substantive or procedural due process for *its licensees' acts* discriminating for access to medication, actions violating core privacy interests, acts depriving Americans the right to medical self-determination, or acts depriving American citizens of their life and health." *Id.* ¶ 453 (emphasis added). The plaintiffs' rights to due process under the Fifth Amendment are not protected where they are allegedly deprived by private entities. Because there has been no causative government action—an essential element to a claim of denial of due process under the Fifth Amendment—Count IV must be dismissed.[26]

The due process clause of the Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty or property, without due process of law." U.S. Const. amend. V. This constitutional provision applies to and restricts only the federal government and not private persons. *See Public Utils. Comm'n of D.C. v. Pollak*, 343 U.S. 451, 461 (1952). The actions of private parties thus are not subject to the requirements of constitutional due process unless they can be fairly considered government action. *See Shelley v. Kraemer*, 334 U.S. 1, 13 (1948); *see also Lugar v. Edmonson Oil Co.*, 457 U.S. 922, 937 (1982) ("Our cases have . . . insisted that the

---

protection claim, it too must fail for the same reasons that the substantive and procedural due process claims fail—i.e., there has been no government action.

[26] Even if plaintiffs' had alleged government action (which they do not), their substantive due process claims would be subject to rational basis review, rather than strict scrutiny, because there is no fundamental right to access to drugs, not even for the terminally ill. *See Abigail Alliance for Better Access to Developmental Drugs v. von Eschenbach*, 495 F.3d 695, 697 (D.C. Cir. 2007) (*en banc*) ("[W]e conclude that there is no fundamental right 'deeply rooted in this Nation's history and tradition' of access to experimental drugs for the terminally ill . . . ."); *see also Mitchell v.Clayton*, 995 F.2d 772, 775 (7th Cir. 1993); *United States v. Burzynski Cancer Research Inst.*, 819 F.2d 1301, 1313–14 (5th Cir. 1987); *Carnohan v. United States*, 616 F.2d 1120, 1122 (9th Cir. 1980); *Rutherford v. United States*, 616 F.2d 455, 457 (10th Cir. 1980).

conduct allegedly causing the deprivation of a federal right be fairly attributable to the [government].").[27]

 In order to determine whether private action may be "fairly attributed" to the government, the Supreme Court has offered three tests potentially relevant here. *See Lugar*, 457 U.S. at 937. First, the "public function" test asks whether the private entity exercises powers traditionally exclusively reserved to the government. *See id.* at 939. Second the "state compulsion" test asks whether the government exercised such coercive power or provided such significant encouragement as to direct the private activity. *See id.* Third the "nexus" test requires a sufficiently close relationship between the government and challenged actions of the regulated entity. *Id. See also Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 298 (2001) (finding that a private association was "overborne by the pervasive entwinement of public institutions and public officials").

 The private actions of Genzyme and Hospira cannot be fairly attributed to the government. First, the drug manufacturers are not performing a public function because the production and distribution of drugs are not governmental powers enjoyed by the manufacturers. *See Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982) ("That a private entity performs a function which serves the public does not make its acts [governmental] action."). Plaintiffs have not alleged and cannot show that the power to produce and distribute drugs is "traditionally the exclusive prerogative of the [government]." *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 353 (1974).

---

[27] The Supreme Court uses the same standards to attribute the actions of private actors to the federal government under the Fifth Amendment as it does to attribute private actions to state governments under the Fourteenth Amendment. *See S.F. Arts & Athletics v. U.S. Olympic Comm.*, 483 U.S. 522, 542 n.21 (1987).

Second, the government has not coerced or even encouraged Genzyme or Hospira to deprive plaintiffs of access to full doses of Fabrazyme and Aquasol A.  To the contrary, the government has worked and continues to work with these manufacturers to try to make the drugs in short supply available to patients as quickly as possible.  Plaintiffs allege that Genzyme and Hospira have apprised the government of their manufacturing and distribution plans, *see* Compl. ¶ 269, and that FDA did not enjoin Genzyme from producing Fabrazyme at the Allston facility under the Fabrazyme Consent Decree, *see* Compl. ¶ 251, but neither allegation is sufficient to convert the manufacturers' actions into government actions.  *See Blum v. Yaretsky*, 457 U.S. 991, 1004 (1982) ("Mere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the [government] responsible for those initiatives under the [Due Process Clause]."); *Am. Mfrs. Mutual Ins. Co. v. Sullivan*, 526 U.S. 40, 52 (1999).  There are simply no facts to support a conclusion that the government coerced or encouraged Genzyme and Hospira to market and distribute Fabrazyme in any particular way or to cease temporarily production of Aquasol A so as to deprive plaintiffs of access to these drugs.

Third, the relationship between the government and the manufacturers does not establish a nexus such that the manufacturers' choices relating to manufacture and distribution of drugs in short supply must be legally deemed to be government action.  The relationship between FDA and drug manufacturers is purely a regulatory one, and "[e]ven extensive regulation by the government does not transform the actions of the regulated entity into those of the government." *S.F. Arts & Athletics, Inc. v. U.S. Olympic Comm.*, 483 U.S. 522, 544 (1987); *see also Anderson v. USAir, Inc.*, 818 F.2d 49, 56 (D.C. Cir. 1987) ("[A private entity] is not transformed into a government actor by regulation.").  Because Genzyme and Hospira are not governmental actors,

plaintiffs' claims against the government that these manufacturers have marketed Fabrazyme and Aquasol A in a manner that violates their rights under the Fifth Amendment must fail.

### E.    Count V

In the final Count of the complaint, plaintiffs allege that FDA has violated the FDCA by failing to take "appropriate action within its authority against reckless and irresponsible manufacturers in order to protect public health, including withdrawal of licenses."  Compl. ¶ 458.[28]  Count V fails for a fundamental reason:  it does not establish a cause of action under federal law.  Plaintiffs lack a private right of action under the FDCA to challenge FDA's failure to revoke Genzyme's BLA and withdraw Hospira's NDA.  Count V also does not satisfy the requirements for stating a claim under the APA (which plaintiffs do not allege in any event), because plaintiffs have not challenged any final agency action by FDA and FDA is neither authorized nor required to withdraw approval of a drug on the ground that the manufacturer caused drug shortages.  For these reasons, Count V should be dismissed.

### 1.    Plaintiffs Do Not Have A Private Right of Action under the FDCA

Plaintiffs, who are not affiliated with Genzyme and Hospira, do not have a private right of action to challenge FDA's decision-making on Genzyme's and Hospira's marketing applications.  It is well established that there is no express or implied private right of action

---

[28]  Plaintiffs further allege that "[i]f the HHS refuses to withdraw licenses from reckless manufacturers or otherwise argues that the FDCA does not give it the power to exclude irresponsible manufacturers from interstate commerce, then the FDCA is accordingly unconstitutional."  *Id.* ¶ 468.  This allegation fails to state a claim on its face because it does not identify which constitutional amendment or doctrine the FDCA allegedly violates.  *Cf. supra* Arg. Part II.A–B, D–E (explaining why plaintiffs' challenges under the nondelegation doctrine, and Tenth and Fifth Amendments, fail as a matter of law).

under the FDCA.[29]  Nor does the PHSA provide plaintiffs any private right of action, and none

may be implied.  *Cf. CareToLive v. von Eschenbach*, 525 F. Supp. 2d 938, 952 n.3 (S.D. Ohio

2007), *aff'd*, (finding no private right action under the PHSA).  *See also Thompson v. Thompson*,

484 U.S. 174, 179 (1988) ("Unless . . . congressional intent [to create a private right of action]

can be inferred from the language of the statute, the statutory structure, or some other source, the

essential predicate for implication of a private remedy simply does not exist.").  The statutory

provisions and regulations that govern the approval of BLAs and NDAs provide the drug

sponsor, *to the exclusion of the general public*, with particularized rights and procedural

remedies.[30]  These provisions do not provide a right to judicial relief to members of the general

public.

The FDCA does permit judicial review of a final agency decision refusing or

withdrawing approval of an NDA, as do the regulations governing denial and revocation of a

BLA, but again, such review is limited to the product *sponsor*.[31]  *See, e.g., Weinberger v. Bentex*

---

[29] *See* 21 U.S.C. § 337(a) ("Except as provided in subsection (b) of this section [regarding suits by states in their own names], all such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States."); *see also Wander v. Kaus*, 304 F.3d 856, 859 (9th Cir. 2002); *Ellis v. C. R. Bard, Inc.*, 311 F.3d 1272, 1284 n.10 (11th Cir. 2002); *Kemp v. Medtronic, Inc.*, 231 F.3d 216, 236 (6th Cir. 2000); *Orthopedic Bone Screw Prods. Liab. Litig.*, 193 F.3d 781, 788 (3d Cir. 1999); *PDK Labs., Inc. v. Friedlander*, 103 F.3d 1105, 1113 (2d Cir. 1997); *Mylans Labs., Inc. v. Matkari*, 7 F.3d 1130, 1139 (4th Cir. 1993).

[30] *See generally* 21 U.S.C. § 355 (providing the administrative procedures by which *sponsors* of NDAs apply for approval from FDA to market new drugs); *see also* 21 C.F.R. § 601.2 (providing the administrative procedures by which *sponsors* of BLAs apply for approval from FDA to market biologics).

[31] *See* 21 U.S.C. § 355(h) ("An appeal may be taken by the *applicant* from an order of the [the agency] refusing or withdrawing approval of an application under this section." (emphasis added)); 21 C.F.R. §§ 601.4(b), 601.7(a) (authorizing *sponsor* of denied BLA opportunity to request a public hearing and be issued a final decision subject to judicial review pursuant to 21 C.F.R. part 12, subpart H or 21 C.F.R. part 314, subpart E); *id.* § 601.43(f) ("The

*Pharms., Inc.*, 412 U.S. 645, 651 (1973) ("[A]n order denying an NDA or withdrawing one is reviewable . . . ."); *Cutler v. Hayes*, 818 F.2d 879, 887 n.61 (D.C. Cir. 1987) (same).  And even if judicial review of refusals and withdrawals petitioned by the general public were permitted, it would not be available here because Hospira's NDA for Aquasol A and Genzyme's BLA for Fabrazyme have been and continue to be *approved*, not refused or withdrawn.  There is no statutory basis for judicial review of an NDA and a BLA which, like Hospira's and Genzyme's, have been *approved*.  There is likewise no regulatory basis for a member of the general public to challenge a drug approval outside FDA's citizen petition process described in 21 C.F.R. 10.30.  And there is certainly no statutory basis for a member of the public to challenge a manufacturer's *distribution* of a drug approved by FDA.

No other provision of the FDCA provides a cause of action for the general public to challenge a drug approval.  Accordingly, the FDCA does not provide a jurisdictional basis for this challenge.

### 2.    Plaintiffs Have Not Stated a Claim Under the APA for a Violation of the FDCA

Although plaintiffs do not cite the APA as a basis for this Court's jurisdiction, the APA does supply an avenue of judicial review for a plaintiff challenging either agency inaction or action, provided certain conditions are met.  *See* 5 U.S.C. §§ 706(1)–(2).  To challenge agency inaction, a plaintiff may seek to "compel agency action unlawfully withheld or unreasonably delayed," *id.* § 706(1), but "only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it is *required to take*," *SUWA*, 542 U.S. at 64 (emphasis in original).  To challenge agency action, a plaintiff may ask the Court to "hold unlawful and set aside agency

---

Commissioner's decision [to withdraw accelerated approval] constitutes final agency action from which the *applicant* may petition for judicial review." (emphasis added)).

action," 5 U.S.C. 706(2), but only if the agency action is "*final*," *id.* § 704 (emphasis added); *see also SUWA*, 542 U.S. at 61–62.

Plaintiffs have not stated a claim under the APA for relief from FDA's inaction. Plaintiffs generally complain (without citing any statutory provision) that FDA has not withdrawn approval of Fabrazyme and Aquasol A.  *See, e.g.*, Compl. ¶ 467.  However, to state a claim under 5 U.S.C. § 706(1), plaintiffs must show that FDA is *required* to withdraw approval of an NDA and BLA because a manufacturer caused a drug shortage.  *See SUWA*, 542 U.S. at 65 ("The limitation to *required* agency action rules out judicial direction of even discrete agency action that is not demanded by law . . . .").  By statute and regulation, FDA is authorized to withdraw approval of NDAs and BLAs based on specific findings, such as a finding of lack of safety or efficacy or a failure to comply with certain statutory and regulatory requirements.[32] FDA is not even authorized, much less *required by law*, to withdraw approval because a manufacturer caused a shortage of an approved drug.[33]  Accordingly, plaintiffs cannot seek relief to "compel agency action unlawfully withheld or unreasonably delayed," 5 U.S.C. § 706(1).

Nor have plaintiffs stated a claim under the APA for relief from FDA's action.  The APA authorizes judicial review only with respect to "final agency action," *id.* § 704, and an agency action is "final for the purposes of [the APA]" only after a plaintiff "has exhausted all

---

[32]  *See, e.g.*, 21 U.S.C. § 355(e) (listing specific, enumerated conditions when the agency is authorized to withdraw approval of an NDA); 21 C.F.R. §§ 601.5–601.6 (same for revocation and suspension of a BLA); *id.* § 601.43 (same for accelerated approval of a BLA); *see also supra* notes 2–4 and accompanying text.

[33]  Plaintiffs also cannot challenge, under the Genzyme Consent Decree, FDA's decision not to halt the production of Fabrazyme at the Allston facility during the drug shortage.  *See* Compl. ¶¶ 251–57.  FDA's decision not to halt the distribution of certain drugs in short supply, including Fabrazyme, while halting the distribution of other drugs, is classic agency action "committed to agency discretion by law ," 5 U.S.C. § 701(a)(2), and is therefore not subject to judicial review. *See Heckler*, 470 U.S. at 837–38; *see also supra* Arg. Part II.C.3.

administrative remedies expressly prescribed by statute or agency rule," *Darby v. Cisneros*, 509

U.S. 137, 146 (1993) (quotation marks omitted).  Plaintiffs have not exhausted the administrative

remedies available to them under FDA's regulations and do not otherwise identify final agency

action.  FDA regulations provide:  "An interested person may petition the Commissioner [of

Food and Drugs] to issue, amend, or revoke a regulation or order, or to take or refrain from

taking any other form of administrative action," 21 C.F.R. §§ 10.25(a), and there must be "a *final*

*administrative decision based on a petition submitted under § 10.25(a) . . . before* any legal

action is filed in a court complaining of the action or failure to act," *id.* §  10.45(b) (emphases

added).[34]  As described above, Plaintiffs have not filed a citizen petition asking FDA to withdraw

approval of Fabrazyme or Aquasol A and have not received a response to their petition asking

FDA to cause the allocation of full doses of Fabrazyme to U.S. patients.  Without a citizen

petition response or some other identifiable final agency action, plaintiffs are not entitled to seek

relief to "hold unlawful and set aside agency action," 5 U.S.C. § 706(2).

## CONCLUSION

For all of the foregoing reasons, U.S. defendants' motion to dismiss should be granted.

| | |
|---|---|
| Of Counsel: | RONALD C. MACHEN JR., D.C. Bar #447889<br>United States Attorney |
| WILLIAM B. SCHULTZ<br>Acting General Counsel | for the District of Columbia |
| | STUART F. DELERY<br>Assistant Attorney General |
| ELIZABETH H. DICKINSON<br>Associate General Counsel,<br>Food and Drug Division | |
| | MAAME EWUSI-MENSAH FRIMPONG<br>Acting Deputy Assistant Attorney General |

---

[34]  This Court has applied the exhaustion requirement contained in FDA regulations.  *See, e.g.*, *Holistic Candlers & Consumer Ass'n v. FDA*, 770 F. Supp. 2d 156, 163 (D.D.C. 2011), *aff'd on other grounds*, 664 F.3d 940 (D.C. Cir. 2012); *Ass'n of Am. Physicians & Surgeons, Inc. v. FDA*, 539 F. Supp. 2d 4, 22–23 (D.D.C. 2008); *Garlic v. FDA*, 783 F. Supp. 4, 4–5 (D.D.C. 1992); *Estee Lauder, Inc. v. FDA*, 727 F. Supp. 1, 6–7 (D.D.C. 1989).

| | |
|---|---|
| ERIC M. BLUMBERG<br>Deputy Chief Counsel, Litigation<br><br>Julie Dohm<br>Assistant Chief Counsel<br>U.S. Department of Health & Human Services<br>Office of the General Counsel<br>White Oak 31 Room 4582<br>10903 New Hampshire Avenue<br>Silver Spring, MD 20993-0002<br>(301) 796-8732 | MICHAEL S. BLUME<br>Director, Consumer Protection Branch<br><br><br>By:  /s/ Lauren H. Bell<br>LAUREN H. BELL<br>Trial Attorney<br>Consumer Protection Branch<br>U.S. Department of Justice<br>P.O. Box 386<br>Washington, DC 20044<br>Tel: (202) 353-1991<br>Fax: (202) 514-8742 |

Attorneys for U.S. Defendants

**CERTIFICATE OF SERCVICE**

I hereby certify that I caused a copy of the foregoing Motion to Dismiss, Memorandum in Support of Motion to Dismiss, and Proposed Order to be served via the District Court's electronic filing (ECF) system to the registered participants identified on the Notice of Electronic Filing (NEF) on this 4th day of May, 2012.


 /s/ Lauren H. Bell
Lauren H. Bell